UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **CLARENCE SHIPLEY,** | * | |
| c/o Brown, Goldstein & Levy, LLP | | |
| 120 E. Baltimore Street, Suite 2500 | * | |
| Baltimore, Maryland 21202 | | |
| (County of Residence: Baltimore County), | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | Civil Action No.  1:21-cv-03173 |
| | | |
| Deems Martin Disney, Jr. | * | |
| 1835 Ellinwood Road | | |
| Rosedale, Maryland 21237, | * | |
| | | |
| Robert John Bowman | * | |
| 1750 Joan Avenue | | |
| Parkville, Maryland 21234, | * | |
| | | |
| Christopher Bieling | * | |
| 11212 Brooklawn Drive | | |
| Hudson, Florida 34667, | * | |
| | | |
| Richard James | * | |
| 812 Branford Circle | | |
| Lutherville-Timonium, Maryland 21093, | * | |
| | | |
| Terrence P. McLarney | * | |
| 14359 Musgrove Farm Court | | |
| Glenwood, Maryland 21738, | * | |
| | | |
| Jay Charles Landsman, Sr. | * | |
| 3601 Hernwood Road | | |
| Woodstock, Maryland 21163, | * | |
| | | |
| Edward Nelson Henneman, Sr. | * | |
| 7553 Baltimore Annapolis Boulevard | | |
| Glen Burnie, Maryland 21060, | * | |
| | | |
| Thomas Frank Gerst | * | |
| 259 Glen Court | | |
| Pasadena, Maryland 21122, | * | |

LeRoy Stanton                                    *
508 Milford Mill Road
Pikesville, Maryland 21208,                       *


John Does 1-10, and                               *

**BALTIMORE POLICE**                              *
**DEPARTMENT,**
                                                  *
   **Serve on:**
   Commissioner Michael Harrison                  *
   601 E. Fayette Street
   Baltimore, MD 21201,                           *

            Defendants.                           *

   *     *     *     *     *     ooo0ooo     *     *     *     *     *

### COMPLAINT AND REQUEST FOR JURY TRIAL

Plaintiff Clarence Shipley, by his undersigned attorneys, files this Complaint against Deems Martin Disney, Jr., Robert John Bowman, Christopher Bieling, Richard James, Terrence P. McLarney, Jay Charles Landsman, Sr., Edward Nelson Henneman, Sr., Thomas Frank Gerst, LeRoy Stanton, and John Does 1-10 (collectively, the "Officer Defendants") and the Baltimore Police Department ("BPD") for violating his rights and causing his wrongful, 27-year incarceration. Mr. Shipley alleges as follows:

**INTRODUCTION**

*"[S]omething I didn't do."*

> THE COURT: Is there anything the Defendant wishes to say before sentence is imposed? Mr. Shipley, this is your opportunity to say anything you wish to say before sentence is imposed.
>
> THE DEFENDANT: Only thing I got to say is I'm ready to get sentenced for something I didn't do. I don't think I should be sentenced for something I didn't do. That's all.

1. Those are the words of then-20-year-old Clarence Shipley just before a Baltimore City judge sentenced him to prison for the rest of his life. He would repeat those words time and time again for 27 years—never wavering—until, finally, he was free.

2. On July 13, 1992, a Baltimore City Circuit Court judge sentenced Mr. Shipley to life in prison for the murder of Kevin Smith—"something [he] didn't do."

3. The judge also sentenced Mr. Shipley to six 20-year terms, concurrent to the life murder sentence, for the attempted robbery and assault of Kevin Smith, Edward Eugene Smith (Kevin Smith's brother, aka "Gene"), and Michelle Shipley (Mr. Shipley's sister)— "something [he] didn't do."

4. Finally, the judge sentenced Mr. Shipley to three 20-year terms, consecutive to the life murder sentence, for the use of a handgun in the three attempted robberies—"something [he] didn't do."

5.      On that Sentencing Day in 1992, Mr. Shipley—a 20-year-old African-American male, from Baltimore's Cherry Hill neighborhood, with a single mother on welfare and without his murdered father—stood before the judge as an innocent man.

6.      Exoneration Day for Mr. Shipley came at last on December 18, 2018. On that day, Mr. Shipley stood before another Baltimore City Circuit Court judge. That judge reviewed Mr. Shipley's case, including the evidence of unconstitutional misconduct, and concluded that Mr. Shipley had been "sentenced for something [he] didn't do." After 27 years wrongfully imprisoned in a cage, Mr. Shipley was rightfully free.

7.      Clarence Shipley never should have spent a day in that cage. He entered prison at 20 years old and left at 47 years old.

## *"[S]hooter is a Larry Davis"*

8.      Mr. Shipley's wrongful conviction was the result of a blinkered investigation by BPD, and the Officer Defendants. After having targeted Mr. Shipley, the police ignored the substantial evidence pointing to his innocence and engaged in unconstitutional misconduct to secure his conviction.

9.      No physical evidence tied Mr. Shipley to the crime scene. He had six alibi witnesses—including his sister Michelle Shipley, who was a victim of the attempted robbery he "didn't do." But that was not enough for a poor, African-American man from Cherry Hill to overcome the power and wrongdoing of BPD.

10.     On October 25, 1991, the night Kevin Smith was murdered, Edward Smith—BPD's star eyewitness and the victim's brother—yelled at the fleeing Murderer, "I know who you are!"

11.     Less than 12 hours later, Edward Smith called BPD and identified the Murderer as "Larry Davis." Specifically, Mr. Smith reported, "[S]hooter is a Larry Davis." A BPD employee informed Detective David John Brown[1] about Edward Smith's call with the following note:



**Edward Smith Telephone Call Note (Oct. 26, 1991)—Not Disclosed to Defense Counsel[2]**

12.     By the time trial began, the Officer Defendants had changed Edward Smith's story from implicating Larry Davis to implicating Clarence Shipley. To secure the conviction of Mr. Shipley, the Defendants made sure that key evidence, such as the note above, was not provided to Mr. Shipley and his lawyer. As a consequence, when Edward Smith took the stand and pointed the

---

[1]  Detective Brown died in 2013.
[2] The highlighting does not appear in the original document.

blame at Mr. Shipley, Mr. Shipley's lawyer had no meaningful way to show that the morning after the murder, Mr. Smith had implicated Larry Davis—not Clarence Shipley.

## The Flapjack Assault of a Teenager

13.     Not only did the Officer Defendants hide evidence of Mr. Shipley's innocence from his lawyer, they also coerced Allan Scott—a teenager at the time—to falsely implicate Mr. Shipley in the murder.

14.     Certain Officer Defendants physically assaulted the then-18-year-old African-American man when they arrested and transported him to the BPD police station on the night of October 28, 1991. At least one Officer Defendant hit Mr. Scott on the head with a "flapjack."[3]

15.     After the assault, certain Officer Defendants denied Mr. Scott medical treatment for the contusion he suffered. They denied him permission to leave the police station for hours. They denied him access to his parents. They denied him a lawyer.

16.     While chained to a desk, certain Officer Defendant threatened Mr. Scott with substantial prison time if he refused to testify against Mr. Shipley. So, he did. Mr. Scott testified falsely against Mr. Shipley at trial. BPD and certain Officer Defendants failed to disclose to Mr. Shipley's lawyer both the deal given to Mr. Scott in exchange for his testimony and the physical coercion used to extract such a deal.

17.     BPD's misconduct in this case is yet another chapter in the long story of BPD's pattern and practice of wrongdoing during homicide investigations. The history of BPD officers and detectives withholding exculpatory evidence from the accused, coercing and threatening witnesses, fabricating evidence, and intentionally failing to conduct meaningful investigations is decades long.

---

[3] A "flapjack," also known as a blackjack, slapjack, or leather slapper, is a leather pouch sewn around a flexible steel handle with molded lead in the striking end.

6

18.     Mr. Shipley lost nearly three decades of his life to the BPD and its officers' wrongdoing. During the time he was wrongfully imprisoned, he was surrounded by violence, suffering, and despair—his own made more acute by the knowledge of his innocence.

19.     This lawsuit seeks to redress the Defendants' unconstitutional misconduct that imprisoned a young man from Cherry Hill for crimes "[he] didn't do."

## JURISDICTION AND VENUE

20.     This action is brought under 42 U.S.C. § 1983.

21.     This Court has both federal question and supplemental jurisdiction under 28 U.S.C. §§ 1331 and 1367.

22.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events leading to this Complaint occurred in this judicial district.

23.     On December 5, 2019, undersigned counsel sent the then-City Solicitor for Baltimore City notice of Mr. Shipley's claims in compliance with the Maryland Local Government Tort Claims Act.

24.     The City of Baltimore did not respond.

25.     On December 5, 2019, undersigned counsel sent the Maryland Treasurer notice of Mr. Shipley's claims.

26.     Maryland denied Mr. Shipley's claims by letter dated January 22, 2020.

## PARTIES

27.     Plaintiff Clarence Shipley was born in Baltimore and at all times relevant to this Complaint was a citizen and resident of the State of Maryland.

28.     At all times relevant to this Complaint, the Officer Defendants were employees of the BPD, acting under color of state law and within the scope of their employment under the

7

statutes, ordinances, regulations, policies, customs, and usage of the BPD. Mr. Shipley sues the Officer Defendants in their individual capacities.

29.     Defendant BPD employed each of the Officer Defendants at all times relevant to this suit. BPD is a "person" within the meaning of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

### A.  Kevin Smith—Baltimore's 237th Murder Victim of 1991.

30.     After work on October 25, 1991, Kevin Smith met up with his brother, Edward Smith, and his friend, Michelle Shipley. Together, they visited the apartment of a woman named "Ruth" in the Cherry Dale apartment complex in the Cherry Hill neighborhood of Baltimore City.

31.     After several hours, Kevin Smith, Edward Smith, and Ms. Shipley left the apartment and walked to the Cherry Hill Shopping Center. Kevin Smith was carrying cash.

32.     At approximately 10:50 p.m., the trio returned from the Cherry Hill Shopping Center and walked along Cherry Hill Road toward Joseph Avenue. Kevin and Edward Smith were walking together slightly ahead of Ms. Shipley.

33.     Near the corner of Joseph Avenue and Cherry Hill Road, Edward and Kevin Smith and Ms. Shipley were approached by the Murderer. The Murderer approached Kevin Smith, brandished a handgun, and demanded money.

34.     Ms. Shipley fled in fear.

35.     Kevin Smith refused to surrender his money. At some point, Kevin Smith turned to run away, and the Murderer shot him in the back.

36.     The Murderer took off running up Joseph Avenue, turned left into the St. Veronica's Church parking lot, and disappeared.

37.     As of October 25, 1991, Kevin Smith was Baltimore's 237th murder victim of the year.

8

38.     Officer Defendant Detectives Disney, Bowman, Bieling, James, and Henneman, along with their supervisors Officer Defendant Detectives McLarney and Landsman worked together in BPD's Homicide Unit. As homicide detectives investigating the Smith murder, the aforementioned Officer Defendants worked with Officer Defendant patrol officers Henneman, Gerst, and Stanton.

## B.  "I know you. I know who you are."
-Edward Smith's statement to the Murderer on the night of the murder.

Me and my brother Kevin Smith and a girl named Michell was walking on Cherry hill Rd comming from a friends house. This guy came up to us and pulled a gun out of the front of his hoody and said "you know what it is". I said to him " I know you I know who you are " and my brother started to run, I bent over to pick up a bottle to hit him and he shot at my brother. I hit him with the bottle and he pointed the gun at me but it didn't go off, and he started to run back up Veronica.

**Edward Smith's Statement to Defendant Det. Bowman, Oct. 25, 1991 (excerpt)[4]**

39.     On the night of the murder of his brother, eyewitness Edward Smith was interviewed by Defendant BPD Detective Robert J. Bowman at the BPD Homicide Unit. Edward Smith told Det. Bowman that he recognized the Murderer. Specifically, Mr. Smith reported that he told the Murderer, "I know you. I know who you are." Mr. Smith provided these exact words to

---

[4] The highlighting does not appear in the original document.

9

Defendant Det. Bowman at approximately 11:45 p.m. on the night of his brother's murder—less than an hour after the murder.

40.     Det. Bowman wrote down Mr. Smith's words as they appear in the above excerpt.

41.     During that same night-of-the-murder interview, Edward Smith provided to Det. Bowman the following description of the Murderer, whom he claimed to know:

> Q. Can you describe the shorter?
> A. B/m 5'3 150-160 Short wavey hair 29-30 Black hoody Blue jeans. I saw him earlier tonight standing on Shellbanks near the rental office.

**Edward Smith's Statement to Defendant Det. Bowman, Oct. 25, 1991 (excerpt)[5]**

42.     According to Mr. Smith, the Murderer was a black male, 5'3" tall, 150 to 160 pounds, with short, wavy hair, 29-to-30 years old, and wearing a black hoodie and blue jeans.

43.     This description did not fit Clarence Shipley for, at least, two reasons. First, Mr. Shipley did not have wavy hair. He had shortly-cut hair. Second, Mr. Shipley was not 29-to-30 years old. He had just turned 20 years old in September 1991.[6]

44.     Certain Officer Defendants knew that Edward Smith's description did not fit Clarence Shipley because they had their own BPD-taken photo of Clarence Shipley's physical appearance in 1991.

---

[5]  The highlighting does not appear in the original document.
[6]  According to court records, Mr. Shipley weighed 155 pounds and stood at 5'6".



**BPD Photo of Clarence Shipley in 1991**

45.    When certain Officer Defendants looked at their own 1991 photo of Mr. Shipley and compared it to Edward Smith's night-of-the-murder description of the Murderer, they saw that Mr. Shipley did not have wavy hair and did not appear to be 29-to-30 years old. They saw that Mr. Smith's description of the murderer did not match Clarence Shipley.

46.    Edward Smith appeared certain about his non-Shipley description of the murderer because he told Det. Bowman that he had seen the murderer not once but twice that night. Mr. Smith reported, "I saw [the murderer] earlier that night." The first time that Mr. Smith reportedly saw the Murderer was "on Shellbanks near the rental office." The second time that Mr. Smith reportedly saw the Murderer was when the Murderer shot his brother (Kevin Smith) in the back.

11

**C. Did BPD's Star Witness Edward Smith Actually "[K]now" the Murderer?**

47.     During the three-day trial of Clarence Shipley in June 1992, the prosecutor called one eyewitness for her case-in-chief—Edward Smith.

48.     In her rebuttal case, the prosecutor called Allan Scott, whose nickname was "Tony." Mr. Scott rebutted Mr. Shipley's six alibi witnesses—one of whom was Mr. Shipley's sister, eyewitness Michelle Shipley.

49.     All six of Mr. Shipley's alibi witnesses testified that Mr. Shipley was with his girlfriend at her house, and thus could not have been at the crime scene.

50.     But Mr. Scott testified that he saw Mr. Shipley at the crime scene just before the murder because Mr. Shipley had reportedly robbed Mr. Scott and another person near the crime scene earlier that night.

51.     The prosecutor argued that Mr. Scott and Mr. Shipley's six alibi witnesses cancelled each other at trial. The prosecutor argued that Mr. Scott and the six alibi witnesses were a "wash."

52.     The prosecutor argued that the "real evidence" was Edward Smith's eyewitness testimony.

53.     Specifically, in the prosecutor's Closing Argument, the prosecutor told the jury:

12

> Finally, when you talk about Tony, does Tony bolster the State's case? If you don't believe Tony, don't believe Tony because Tony and the alibi witnesses are a wash, because the bottom line is the real evidence is what Edward Smith saw and he saw the Defendant who he knew, who he recognized, whose picture he picked out immediately. Did he sit there and wait? No. He knew who it was. Maybe he didn't know his name, maybe he couldn't figure out how to find him. Ultimately the detectives did.

**Prosecutor's Closing Argument, June 12, 1992 (excerpt)[7]**

54.     The problem with the prosecutor's closing argument is that had the Officer Defendants properly investigated the case, they "[u]ltimately" would have ruled out Mr. Shipley as a murder suspect for, *at least*, four reasons.

55.     **First**, Edward Smith, on the morning after the murder, said Larry Davis was the Murderer—not Clarence Shipley.

56.     **Second**, certain Officer Defendants knew from an earlier booking photo of Mr. Shipley that he did not match the description of the Murderer that Edward Smith provided to Det. Bowman on the night of the murder.

57.     **Third**, the Officer Defendants would have ruled Mr. Shipley out based on *another* description of the Murderer that Edward Smith provided to responding BPD patrol officer Laura Deuerling *at the crime scene on the night of the murder*.

---

[7] The highlighting does not appear in the original trial transcript.

58.     At the crime scene on October 25, 1991, Edward Smith told Officer Deuerling that the Murderer was a black male, approximately 5'8", with a thin mustache, and wearing a black hoodie and blue jeans.



**Edward Smith's Statement to BPD Officer Laura Deuerling, Oct. 25, 1991 (excerpt)[8]**

59.     The above description of the Murderer, which Edward Smith gave to BPD Officer Deuerling, does not mention the Murderer's weight, age, or hairstyle as did the description he gave to Det. Bowman later that night. Also, this Smith-Murderer description claimed the Murderer to be 5'8", yet, the description Smith gave to Det. Bowman placed the Murderer's height at 5'3", and it claimed that the Murderer had a "thin mustache" when Mr. Shipley was cleanshaven.

60.     When the Defendant placed Smith's two descriptions of the Murderer side-by-side, they saw that the two descriptions given by the same person were inconsistent. Significantly, neither description matched Mr. Shipley.

61.     For convenience, the Smith-Murderer description provided to Defendant Det. Bowman, on the night of the murder, is provided again:

> Q. Can you describe the shorter?
> A. B/M  5'3  150-160  Short wavey hair
> 29-30  Black hoody Blue jeans.
> Saw him earlier tonight standing
> on Shellbanks near the rental office.

**Edward Smith's Statement to Defendant Det. Bowman, Oct. 25, 1991 (excerpt)[9]**

---

[8]  The highlighting appears in the original document.
[9]  The highlighting does not appear in the original document.

62.     The **fourth** reason that the Officer Defendants should have ruled Mr. Shipley out of the murder investigation is the Murderer's clothing. One consistency in both of Mr. Smith's Murderer descriptions is the mention of a black hoodie and blue jeans.

63.     Consistent with his innocence, Mr. Shipley turned himself into BPD when he heard he was a murder suspect on November 3, 1991. Defendants McLarney, Disney, and certain John Doe BPD officers searched Mr. Shipley's house. Despite Mr. Smith's two descriptions, both mentioning a black hoodie and blue jeans, the Officer Defendants did not find a black hoodie or blue jeans, or any other physical evidence linking Mr. Shipley to the murder of Kevin Smith.

64.     Given these four reasons, had the Officer Defendants conducted a good-faith investigation, they would have ruled Mr. Shipley out as a murder suspect in early November 1991. And Edward Smith should not have been BPD's star witness, as the evidence strongly suggested that he did not "know" the Murderer.

**D. Certain Officer Defendants Failed to Disclose That Edward Smith First Named "Larry Davis" as the Murderer—not Clarence Shipley.**

65.     On October 26, 1991—one day after the murder—Edward Smith called BPD at 10:00 a.m. and told them that the Murderer was "Larry Davis." Mr. Smith explained that the Murderer was in his late 20s and lived in the same neighborhood of the shooting—Cherry Hill. Mr. Smith explained that Larry Davis was a "junkie."

66.     As mentioned above, when the BPD employee who took the call from Mr. Smith heard this information, the employee wrote the following note to Det. David John Brown:



**Edward Smith Telephone Call Note, Oct. 26, 1991—Not Disclosed to Defense Counsel[10]**

67.    Det. Disney and the other Officer Defendants hid this evidence and other critical Larry Davis evidence from the prosecuting attorneys and defense counsel. This evidence includes a BPD interview of Larry Davis by Defendant BPD Det. Richard James and Det. Brown in which Mr. Davis admitted that he was "in the crowd" at the murder scene on October 25, 1991, and that he spoke with Edward Smith after the murder about the murder.

68.    The Officer Defendants hid this information about Larry Davis from the prosecutor, and thus, from Mr. Shipley and his lawyer. Had the prosecutor known this information about Larry Davis, she would not have asked the following questions to Edward Smith about Larry Davis on redirect examination at Mr. Shipley's trial:

---

[10] The highlighting does not appear in the original document.

```
        Q      What, if anything, did you say to anyone

about Larry Davis, if you know?

        A      I didn't say, I didn't say anything

about Larry Davis.

        Q      Do you know anyone by the name of Larry

Davis?

        A      No, I do not.
```

**Redirect Examination by Prosecutor of Edward Smith, June 11, 1992 (excerpt)**

69.      Mr. Smith's testimony on June 11, 1992, about his lack of knowledge regarding Larry Davis and his phone call to the BPD on October 26, 1991 reporting Larry Davis as the Murderer, cannot both be true.

70.      In a BPD Report dated November 3, 1991, Det. Brown and Defendant Det. Disney stated that "it appears that Shipley will use 'Larry Davis did it' as an alibi defense." Instead of investigating Mr. Shipley's defense in good faith, the Officer Defendants investigated Mr. Shipley's defense in bad faith. They sought "to win" and discredit Mr. Shipley's truthful defense. That is why the Officer Defendants failed to disclose the key Larry-Davis information.

71.      There are many steps the Officer Defendants could have taken if they were interested in a good faith investigation. Those steps include: a) not coercing Allan Scott to extract his cooperation against Mr. Shipley, b) showing a photo array to Edward Smith and Michelle Shipley of the Larry Davis that Officer Defendant James interviewed on January 2, 1992, c) allowing Larry Davis to take a polygraph examination as he requested, d) following the leads of the numerous people who called into BPD and stated that the Murderer was Larry Davis, d) investigating why Edward Smith gave conflicting descriptions of the Murderer on the night of the murder, and e) interviewing the numerous witnesses who were on the scene the night of the murder.

17

**E.  Certain Officer Defendants Beat Allan Scott with a Flapjack and Forced Him to Implicate Shipley.**

72.     On October 28, 1991, certain Officer Defendants arrested 18-year-old Allan Scott on suspicion of multiple car thefts and interrogated him.

73.     During the arrest, certain Officer Defendants assaulted Mr. Scott by hitting him in the head with a "flapjack." This assault caused a contusion.

74.     Certain Officer Defendants transported Mr. Scott to the Southern District police station. There, certain Officer Defendants left him isolated and chained him to a desk in an interrogation room for about three hours without medical attention for the contusion from the flapjack assault. Certain Officer Defendants did not permit Mr. Scott to see his parents or a lawyer.

75.     Officer Defendants Ed Henneman, Tom Gerst, Leroy Stanton, and certain other Officer Defendants interrogated Mr. Scott. According to those officers, Mr. Scott allegedly claimed that on the night Kevin Smith was murdered, a man named "Scooter" had robbed Mr. Scott at gunpoint in an area near the murder scene. Mr. Scott allegedly identified Scooter as Clarence Shipley. That story was false.

76.     Officer Defendants Ed Henneman, Tom Gerst, Leroy Stanton, and certain other Officer Defendants fed Mr. Scott the information they needed to frame Mr. Shipley with murder. They yelled at the teenage Mr. Scott and threatened to charge him with numerous car thefts unless he admitted that he knew Clarence Shipley murdered Kevin Smith on October 25, 1991.

77.     At the time, Mr. Scott only knew Mr. Shipley as "Scooter." He did not know his real name. The interrogating Officer Defendants fed him Mr. Shipley's name and then claimed that Mr. Scott identified "Scooter" as Mr. Shipley—another lie.

78.     Officer Defendants Ed Henneman, Tom Gerst, and Leroy Stanton wrote out and witnessed a statement reportedly from Mr. Scott declaring that "Scooter" approached Mr. Scott

around 10:00 p.m. on October 25 at Cherry Hill and Joseph Avenue. Scooter allegedly pulled out a .32 or .38 caliber silver revolver and said, "You want to see me know [sic]." Mr. Scott fled.

79. Mr. Scott allegedly described Scooter as wearing a red San Francisco 49ers coat with a hood, a blue sweatshirt, light blue stone washed jeans, and red and white FILA tennis shoes. He described Scooter as about 5'10" inches tall, 170 pounds, and 18-19 years old.

80. Mr. Scott did not write or sign the statement. His signature was forged by certain Officer Defendants.

81. In the statement, Mr. Scott also allegedly admitted to stealing approximately six cars.

82. In exchange for his statement, Officer Defendants Ed Henneman, Tom Gerst, and Leroy Stanton, and certain other Officer Defendants promised Mr. Scott leniency on the car thefts.

83. The above-mentioned Officer Defendants and certain Officer Defendants in the Homicide Unit did not tell the prosecutor that they had promised Mr. Scott a deal on the car thefts in exchange for his testimony against Mr. Shipley.

84. The above-mentioned Officer Defendants and certain Officer Defendants in the Homicide Unit also failed to disclose to the prosecutor that BPD officers had assaulted Mr. Scott to extract his cooperation.

85. Mr. Scott was eventually charged with and convicted of only one car theft.

86. The same day he interrogated Mr. Scott, October 28, 1991, Officer Defendant Henneman contacted Det. Brown and told him that Mr. Scott was willing to provide information about the Kevin Smith murder. Officer Defendant Henneman and certain Officer Defendants knew that Mr. Scott's information about Mr. Shipley was false.

87. Det. Brown and Officer Defendant Disney created a report which included this false narrative. Supervising Officer Defendant McLarney and at least one other supervisory Officer Defendant approved of the Brown-Disney false report.

88.     In that false report, Det. Brown Officer and Officer Defendant Disney noted that an armed robbery had been reported early in the morning of October 25, 1991, near the site of the Kevin Smith murder. Det. Brown and Officer Defendant Disney falsely stated that the suspect in the early morning robbery and the suspect in the Kevin Smith homicide "closely match[ed]" the description given by Mr. Scott.

89.     In fact, Mr. Scott's description of Mr. Shipley differed significantly from Edward Smith's inconsistent descriptions of the Murderer.

90.     Det. Brown and Det. Disney willfully mischaracterized Mr. Scott's description of the Murderer in order to bolster the appearance of Mr. Shipley's guilt.

91.     Det. Brown and Det. Disney never showed Mr. Scott a photo array or line-up, including Mr. Shipley. These Defendants and certain other Officer Defendants failed to conduct a good-faith investigation in order to conceal their unconstitutional misconduct.

92.     Officer Defendant Disney knew that Mr. Scott's information was false. Officer Defendant Disney was familiar with BPD's illegal interrogation techniques, including feeding information to witnesses, promising leniency to witnesses without disclosing such deals to the prosecution or defense, and fabricating witness statements.

**F.  After the Officer Defendants' Assault on Allan Scott, Edward Smith Changed His Story to Implicate Clarence Shipley Rather Than Larry Davis.**

93.     After the assault and coercion of 18-year-old Allan Scott on October 28, 1991, the Officer Defendants turned their efforts to changing Edward Smith's story from implicating Larry Davis to implicating Clarence Shipley.

94.     On November 2, 1991, Det. Disney, Det. Bowman, Det. Brown, and certain other Officer Defendants showed up at Edward Smiths' house. The Officer Defendants showed Mr. Smith either a photo array containing Clarence Shipley, or a singular photo of Mr. Shipley. Mr. Smith reportedly identified Clarence Shipley as the Murderer. During this unconstitutionally

suggestive photo procedure, one of the Officer Defendants told Mr. Smith the nickname of Mr. Shipley.

95.     At no time did any Officer Defendant attempt to reconcile Mr. Smith's previous two descriptions of the Murderer with Mr. Shipley's photo or Mr. Smith's initial implication of Larry Davis as the Murderer.

96.     On that day, Mr. Smith changed his story from implicating Larry Davis to falsely implicating Clarence Shipley in the murder of Kevin Smith.

## G. Certain Supervising Officer Defendants Failed to Adequately Supervise the Smith Murder Investigation and Appropriately Intervene.

97.     At all times during the Smith murder investigation, Defendants Sgt. McLarney, Sgt. Landsman, and at least one other Officer Defendant with supervisory roles oversaw the Smith murder investigation.

98.     These Supervising Defendants failed to supervise and/or intervene in myriad ways, including reviewing the multiple descriptions of the Murderer provided by Edward Smith, reviewing the Homicide File (despite signing and initialing the "Case Review" form of the Homicide File), disclosing exculpatory and impeachment evidence, engaging in a good-faith investigation into Mr. Shipley's alibi (including investigating and polygraphing Larry Davis, as Davis offered), reviewing the false report regarding Allan Scott, and ensuring that teenagers are not assaulted in police custody to extract their cooperation in criminal cases.

## H. Certain Officer Defendants Fabricated Documents to Falsely Charge Clarence Shipley.

99.     Certain Officer Defendants falsified documents to falsely arrest, charge, and convict Mr. Shipley.

21

100.    For example, Defendant Det. Sgt. Jay Charles Landsman, Sr. wrote (or at least approved and signed), the first 24-Hour Report in BPD's homicide file for the murder of Kevin Smith. BPD calls this a "24-Hour Report" because a BPD homicide detective is supposed to document the key facts in a homicide investigation within a day's time, given that time is of the essence when solving homicide crimes.

101.    According to the BPD Homicide File, the only people who provided descriptions of the Murderer in the first 24 hours were Edward Smith (twice) and George Boddy.

102.    Not only did supervising detective Landsman sign off on this 24-Hour Report, but Det. Sgt. Terrence P. McLarney and Det. Lt. John Doe also approved the 24-Hour Report by signing the "Case Review" in the Homicide File.

103.    In that 24-Hour Report, Officer Defendants Sgt. McLarney, Det. Lt. John Doe, Det. Sgt. Landsman, and Det. Disney wrote and/or approved a description of the Murderer stating that he was a black male wearing a black hooded sweatshirt and "NFD," which means "no further details."

POLICE DEPARTMENT
BALTIMORE, MARYLAND

Criminal Investigation Division
**24 HOUR CRIME REPORT**
P8 / 151

From: 0800 ____ 25 October 1991 ____ To: 0800 ____ 26 October 1991 ____

To:    Chief of the Criminal Investigation Division

From: [X] Crimes Against Persons        [ ] Property Crimes

[ ] Special Investigation        [ ] Vice Control

Incident: ____ Homicide/Shooting, 9J-58139, H91237

Location: ____ 2500 Joseph St. (on the street)

Time — Date: ____ 25 October 1991 @ 2255 hours

Method: ____ GSW to the back

Complaint or Victim: ____ Kevin Smith, B/M/29, ███████████

Suspect/s Wanted: ____ B/M, Black hooded sweatshirt, NFD

Arrested: ____ N/A

C.I.D. Investigator on Scene: ____ Det's David John Brown, Sr. & D. Martin Disney

Summary: (To include records of Arrest)        **MOTIVE:** Attempted Robbery

---

as the victims brother threw a bottle in his general direction. The police were notified via a call to 911, and Officer L. Deuerling, 9C32 responded.

Crime Lab responded, unit 4421, Tech. Williams, who processed the scene, to include the recovery of evidence, photgraphs and a sketch.

The victim was transported to the O.C.M.E. by Investigato Ben Henry, where an autopsy will be performed on 26 October 1991.

The victims brother, Edward Smith, M/B/27, DOB: ████████ of ██████████████ was on the scene and identified the victim as Kevin Smith. He was unable to provide the date of birth at this time.

As of this writing it is unknown if the victim has a record with this agency.

This investigation is continuing.....

*Sgt Jay L Sander*

**BPD 24-Hour Report (excerpt)[11]**

---

[11] The highlighting of the 24-Hour Report and circling of Det. Landsman's signature do not appear in the original document.

104.    The description of the Murderer in BPD's 24-Hour Report is false. Within 24 hours, BPD had additional details of the Murderer from the *two* different and inconsistent descriptions provided by Edward Smith and a third description from eyewitness George Boddy.

105.    As mentioned, within 24 hours, BPD took a third description of the Murderer from eyewitness George Boddy—in addition to the two Murderer descriptions from Edward Smith. Although Mr. Boddy reportedly did not see the murder, he did see the Murderer. Det. Christopher Bieling interviewed Mr. Boddy on the night of the murder and took a statement. In that statement, Mr. Boddy reportedly told Det. Bieling that the murder was a short, Black male, with dark-colored clothing.

106.    Given the two descriptions of the Murderer by Edward Smith and the description of the Murderer by Mr. Boddy received by the Officer Defendants in the first 24 hours after the murder, the description of the Murderer in the 24-Hour Report is false.

107.    The Officer Defendants created other false documents. For example, on November 2, 1991, Det. Brown and Det. Disney obtained an Arrest Warrant for Mr. Shipley and a Search Warrant for his residence based on the photographic identification by Edward Smith.

108.    The Arrest Warrant contained false information. It provided that Mr. Shipley was 5'10" and 20 years old—six to seven inches taller than Mr. Smith had previously described the Murderer and almost a decade younger.

109.    The Affidavit supporting the request for a Search Warrant was also false. In the Affidavit, Detective Brown falsely relayed the witnesses' description of the Murderer. Det. Brown stated that both eyewitnesses (Edward Smith and Allan Scott) described the Murderer as 20 years old, which was Mr. Shipley's age at the time. Edward Smith in fact described the Murderer as 29–30 years old, and Mr. Scott's alleged statement describes his assailant as 18–19 years old. The false Affidavit also stated that a witness who could only be Mr. Scott reported that the assailant was

wearing a dark hoodie, falsely conforming to what Mr. Smith said. In truth, Mr. Scott's alleged statement described the Murderer as wearing a red 49ers coat with a hood and a blue sweatshirt. Finally, Det. Brown stated that Mr. Scott identified his alleged assailant as Clarence Shipley, which was also untrue.

110. The Application for a Statement of Charges, written by Defendant Det. Disney, is another false document. It repeated the false story allegedly told by Mr. Scott, and it omitted BPD's promise to reduce the severity of Mr. Scott's offenses, the Officer Defendants' assault of Mr. Scott, and their fabrication of evidence.

111. As a result of the false documents described above, which were forwarded to the prosecutor, Mr. Shipley was falsely charged with murder, assault, attempted robbery, and related gun crimes on November 2, 1991.

## I. Mr. Shipley's Murder Trial Lasted Three Days.

112. On June 10, 1992, a jury trial began. The only issue contested at the trial was the identity of the Murderer. The trial ended on June 13, 1992, with Mr. Shipley's wrongfully convicted on all counts.

113. Prior to the trial, a Baltimore City judge presented Mr. Shipley with a guilty plea offer of 25 years with all but 10 years suspended. Mr. Shipley maintained his innocence and rejected the plea.

114. On July 13, 1992, a Court sentenced Mr. Shipley to life in prison plus 20 years for "something [he] didn't do."

## J. Mr. Shipley Fought 27 Years for Freedom.

115. Mr. Shipley filed numerous motions challenging his conviction in the 27 years of his incarceration.

116.    In January 2014, Mr. Shipley's friends and relatives raised sufficient funds to retain a private investigator to reinvestigate his case.

117.    The investigator referred the case to Michele Nethercott, then the Director of the University of Baltimore Innocence Project Clinic. Ms. Nethercott collaborated with the Office of the Public Defender and the Mid-Atlantic Innocence Project.

118.    Ms. Nethercott requested that the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office ("SAO") review and investigate the case.

119.    At the conclusion of the reinvestigation of the case by the CIU, the CIU took the rare step of joining Mr. Shipley in a Joint Petition for the Issuance of a Writ of Actual Innocence.

120.    On December 18, 2018, the Baltimore City Circuit Court granted the Petition, and the SAO dismissed the charges.

121.    Finally, Mr. Shipley came home to freedom.



**Clarence Shipley in 2019 after winning his 27-Year Fight for Freedom**
**(Credit:** *The Washington Post***)**

### K.  Since at least the 1960s, the BPD Has Engaged in a Pattern and Practice of Unconstitutional Misconduct.

122.    The unconstitutional conduct that led to the wrongful convictions of Mr. Shipley was part of a longstanding pattern and practice within the BPD of unconstitutional conduct in the course of homicide investigations. At the time of Mr. Shipley's wrongful convictions and throughout his incarceration, the practices described in this Complaint were sufficiently widespread within the

BPD to assume the quality of a "custom or usage" of which the BPD had actual or constructive knowledge.

123.    The BPD has long maintained a policy, practice, or custom of: using coercive techniques in interviews and interrogations to obtain confessions and false statements; fabricating inculpatory evidence; withholding exculpatory and impeachment evidence from prosecutors, defense attorneys, and judges; and, in bad faith, failing to conduct investigations in order to shield earlier wrongful acts in the course of homicide investigations.

124.    These practices were sufficiently widespread that BPD knew or should have known that its officers engaged in such conduct. Nevertheless, it failed to take action to stop such conduct, including refusing to investigate or discipline officers it knew or should have known had so abused their offices. By deliberately turning a blind eye, BPD condoned, facilitated, and encouraged these practices.

125.    Despite actual or constructive knowledge that its officers required more training on their obligations regarding the disclosure of evidence, interactions with witnesses (including teenagers), and the conduct of investigations in homicide cases (including the need to follow leads that contradicted detectives' prevailing theory of the case), BPD failed to provide adequate training on these topics. Its failures perpetuated the kinds of unconstitutional misconduct in Mr. Shipley's case.

126.    BPD's long history of unconstitutional misconduct goes back to at least the 1960s.

127.    In 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager. It was later discovered that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman. A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax. Rather than

present all evidence to the prosecutors, the BPD officers presented incomplete and fabricated reports. Mr. Lomax was granted a new trial based on these violations, and the State dismissed the charges.

128.    In 1974, Michael Austin was convicted of shooting and killing a private security guard. BPD officers, among other violations, failed to turn over to both prosecutors and the defense a non-identification of Mr. Austin by the eyewitness with the best direct view of the murder. BPD officers also failed to disclose that the same eyewitness again refused to identify Mr. Austin as having been one of the two perpetrators of the crime when they came back and showed the witness a second set of photographs containing at least one photo of Mr. Austin. BPD officers also failed to investigate other potential suspects and buried exculpatory evidence. The trial prosecutor later testified that, "[H]ad I known then what I know now, I would have never prosecuted the case."

129.    In 1981, Wendell Griffin was convicted of the murder of James Wise. As part of that investigation, BPD homicide detectives engaged in substantial misconduct, including suppressing the results of two photo arrays shown to an important witness who had *not* identified Mr. Griffin; suppressing witness statements that excluded Mr. Griffin as the murderer; and failing to include material information in an affidavit for a search warrant for Mr. Griffin's car. Donald Kincaid, a BPD homicide detective, also coerced another key witness, Delores Queen, into falsely testifying by threatening her with a perjury prosecution and possible loss of her children if she did not "cooperate" with him. Det. Kincaid himself testified:

Q.    What if anything did you tell Delores Queen when you first picked her up?

A.    I told her I received certain information that she told she know [sic] about this homicide. And if she didn't cooperate with me, under the law and [with] the assistance of the State's Attorney's Office, I could summon her to the Grand Jury, have her put her testimony to the Grand Jury and I would come with the witnesses that gave me the information and this witness would testify. And if the Grand Jury felt she was lying, the State's Attorney's Office could bring perjury charges against her. If perjury charges were brought, she could be arrested and lose her children.

28

130.    In 1984, Alfred Chestnut, Andrew Stewart, and Ransom Watkins were wrongfully convicted of the murder of a 14-year-old. They were arrested as teenagers and spent a combined 108 years wrongly incarcerated. In 2019, evidence came to light that BPD officers had coerced four middle school students into falsely implicating Mr. Chestnut, Mr. Stewart, and Mr. Watkins; coached the four middle schoolers so that their stories would match at trial; concealed their coercive conduct that had extracted the false statements; withheld witness statements that supported the teens' innocence; and deliberately failed to investigate—and later concealed—evidence identifying the likely perpetrator of the murder.

131.    In 1987, Gary Washington was convicted of murder. Twenty-five years later, it was discovered that BPD officers had procured the conviction by coercing false witness testimony and fabricating two statements, including one from a thirteen-year-old. The officers also suppressed exculpatory evidence, including evidence of their own misconduct during the investigation.

132.    James Owens' February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives had fabricated inculpatory evidence from the star witness and withheld evidence of several earlier, inconsistent statements made by that witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

133.    Also in 1988, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder. In post-conviction proceedings, counsel for Mr. Coleman elicited testimony from the BPD detective investigating the homicide, Detective Sydnor, that BPD detectives used their discretion to decide which documents to share with state prosecutors. When asked whether he forwarded copies of everything in his file to the prosecutor, Det. Sydnor responded that, "It depends on what it's about. Yeah, if it's pertinent to the investigation, yeah, I would. If it's something between me and another detective I may not."

29

134. In a later exchange, Det. Sydnor answered affirmatively when asked, "isn't it fair to say that you do not always photocopy every information sheet and every set of notes that you take but, in fact, you usually concentrate on the ones that you believe are relevant to this offense?" The detective admitted that police did not copy and give to the prosecution everything in Anthony Coleman's case file—rather, the officers presented incomplete or falsified information to prosecutors. Later, during direct examination, the detective explained that "sometimes" he would have witnesses review his notes of their conversation, sign the notes, and adopt them. When witnesses gave "important" statements, he would write them down, but he did not document everything that a witness told him.

135. After determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel, the Court of Special Appeals vacated the judgment denying post-conviction relief and remanded Mr. Coleman's case for further proceedings.

136. In 1989, Jerome Johnson was wrongly convicted of the murder of Aaron Taylor. In that case, BPD officers concealed a police report containing a statement from the state's star witness (a 15-year-old girl)—the only person to implicate Mr. Johnson at trial—that contradicted her trial testimony. Mr. Johnson uncovered the suppressed police reports while incarcerated. In 2018, he was released after serving 30 years in prison for a murder he did not commit.

137. In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. BPD officers fabricated gunshot residue evidence and suppressed notes and other evidence of an alternate perpetrator. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him were dismissed. In 2017, a federal court jury found that an officer had violated Mr. Burgess's constitutional rights and awarded him $15 million. The evidence at that trial included testimony from BPD detectives that BPD policies and practices did not require the proper

documentation and recording of evidence or require officers to disclose evidence to state prosecutors.

138.    Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that BPD officers failed to disclose eyewitness statements and other exculpatory evidence. An independent investigation by *The Baltimore Sun* uncovered additional undisclosed evidence. Not only was this information never disclosed to Mr. Pettiford's trial counsel, it had never been disclosed to Mr. Pettiford's post-conviction counsel. At a hearing on Mr. Pettiford's motion to re-open post-conviction, Judge Ellen M. Heller found that a BPD detective knew that he had to disclose a witness statement and that his failure to disclose to do so was "egregious." Mr. Pettiford's plea was ultimately vacated and charges against him were dismissed.

139.    In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that exculpatory witness statements had been withheld and the sole witness recanted her testimony at a post-conviction proceeding.

140.    In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit. Mr. Bryant was exonerated in 2016. Mr. Bryant's post-conviction proceedings uncovered that BPD officers fabricated witness identifications and failed to disclose several key pieces of evidence exculpating Mr. Bryant and pointing to another suspect, including undisclosed witnesses and witness statements.

141.    In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the shooting death of a 15-year-old boy. At trial, the state presented evidence that a witness identified Jones in a photo array and that Mr. Jones had a particle of gunshot residue on his hand. During the post-conviction phase of Mr. Jones' case, his counsel discovered evidence in the BPD file that the witness who identified Mr. Jones at trial had told a BPD officer that he had not seen the shooting or

31

the Murderer. Further, internal BPD documents revealed that gunshot residue results were unreliable because of widespread contamination of police department facilities. Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their production. Ultimately, Mr. Jones' conviction was vacated and the state nolle prossed the charges against him.

142. In addition to the instant case and cases dating from the sixties to the nineties demonstrating BPD's pattern and practice of unconstitutional conduct, Lieutenant Stephen B. Tabeling completed a report in 2000 about BPD's Homicide Unit as requested by then-BPD Commissioner Ronald L. Daniel. Lieutenant Tabeling's report found, among other things, that: there is "an apparent mutual lack of confidence and a serious divisive deficiency in teamwork" between the BPD and the SAO; BPD Homicide Detectives kept case folders in "abysmal condition—that is, when they can be located"; and homicide detectives lacked appropriate processes and protocols for recording information gathered during their investigations. On information and belief, these deficiencies dated to before and during the period when the Officer Defendants committed the misconduct in Mr. Shipley's case.

143. The BPD's policy, pattern, and practice of misconduct in murder investigations described above was perpetuated by the BPD's failure to train, supervise, and discipline its police officers, even though BPD knew or should have known that further training, supervision, and discipline was necessary. Instead, BPD sanctioned and facilitated the kind of misconduct that Defendants committed against Mr. Shipley.

144. For example, there was a failure during the relevant period to train police officers on disclosing evidence and complying with their obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963), despite the obvious necessity of such training, as shown by the public testimony and reports from BPD officers that, as a policy or practice, the BPD tolerated

the fabrication of evidence and did not require officers to turn all *Brady* information over to prosecutors.

145.    The BPD also failed to properly supervise and discipline its police officers. As a result, officers continued to violate suspects' rights with impunity in the manner described more fully above, as evidenced by the recent revelations of misconduct within the BPD's Gun Trace Task Force. A 2016 Report of the U.S. Department of Justice, Civil Rights Division concluded, "[t]his pattern or practice [of unconstitutional conduct] is driven by systemic deficiencies in BPD's policies, training, supervision, and accountability structures."

146.    Despite actual or constructive knowledge of the pattern of misconduct, including, but not limited to, the repeated failure to disclose exculpatory and impeachment evidence to prosecutors, the defense, and on applications for warrants; the fabrication of evidence, including by improper interrogations; and cover-ups of misconduct in the course of investigations, the BPD and its supervising officials did not act to remedy the abuses described in the preceding paragraphs. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to prevent or remedy Mr. Shipley's injuries.

147.    These failures were a direct and proximate cause of the injuries suffered by Mr. Shipley.

**L.  The 27-Year Cost of Clarence Shipley's Wrongful Conviction.**

148.    Defendants' misconduct robbed Mr. Shipley of the best years of his life. Only after decades of imprisonment did he regain the freedom that had been stolen from him at age 20.

149.    Mr. Shipley spent more than 27 years caged in Maryland prisons.

150.    Mr. Shipley suffered immense physical and emotional pain throughout his imprisonment.

151.    He awoke each day to the torture of being trapped inside a small cell for a murder he did not commit.

152.    He encountered and experienced the violence and degradation inherent to prison life.

153.    When Mr. Shipley lost his youngest son in a tragic fire, he had to grieve alone, in a dark cage, after every prisoner went to bed. In prison, grieving is perceived by many as weakness, and with weakness comes violent consequences.

154.    Today, Mr. Shipley has no relationship with his oldest son due to his decades-long absence.

155.    The aftermath of confinement in Maryland's prisons causes Mr. Shipley to experience flashbacks, night terrors in which he wakes up screaming, anxiety, depression, and post-traumatic stress disorder. He has constant back pain from an assault in prison.

156.    He missed out on seeing the birth of his grandsons. He married his current wife in prison, behind bars.

157.    Today, he struggles with technology and assimilating to life outside of prison. He no longer knows his family, and his family no longer knows him.

158.    Mr. Shipley's injuries and damages were foreseeable to Defendants at the time of their acts and omissions.

159.    All the acts and omissions committed by Defendants were done intentionally, unlawfully, wantonly, recklessly, negligently, and/or in bad faith.

## FEDERAL CLAIMS

### Count I – 42 U.S.C. § 1983
### Malicious Prosecution (Fourth and Fourteenth Amendments)
### (Against Officer Defendants)

160.    Each foregoing paragraph is incorporated as if restated fully herein.

34

161.    In the manner described above, by their conduct and under the color of state law, the Officer Defendants caused Mr. Shipley to be arrested, charged, and prosecuted for the murder of Kevin Smith pursuant to legal process that was unsupported by probable cause, thereby violating Mr. Shipley's clearly established rights, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures. No reasonable officer in 1991 or 1992 would have believed this conduct was lawful.

162.    The misconduct described in this Count was objectively unreasonable, and the Officer Defendants acting individually and in concert, intentionally, knowingly, and deliberately misrepresented the truth and withheld exculpatory facts from the prosecutor.

163.    The proceedings terminated in Mr. Shipley's favor on December 18, 2018.

164.    As a direct and proximate result of the malicious prosecution of Officer Defendants, Mr. Shipley suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

### Count II – 42 U.S.C. § 1983
### Violation of Due Process (Fourteenth Amendment)
### Fabrication of Evidence
### (Against Officer Defendants)

165.    Each foregoing paragraph is incorporated as if restated fully herein.

166.    In the manner described above, by their conduct and under the color of state law, the Officer Defendants fabricated evidence against Mr. Shipley.

167.    The Officer Defendants performed the above-described acts in bad faith and under color of state law, deliberately, recklessly, and indifferent to Mr. Shipley's clearly established constitutional rights and innocence. No reasonable officer in 1991 or 1992 would have believed this conduct was lawful.

168.    As a direct and proximate result of the fabrication of evidence of the Officers Defendants, including fabrication of witness testimony, Mr. Shipley suffered injuries, including but

35

not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

**Count III – 42 U.S.C. § 1983**
**Violation of Due Process (Fourteenth Amendment)**
**Failure to Adequately Investigate and Disclose Exculpatory and Impeachment Evidence**
**(Against Officer Defendants)**

169.    Each foregoing paragraph is incorporated as if restated fully herein.

170.    In the manner described above, by their conduct and under color of state law, the Officer Defendants deprived Mr. Shipley of his constitutional rights to be free from deprivation of liberty without due process of law. The Officer Defendants individually, jointly, and in conspiracy with one another and others, deliberately withheld exculpatory and impeachment evidence. The Officer Defendants also in bad faith failed to adequately investigate the crime, including pursuing leads pointing to the true perpetrator, in order to shield their wrongful acts. In doing so, the Officer Defendants violated their clearly established duty to report to prosecutors all exculpatory and impeachment materials. No reasonable officer in 1991 or 1992 would have believed this conduct was lawful.

171.    Absent the misconduct of the Officer Defendants, the prosecution of Mr. Shipley could not and would not have been pursued, and he would not have been convicted. The misconduct of the Officer Defendants directly led to the unjust and wrongful criminal conviction of Mr. Shipley and his continuing wrongful imprisonment. The Officer Defendants thus denied him of his constitutional rights to be free from deprivation of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

172.    As a direct and proximate result of this violation of their constitutional rights to be free from deprivation of liberty without due process of law, Mr. Shipley suffered injuries, including but not limited to the loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

**Count IV – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Against Officer Defendants)**

173.    Each foregoing paragraph is incorporated as if restated fully herein.

174.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, certain of the Officer Defendants stood by without intervening to prevent the violation of Mr. Shipley's constitutional rights, although each of the Officer Defendants had the opportunity to do so.

175.    The misconduct described in this Count was objectively unreasonable and was undertaken in bad faith, intentionally, recklessly, and with willful indifference to Mr. Shipley's clearly established constitutional rights.

176.    As a direct and proximate result of certain Officer Defendants failure to intervene to prevent the violation of Mr. Shipley's clearly established constitutional rights, Mr. Shipley suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

**Count V – 42 U.S.C. § 1983**
**Supervisory Liability**
**(Against Defendants Terrence P. McLarney, Jay Charles Landsman, Sr., and certain Officer Defendants)**

177.    Each foregoing paragraph is incorporated as if restated fully herein.

178.    Detectives Terrence P. McLarney, Jay Charles Landsman, Sr., and certain Officer Defendants were personally involved in the investigation of Mr. Shipley under the direct supervision of the investigative team, including Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, and certain Officer Defendants.

179.    Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, and certain Officer Defendants acted with impunity in an environment in which they were not adequately supervised by Detectives Terrence P. McLarney, Jay

37

Charles Landsman, Sr., and certain John Does 1-10, both in this case and as a matter of practice and custom. Detectives Terrence P. McLarney, Jay Charles Landsman, Sr., and certain Officer Defendants knew, or should have known, that Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, and certain other Officer Defendants were engaging in the unconstitutional conduct described above in the investigation of the Kevin Smith murder. Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, and certain other Officer Defendants knew, or should have known, that Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, and certain other Officer Defendants, and other detectives in BPD's homicide unit under their supervision had previously engaged in similar unconstitutional conduct in the course of murder investigations. Detectives Terrence P. McLarney, Jay Charles Landsman, Sr., and certain other Officer Defendants had the power to discipline the officers or take other action to prevent these abuses of power but failed to do so.

180.    Detectives Terrence P. McLarney, Jay Charles Landsman, Sr., and certain John Does 1-10 acted recklessly and intentionally in violation of Mr. Shipley's constitutional rights by failing to adequately supervise Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, and certain Officer Defendants, thereby allowing and causing those detectives to deprive Mr. Shipley of his clearly established constitutional rights, including his rights to be free from malicious prosecution and free from deprivation of liberty without due process of law.

181.    The reckless and deliberately indifferent conduct of Detectives Terrence P. McLarney, Jay Charles Landsman, Sr., and certain Officer Defendants violated his clearly established duty, in 1991 and 1992, to supervise the detectives, and no reasonable police supervisor in 1991 and

1992 would have believed that reckless supervision in the fact of actual or constructive notice of misconduct by their subordinate officers were lawful.

182.    As a direct and proximate result of the acts and omissions of Detectives Terrence P. McLarney, Jay Charles Landsman, Sr., and certain Officer Defendants, Mr. Shipley suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and he continues to suffer emotional distress.

**Count VI – 42 U.S.C. § 1983**
***Monell* Claim (Fourteenth Amendment)**
**(Against the Baltimore Police Department)**

183.    Each foregoing paragraph is incorporated as if restated fully herein.

184.    The actions the Officer Defendants were undertaken pursuant to policies that were ratified by policymakers with final policymaking authority and/or pursuant to persistent and widespread patterns of practice. These policies and practices included regularly failing to disclose exculpatory and impeachment evidence to the defense, prosecutors, and in applications for warrants; fabricating evidence; improperly interrogating witnesses; and in bad faith failing to conduct investigations in order to shield earlier wrongful acts. BPD's illegal policies and practices also included the failure to adequately train police officers in the homicide unit on their obligations regarding disclosure of exculpatory and impeachment evidence; fabrication of evidence; interrogations, including of minors; and proper investigation; failure to supervise officers in the homicide unit; and failure to supervise and discipline police officers in the homicide unit who engaged in violations similar to those described above.

185.    These policies and practices were so widespread within the BPD as to constitute a "custom or usage" of which BPD policymakers and supervisors had actual or constructive knowledge.

39

186. The BPD's policy, custom, and/or pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative actions, and its policy, custom, and/or pattern and practice of failing to adequately supervise, discipline, and train BPD detectives and officers, is reflected by the multiple acts of misconduct and illegality committed by multiple BPD detectives and officers as described above, and the testimony and reporting of BPD detectives and officers that these practices constituted the official or unofficial policies of the BPD.

187. BPD maintained the policies and practices described in this Count with deliberate indifference to Mr. Shipley's constitutional rights.

188. The BPD is therefore liable for the misconduct committed by certain Officer Defendants.

189. As a direct and proximate result of the BPD's actions, Mr. Shipley's constitutional rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and they continue to suffer emotional distress.

## STATE LAW CLAIMS

### Count VII
### Malicious Prosecution
### (Against Officer Defendants)

190. Each foregoing paragraph is incorporated as if restated fully herein.

191. The Officer Defendants accused Mr. Shipley of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to the prosecutor and other officials to exert influence and to institute and continue the judicial proceedings.

192. The Officer Defendants caused Mr. Shipley to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

193.    The Officer Defendants fabricated evidence and withheld exculpatory evidence that would have established Mr. Shipley's innocence. The Officer Defendants knew that, as described more fully above, no true or reliable evidence implicated Mr. Shipley in the murder of Kevin Smith.

194.    The Officer Defendants intentionally failed to investigate evidence that would have confirmed Mr. Shipley's innocence.

195.    The misconduct described in this Count was undertaken intentionally, willfully, and with reckless indifference to the rights of others.

196.    The proceedings terminated in Mr. Shipley's favor on December 18, 2018.

197.    As a direct and proximate result of this misconduct, Mr. Shipley suffered and continue to suffer injuries as set forth above, including physical injury and emotional distress, and they continue to suffer emotional distress.

**Count VIII**
**Intentional Infliction of Emotional Distress**
**(Against Officer Defendants)**

198.    Each foregoing paragraph is incorporated as if restated fully herein.

199.    The acts and conduct of the Officer Defendants as set forth above were extreme and outrageous. The actions of the Officer Defendants were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Shipley, as more fully alleged above.

200.    As a direct and proximate result of the actions of the Officer Defendants, Mr. Shipley suffered and continue to suffer physical injury and severe emotional distress, and he continues to suffer emotional distress.

**Count IX**
**Indemnification**
**(Against the Baltimore Police Department)**

201.    Each foregoing paragraph is incorporated as if restated fully herein.

41

202.     Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for acts or omissions within the scope of their employment activities.

203.     The Officer Defendants are or were employees of the BPD who acted within the scope of their employment in committing the misconduct described in this Complaint.

204.     Accordingly, the BPD should be ordered to indemnify the Officer Defendants for any judgment entered against them in this matter and to pay such judgment to Mr. Shipley.

## Demand for Damages

Plaintiff Clarence Shipley requests that this Court enter judgment in favor of him and against Deems Martin Disney, Jr., Robert J. Bowman, Christopher Bieling, Richard James, Terrence McLarney, Jay Charles Landsman, Sr., Edward Nelson Henneman, Sr., Thomas Frank Gerst, Leroy Stanton, and the Baltimore Police Department and award him:

1.     Compensatory damages, attorneys' fees, and costs against all Defendants, jointly and severally;

2.     Punitive damages against each Officer Defendant; and

3.     Any and all other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff Clarence Shipley demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues of fact.

Dated:  December 14, 2021                         Respectfully submitted,

_____

Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com
Andrew D. Freeman (Bar No. 03867)

42

adf@browngold.com
Chelsea J. Crawford (Bar No. 19155)
ccrawford@browngold.com
Neel K. Lalchandani (Bar No. 20291)
nlalchandani@browngold.com

Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21201
Tel: (410) 962-1030
Fax: (410) 385-0869

*Attorneys for Plaintiff Clarence Shipley*