UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| CLARENCE SHIPLEY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.  SAG-21-03173 |
| DEEMS MARTIN DISNEY, JR., *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* ooo0ooo \* \* \* \* \*

## AMENDED COMPLAINT AND REQUEST FOR A JURY TRIAL

Plaintiff Clarence Shipley, by his undersigned attorneys, files this Amended Complaint against Deems Martin Disney, Jr., Robert John Bowman, Richard James, Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton (collectively, the "Officer Defendants") and the Baltimore Police Department ("BPD") for violating his civil rights, resulting in his wrongful, 27-year incarceration. Mr. Shipley alleges as follows:

## INTRODUCTION

*"[S]omething I didn't do."*

```
        THE COURT:  Is there anything the
Defendant wishes to say before sentence is
imposed?  Mr. Shipley, this is your opportunity to
say anything you wish to say before sentence is
imposed.
        THE DEFENDANT:  Only thing I got to say
is I'm ready to get sentenced for something I
didn't do.  I don't think I should be sentenced
for something I didn't do.  That's all.
```

1.      Those are the words of then-20-year-old Clarence Shipley just before a Baltimore City Circuit Court judge sentenced him to prison for the rest of his life. He would repeat those words time and time again for 27 years—never wavering—until, finally, he was free.

2.      On July 13, 1992, a Baltimore City Circuit Court judge sentenced Mr. Shipley to life in prison for the murder of Kevin Smith—"something [he] didn't do."

3.      The judge also sentenced Mr. Shipley to six 20-year terms, concurrent to the life murder sentence, for the attempted robbery and assault of Kevin Smith, Edward Eugene Smith (Kevin Smith's brother), and Michelle Shipley (Mr. Shipley's sister)—"something [he] didn't do."

4.      Finally, the judge sentenced Mr. Shipley to three 20-year terms, consecutive to the life murder sentence, for the use of a handgun in the three attempted robberies—"something [he] didn't do."

5.     On that Sentencing Day in 1992, Mr. Shipley—a 20-year-old African-American male from Baltimore's Cherry Hill neighborhood, with a single mother on welfare and without his murdered father—stood before the judge as an innocent man.

6.     Exoneration Day for Mr. Shipley came at last on December 18, 2018. On that day, Mr. Shipley stood before another Baltimore City Circuit Court judge. That judge granted a joint Petition for a Writ of Actual innocence filed by Mr. Shipley and the State's Attorney's Office ("SAO"). After 27 years wrongfully imprisoned in a cage, Mr. Shipley was rightfully free.

7.     Clarence Shipley entered prison at 20 years old and left at age 47.

8.     Mr. Shipley's wrongful conviction was the result of an investigation by BPD and the Officer Defendants plagued by tunnel vision. After having targeted Mr. Shipley, the Officer Defendants and BPD ignored the substantial evidence pointing to his innocence and engaged in unconstitutional misconduct to secure his conviction.

9.     The Officer Defendants withheld evidence from the prosecutor that another man, Larry Davis, committed the murder. They coerced evidence against Mr. Shipley from a witness, Allan Scott, through physical intimidation and by promising him leniency for other crimes— promises that were not disclosed to the prosecutor or defense. They also withheld a description of the Murderer that was inconsistent with Mr. Shipley.

10.    No physical evidence tied Mr. Shipley to the crimes for which he was convicted. He had six alibi witnesses—including his sister Michelle Shipley, who was a victim of the attempted robbery. But that was not enough for a poor, African-American man from Cherry Hill to overcome the power and wrongdoing of the BPD.

11.    BPD's misconduct in this case is yet another chapter in the long story of BPD's pattern and practice of wrongdoing during homicide investigations. The history of BPD officers and

detectives withholding exculpatory evidence from the accused, coercing and threatening witnesses, fabricating evidence, and intentionally failing to conduct meaningful investigations is decades long.

12.     The Officer Defendants' misconduct was also caused by BPD's failure to train its officers in their obligations to disclose exculpatory and impeachment evidence and failure to maintain any policy instructing them to do so.

13.     Mr. Shipley lost nearly three decades of his life to BPD and its officers' wrongdoing. During the time he was wrongfully imprisoned, he was surrounded by violence, suffering, and despair—his own made more acute by the knowledge of his innocence.

14.     This lawsuit seeks to redress the Defendants' unconstitutional misconduct that imprisoned a young man from Cherry Hill for crimes "[he] didn't do."

## **JURISDICTION AND VENUE**

15.     This action is brought under 42 U.S.C. § 1983.

16.     This Court has both federal question and supplemental jurisdiction under 28 U.S.C. §§ 1331 and 1367.

17.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events leading to this Complaint occurred in this judicial district.

18.     On December 5, 2019, undersigned counsel sent the City Solicitor for Baltimore City notice of Mr. Shipley's claims in compliance with the Maryland Local Government Tort Claims Act.

19.     The City of Baltimore did not respond.

20.     On December 5, 2019, undersigned counsel sent the Maryland Treasurer notice of Mr. Shipley's claims.

21.     Maryland denied Mr. Shipley's claims by letter dated January 22, 2020.

4

**PARTIES**

22.     Plaintiff Clarence Shipley was born in Baltimore and at all times relevant to this Complaint was a citizen and resident of the State of Maryland.

23.     At all times relevant to this Complaint, the Officer Defendants were employees of the BPD, acting under color of state law and within the scope of their employment through the statutes, ordinances, regulations, policies, customs, and usage of the BPD. Mr. Shipley sues the Officer Defendants in their individual capacities.

24.     Defendant BPD employed each of the Officer Defendants at all times relevant to this suit. BPD is a "person" within the meaning of 42 U.S.C. § 1983.

**FACTUAL BACKGROUND**

**A.     Kevin Smith—Baltimore's 237th Murder Victim of 1991**

25.     After work on October 25, 1991, Kevin Smith met with his brother, Edward Smith, and his friend, Michelle Shipley. Together, they visited the apartment of a woman named "Ruth" in the Cherry Dale apartment complex in the Cherry Hill neighborhood of Baltimore City.

26.     After several hours, Kevin Smith, Edward Smith, and Ms. Shipley left the apartment and walked to the Cherry Hill Shopping Center. Kevin Smith was carrying cash.

27.     At approximately 10:50 p.m., the trio returned from the Cherry Hill Shopping Center and walked along Cherry Hill Road toward Joseph Avenue. Kevin and Edward Smith were walking together slightly ahead of Ms. Shipley.

28.     Near the corner of Joseph Avenue and Cherry Hill Road, the three were approached by the Murderer, who brandished a handgun and demanded money.

29.     Ms. Shipley fled in fear.

30.     Kevin Smith refused to surrender his money. At some point, Kevin Smith turned to run away, and the Murderer shot him in the back.

5

31.     The Murderer then ran up Joseph Avenue, turned left into the St. Veronica's Church parking lot, and disappeared.

32.     As the Murderer was running away, Edward Smith chased the Murderer and threw a bottle at him, screaming something to the effect of, "I know who you are! I know who you are!"

33.     As of October 25, 1991, Kevin Smith was Baltimore's 237th murder victim of the year.

34.     The primary detective assigned to the Kevin Smith homicide was Detective David John Brown. Defendant Deems Martin Disney, Jr., was the secondary detective on the case. Defendants Robert John Bowman and Richard James were detectives in BPD's Homicide Unit who participated in the investigation. The detectives were supervised by Defendant Terrence P. McLarney. Defendants Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton were patrol officers involved in the investigation of the Kevin Smith murder.

**B.     Descriptions of the Murderer Do Not Match Clarence Shipley**

35.     BPD officer Laura Deuerling responded to the scene of the shooting at or around 10:56 p.m.

36.     Detectives Brown and Disney responded to the scene at or around 11:15 p.m.

37.     At the crime scene, Edward Smith told Officer Deuerling that the Murderer was a black male, approximately 5'8", with a thin mustache, and wearing a black hoodie and blue jeans.

**Edward Smith's Statement to BPD Officer Laura Deuerling, Oct. 25, 1991 (excerpt)[1]**

38.     Detectives Brown and Disney arranged for Edward Smith to be transported to the BPD Homicide Unit that night.

_____

[1]  The highlighting appears in the original document.

6

39.    Detective Bowman interviewed Edward Smith at the Homicide Unit. Edward Smith told Det. Bowman that he recognized the Murderer. Specifically, Mr. Smith reported that he told the Murderer, "I know you. I know who you are." Mr. Smith provided these exact words to Det. Bowman at approximately 11:45 p.m. on the night of his brother's murder—less than an hour after the murder.

> Me and my brother Kevin Smith and a girl named Michell was walking on Cherry hill Rd comming from a friends house. This guy came up to us and pulled a gun out of the front of his hoody and said " you know what it is". I said to him " I know you I know who you are " and my brother started to run. I went over to pick up a bottle to hit him and he shot at my brother. I hit him with the bottle and he pointed the gun at me but it didn't go off, and he started to run back up Veronica.

**Edward Smith's Statement to Detective Bowman, Oct. 25, 1991 (excerpt)[2]**

40.    Det. Bowman wrote down Mr. Smith's words as they appear in the above excerpt.

41.    During that same night-of-the-murder interview, Edward Smith provided to Det. Bowman the following description of the Murderer, whom he claimed to know:

---

[2] The highlighting does not appear in the original document.

> Q. Can you describe the shooter?
> A. B/M  5'3  150-160  Short wavey hair
> 29-30  Black hoody Blue jeans.
> Saw him earlier tonight standing
> on Shellbanks near the rental office.

**Edward Smith's Statement to Detective Bowman, Oct. 25, 1991 (excerpt)[3]**

42.     According to Mr. Smith, the Murderer was a black male, 5'3" tall, 150 to 160 pounds, with short, wavy hair, 29-to-30 years old, and wearing a black hoodie and blue jeans.

43.     The description Edward Smith gave to Detective Bowman was inconsistent with his description to Officer Deuerling. Neither description fit Clarence Shipley: Mr. Shipley did not have wavy hair, he had shortly-cut hair; Mr. Shipley was not 29-to-30 years old, he had only just turned 20 years old in September 1991; Mr. Shipley weighed 155 pounds and stood at 5'6"; Mr. Shipley was clean-shaven.

44.     Edward Smith told Det. Bowman that he had seen the Murderer that night before the shooting. Mr. Smith reported, "I saw [the murderer] earlier that night." The first time Mr. Smith reportedly saw the Murderer was "on Shellbanks near the rental office."

45.     Edward Smith's statement to Det. Bowman was not disclosed to the prosecutor or defense counsel.

**C.     Officer Defendants Failed to Disclose that Edward Smith First Named "Larry Davis" as the Murderer—not Clarence Shipley**

46.     On October 26, 1991—one day after the murder—Edward Smith called at 10:00 a.m. to tell BPD that the Murderer was "Larry Davis." Mr. Smith explained that the Murderer was in

---

[3]  The highlighting does not appear in the original document.

his late 20s and lived in the same neighborhood of the shooting—Cherry Hill. Mr. Smith explained

that Larry Davis was a "junkie."

47.    The BPD employee who took the call from Mr. Smith wrote the following note to

Det. David John Brown:



**Edward Smith Telephone Call Note, Oct. 26, 1991—Not Disclosed to Defense Counsel[4]**

48.    This note was not included in the BPD's homicide file for the Kevin Smith murder.

49.    As the secondary investigator on the case, Det. Disney was in close communication

with Det. Brown and was familiar with the evidence in the investigation. Together with Det. Brown,

Det. Disney routinely prepared summaries of the Kevin Smith murder investigation for the Captain

---

[4] The highlighting does not appear in the original document.

of the Crimes Against Persons Section, John MacGillivary. Det. Brown's supervisor, Sgt. McLarney, and his secondary investigator, Det. Disney, knew about the note regarding Larry Davis's call and knew that it was kept separately from the rest of the homicide file. They therefore knew that it was not disclosed to the prosecuting attorneys and defense counsel.

50.     Had the prosecutor known this information about Larry Davis, she would not have asked the following questions to Edward Smith about Larry Davis on redirect examination at Mr. Shipley's trial:

```
     Q     What, if anything, did you say to anyone
about Larry Davis, if you know?
     A     I didn't say, I didn't say anything
about Larry Davis.
     Q     Do you know anyone by the name of Larry
Davis?
     A     No, I do not.
```

**Redirect Examination by Prosecutor of Edward Smith, June 11, 1992 (excerpt)**

51.     Mr. Smith's testimony on June 11, 1992, that he never said anything about Larry Davis, and his phone call to BPD on October 26, 1991, reporting Larry Davis as the Murderer, cannot both be true.

52.     Also on October 26, 1991, Detectives Brown and Disney interviewed Michelle Shipley. Detectives Brown and Disney did not include any notes from this conversation in the homicide file.

53.     In a report filed October 27, 1991, Detectives Brown and Disney stated that Ms. Shipley told them that she would be able to identify a "recent" photograph of the Murderer.

10

54.     There are no documents in the homicide file that indicate that Detectives Brown and Disney ever showed Michelle Shipley a photo array containing a recent photo of Larry Davis.

**D.     Officer Defendants Beat Allan Scott with a Flapjack and Forced Him to Implicate Mr. Shipley**

55.     On October 28, 1991—three days after the murder—BPD officers arrested 18-year-old Allan Scott on suspicion of multiple car thefts and interrogated him. After a lengthy interrogation with the Officer Defendants, Mr. Scott gave evidence pointing to Mr. Shipley as the Murderer.

56.     During the arrest, the officers assaulted Mr. Scott by hitting him in the head with a "flapjack." This assault caused a contusion.

57.     The officers transported Mr. Scott to the Southern District police station. There, Mr. Scott was left isolated and chained to a desk in an interrogation room for about three hours without medical attention for the contusion from the flapjack assault.

58.     Officers Ed Henneman, Tom Gerst, and Leroy Stanton were aware that Mr. Scott had been assaulted. They interrogated Mr. Scott and denied him the opportunity to see or speak with his parents or a lawyer. According to those officers, Mr. Scott allegedly claimed that on the night Kevin Smith was murdered, a man named "Scooter" had robbed Mr. Scott at gunpoint in an area near the murder scene. Mr. Scott allegedly identified Scooter as Clarence Shipley. That story was false.

59.     Officers Henneman, Gerst, and Stanton fed Mr. Scott the information they needed to frame Mr. Shipley with murder. They yelled at the teenaged Mr. Scott and threatened to charge him with numerous car thefts unless he admitted that he knew Clarence Shipley murdered Kevin Smith on October 25, 1991.

11

60.    At the time, Mr. Scott only knew Mr. Shipley as "Scooter." He did not know his real name. Officers Henneman, Gerst, and Stanton fed him Mr. Shipley's name and then claimed that Mr. Scott identified "Scooter" as Mr. Shipley—another lie.

61.    Officers Henneman, Gerst, and Stanton wrote out and witnessed a statement reportedly from Mr. Scott declaring that "Scooter" approached Mr. Scott around 10:00 p.m. on October 25 at Cherry Hill and Joseph Avenue. Scooter allegedly pulled out a .32 or .38 caliber silver revolver and said, "You want to see me know [sic]." Mr. Scott fled.

62.    Mr. Scott allegedly described Scooter as wearing a red San Francisco 49ers coat with a hood, a blue sweatshirt, light blue stone washed jeans, and red and white FILA tennis shoes. He described Scooter as about 5'10" inches tall, 170 pounds, and 18-19 years old.

63.    Mr. Scott did not write or sign the statement. His signature was forged by Officer Henneman, Gerst, or Stanton.

64.    In the statement, Mr. Scott also allegedly admitted to stealing approximately six cars.

65.    In exchange for his statement, Officers Henneman, Gerst, and Stanton promised Mr. Scott a lenient criminal sentence on the car thefts.

66.    The same day he interrogated Mr. Scott (October 28, 1991), Officer Henneman contacted Det. Brown and told him that Mr. Scott was willing to provide information about the Kevin Smith murder. Either (A) Officer Henneman did not disclose to Det. Brown—or any other detective, or the prosecutor—that Mr. Scott had been assaulted by BPD officers or that Mr. Scott had been promised a lenient criminal sentence on the car thefts in exchange for information, or (B) in the alternative, Officer Henneman gave Det. Brown this information, which Det. Brown shared with his secondary investigator, Det. Disney. In any case, information about the officers' mistreatment of Mr. Scott and promises made to him was not disclosed to the prosecutor or defense.

67.     Detective Brown spoke to Mr. Scott on October 28, the same day of Mr. Scott's arrest. Detective Brown did not retain any notes from his own interview with Mr. Scott or make a report of that interview in the homicide file. No records from Det. Brown's interview of Mr. Scott were disclosed to the prosecutor or defense.

68.     Detectives Brown and Disney created a report that included the false narrative coerced from Mr. Scott by Officers Henneman, Gerst, and Stanton. Supervising Officer McLarney approved that report.

69.     In that false report, Dets. Brown and Disney noted that an armed robbery had been reported early in the morning of October 25, 1991, near the site of the Kevin Smith murder. Detectives Brown and Disney falsely stated that the suspect in the early morning robbery and the suspect in the Kevin Smith homicide "closely match[ed]" the description given by Mr. Scott.

70.     In fact, as Dets. Brown and Disney knew, Mr. Scott's description of Mr. Shipley differed significantly from Edward Smith's inconsistent descriptions of the Murderer. Mr. Scott described Mr. Shipley as six to seven inches taller than the Murderer described by Edward Smith. Mr. Scott said Mr. Shipley was wearing a red coat over a blue sweatshirt, not a black hoody. Mr. Scott stated Mr. Shipley was about ten years younger than Edward Smith described the Murderer.

71.     Detective Brown and Det. Disney never showed Mr. Scott a photo array or line-up.

72.     On November 5, 1991, Det. Brown interviewed Mr. Scott. He did not place any notes from this conversation in the homicide file. Detective Brown informed Det. Disney of the substance of this interview. Neither detective disclosed any statements Allan Scott made during this interview to the prosecutor or defense. Neither detective disclosed any information that BPD officers assaulted Allan Scott or that BPD officers offered leniency to Mr. Scott to the prosecutor or defense.

73.      Mr. Scott testified before the grand jury on November 5, 1991, to the false narrative coerced by the Officer Defendants.

74.      Mr. Scott was eventually charged with and convicted of only one car theft.

**E.      After the Officer Defendants' Coercion of Allan Scott, Edward Smith Changed His Story to Implicate Clarence Shipley Rather Than Larry Davis**

75.      After the assault on and coercion of 18-year-old Allan Scott on October 28, 1991, the Officer Defendants turned their efforts to changing Edward Smith's story from implicating Larry Davis to implicating Clarence Shipley.

76.      On November 2, 1991, Dets. Disney, Bowman, and Brown showed up at Edward Smith's house. The detectives showed Mr. Smith a photo array containing Clarence Shipley. At trial, Mr. Smith testified that he did not know Mr. Shipley as "Scooter" until Detectives Disney, Bowman, or Brown told him. Mr. Smith reportedly identified Clarence Shipley as the Murderer.

77.      At no time did any Officer Defendant attempt to reconcile Mr. Smith's previous two descriptions of the Murderer with Mr. Shipley's physical appearance.

78.      On that day, Mr. Smith changed his story from implicating Larry Davis to falsely implicating Clarence Shipley in the murder of Kevin Smith.

**F.      The Officer Defendants Fabricated Documents to Falsely Charge Clarence Shipley**

79.      On November 2, 1991, Det. Brown and Det. Disney obtained an Arrest Warrant for Mr. Shipley and a Search Warrant for his residence based on the photographic identification by Edward Smith.

80.      The Application for a Statement of Charges, written by Detective Disney, stated that Mr. Shipley was 5'10" tall and 20 years old—six to seven inches taller than Mr. Smith had previously described the Murderer and almost a decade younger. It repeated the false story allegedly told by Mr. Scott. It omitted BPD's promise to give Mr. Scott a lenient sentence, the Officer Defendants' assault

of Mr. Scott, and their fabrication of evidence. It also omitted Edward Smith's initial descriptions of the Murderer that did not match Mr. Shipley and his assertion that Larry Davis was the culprit.

81.     The Affidavit supporting the request for a Search Warrant was also false. In the Affidavit, Det. Brown, with Det. Disney's knowledge, falsely relayed the witnesses' description of the Murderer. Detective Brown stated that both Edward Smith and Allan Scott described the Murderer as 20 years old, which was Mr. Shipley's age at the time. In fact, Edward Smith described the Murderer as 29–30 years old, and Mr. Scott's alleged statement describes his assailant as 18–19 years old. The false Affidavit also stated that a witness who could only be Mr. Scott reported that the assailant was wearing a dark hoodie, falsely conforming to what Edward Smith said. In truth, Mr. Scott's alleged statement described the Murderer as wearing a red 49ers coat with a hood and a blue sweatshirt. Finally, Det. Brown stated that Mr. Scott identified his alleged assailant as Clarence Shipley, which was also untrue.

82.     As a result of the false documents described above, which were forwarded to the prosecutor, Mr. Shipley was falsely charged with murder, assault, attempted robbery, and related gun crimes on November 2, 1991.

**G.     To Conceal Their Misconduct, the Officer Defendants Failed to Conduct a Good-Faith Investigation into Mr. Shipley's Alibi or Alternative Suspect Larry Davis**

83.     On November 2, 1991, the same day the Officer Defendants sought Mr. Shipley's arrest warrant, BPD received a call from an anonymous woman who stated that Larry Davis killed Kevin Smith. She told BPD that Larry Davis was living with his girlfriend at the girlfriend's apartment and gave the girlfriend's name and location. She stated that the murder weapon was at that apartment and that Edward Smith would come forward and identify Larry Davis once Mr. Davis was "off the street." The caller described Larry Davis as 5'4" and 130 pounds. Detectives Brown and Disney received the notes from this call but conducted no further investigation into Larry Davis at this time.

84.    The contents of the prosecutor's file at the time of the trial are not currently known. Mr. Shipley's attorney did not cross examine Edward Smith on whether he would come forward and name Larry Davis as the true Murderer if Davis were "off the street." Given that Edward Smith was the linchpin of the State's case and any competent defense attorney would have cross-examined Smith on evidence demonstrating he believed Davis—not Clarence Shipley—was the Murderer, it is a reasonable inference that the Officer Defendants did not disclose this call from an anonymous woman to the prosecutor and the defense never received it.

85.    On November 3, 1991, consistent with his innocence and his belief that BPD would conduct a good-faith investigation, Mr. Shipley turned himself into BPD when he heard he was a murder suspect. That same day, Detectives McLarney, Brown, Disney, and other BPD officers searched Mr. Shipley's house. Despite Mr. Smith's two descriptions of the Murderer, both mentioning a black hoodie and blue jeans, the Officer Defendants did not find a black hoodie or blue jeans during the search, or any physical evidence linking Mr. Shipley to the murder of Kevin Smith.

86.    Detectives Brown and Disney interrogated Mr. Shipley on November 3. Mr. Shipley denied the murder, stated that he was at the home of his girlfriend at the time of the shooting, and gave the detectives the address. Mr. Shipley stated that his sister, Michelle, told him that the Murderer was "Larry from Cherry Dale."

87.    In a BPD Report dated November 3, 1991, Det. Brown and Det. Disney stated that "it appears that Shipley will use 'Larry Davis did it' as an alibi defense." The detectives reported only that Mr. Shipley "made a verbal, self serving statement" and "a brief exculpatory statement, in which inconsistencies are noted," without describing the alleged inconsistencies.

88.    After the November 3, 1991, interrogation of Mr. Shipley, the detectives made no further effort for months to locate or interview Larry Davis.

89.    The detectives made no further effort for months to follow up on Mr. Shipley's alibi.

90.    Detective Brown interviewed Michelle Shipley again on November 7, 1991. Ms. Shipley named other potential witnesses and repeated that she would recognize the Murderer if she saw a recent photograph.

91.    On November 27, 1991, a man named Larry Reginald Davis was arrested for armed assault and robbery in the 300 block of Bridgeview Road, about two blocks from the site of the Kevin Smith murder. Detectives Brown and Disney reviewed Mr. Davis's arrest records on December 3, 1991. They did not interrogate or investigate Mr. Davis for the murder of Kevin Smith.

92.    Finally, on or around January 2, 1991, Detective Brown and Detective Richard James interviewed Larry Reginald Davis, who was at that time held at the Baltimore City Detention Center. Detectives Brown and James went into the interview with the intent to create a record exculpating Mr. Davis, to protect the arrest of Mr. Shipley.

93.    The detectives fed Mr. Davis details about the Kevin Smith murder, including the time, date, and location, and only then asked Mr. Davis what he could tell them. Mr. Davis admitted to being near to the site of the shooting when he heard from "Derrick" that people suspected him of killing Kevin Smith. He denied shooting Kevin Smith but admitted to going to the murder scene minutes later. Mr. Davis claimed that he had heard that Edward Smith and "Scooter" had set up the robbery together. He claimed he then went home to his girlfriend, Lachette Goodwin. He claimed that he had talked to Edward Smith in November 1991 and asked him whether he started the rumor that he had killed Kevin Smith. The interview lasted less than 30 minutes.

94.    While Det. Brown later testified at Mr. Shipley's trial that Assistant State's Attorney Ilene Nathan attended this interview, this testimony was false. While the documentation of the interview states that Dets. Brown and James were present, there is no documentation suggesting the presence of a prosecutor.

17

95.     The notes from this interview were not disclosed to the prosecutor or defense counsel.

96.     As the secondary investigator on the case, Det. Disney was familiar with the interview of Larry Davis and knew the notes from that interview had not been disclosed.

97.     Mr. Davis agreed to a polygraph and a line up. BPD never conducted either. BPD detectives did not present any witness with a photo of Larry Reginald Davis, in an array or otherwise. Nor did they conduct a line up.

98.     BPD detectives never re-interviewed Edward Smith or investigated the story that he had set up his brother's robbery. They also never followed up with people Larry Davis claimed to have seen the night of the murder to confirm Larry Davis's whereabouts. They did not follow up with the potential witnesses named by Michelle Shipley.

99.     In May 1992, at the urging of Mr. Shipley's attorney, Detective Brown finally interviewed Mr. Shipley's alibi witnesses.

100.    BPD conducted no further investigation.

101.    The Officer Defendants failed to conduct a good-faith investigation into Mr. Shipley's alibi, potential witnesses, or Larry Davis in order to protect their arrest of Mr. Shipley and avoid exposing their wrongdoing with regard to their fabrication and withholding of evidence.

**H.     The Supervising Officer Defendant Failed to Adequately Supervise the Smith Murder Investigation and Appropriately Intervene**

102.    At all times during the Smith murder investigation, Sgt. McLarney oversaw the Smith murder investigation. He signed off on the Case Review Form indicating that "all documents" regarding BPD's investigation of Kevin Smith's murder had been "read and noted."

103.    Sgt. McLarney was familiar with the course of the homicide investigation. He reviewed the documents generated in the course of the investigation. He knew that certain documents, including the note about Edward Smith identifying Larry Davis as the murderer and

18

Edward Smith's statement to Det. Bowman, were kept out of the homicide file or otherwise withheld from the prosecutor. He knew that BPD officers had coerced Allan Scott's testimony and failed to record information from the interview with Allan Scott on November 5, 1991. He knew that officers failed to disclose the information about Larry Davis to the prosecutor and failed to investigate Larry Davis's involvement in the Kevin Smith murder. He failed to take any corrective or disciplinary action or raise these issues with the prosecutor.

**I.      Mr. Shipley's Murder Trial Lasted Three Days**

104.    Prior to the trial, Mr. Shipley was offered a plea for 25 years with all but 10 years suspended. Mr. Shipley maintained his innocence and rejected the plea.

105.    On June 10, 1992, a jury trial began. The only issue contested at the trial was the identity of the Murderer.

106.    The only evidence of Mr. Shipley's guilt that the prosecutor offered in her opening statement was Edward Smith's photo identification of Mr. Shipley.

107.    During the three-day trial, the prosecutor called one eyewitness for her case-in-chief—Edward Smith.

108.    Edward Smith was the only witness to identify Mr. Shipley as the Murderer. Edward Smith testified that prior to the shooting, he had been hanging out with someone named Reginald as well as Michelle Shipley and his brother Kevin. He stated that he had known Michelle Shipley for about six years, that he spent a lot of time with her, and that he frequently visited her neighborhood. He testified that he knew the Shipleys lived two blocks from him, that he had seen Clarence Shipley around a number of times before the shooting, and that he knew Clarence was Michelle's brother.

109.    Despite Edward Shipley's statement to police the night of the murder that he saw the suspect on Shellbanks before the shooting, at trial he testified that he did not see Mr. Shipley the night of the murder before the murder.

19

110.    Edward Smith testified that the shooter pulled out the gun with his right hand.

111.    Prior to the trial, BPD detectives improperly coached Edward Smith on his testimony. For example, they fed him information about Mr. Shipley's alibi. Despite claiming not to know Mr. Shipley personally, Edward Smith's testimony revealed that he was familiar with Mr. Shipley's defense and that he knew where Mr. Shipley's girlfriend lived. He testified that Mr. Shipley fled the scene towards "where he say he was at, at first, where he said his girlfriend live at." Detectives did not disclose their improper coaching of Edward Smith to the prosecutor.

112.    The contents of the prosecutor's file at the time of the trial are not currently known. Mr. Shipley's attorney did not cross examine Edward Smith on the statement he gave to Det. Bowman, in which Edward Smith claimed to have seen the Murderer earlier in the evening before the shooting and in which Edward Smith gave a description of the Murderer that was inconsistent with Mr. Shipley's physical appearance. Given that Edward Smith was the linchpin of the State's case and any competent defense attorney would have raised these exculpating inconsistencies, it is a reasonable inference that the Officer Defendants did not disclose Edward Smith's statement to Det. Bowman to the prosecutor and that the defense never received it.

113.    Detective Brown testified that he was aware of other witnesses identified by Michelle Shipley and that he did not interview these witnesses. He stated that Michelle Shipley told him on October 26, 1991, that she had not seen anything. In fact, Ms. Shipley said she could recognize a recent photo of the Murderer.

114.    Detective Brown also falsely stated that Larry Reginald Davis was not involved in the murder and that Larry Davis's accusers were likely Shipley's friends trying to throw him off track.

115.    Because the Officer Defendants concealed the notes of the January 1992 interview with Larry Davis, Mr. Shipley's attorney could not effectively cross Detective Brown on his knowledge that Larry Davis admitted to being near the scene of the crime during the murder and at

the scene shortly thereafter. He could not cross-examine Detective Brown on the fact that the Shipleys could not have originated the rumors about Mr. Davis to protect Mr. Shipley, because those rumors began minutes after the shooting, long before Clarence Shipley was a suspect.

116.     Detective Brown falsely testified that Mr. Scott had given BPD Clarence Shipley's full name.

117.     Mr. Shipley presented six alibi witnesses who testified that he was at the residence of his girlfriend, Khadijah Webb, at the time the murder occurred.

118.     Mr. Shipley's mother, Ola Shipley, testified that Mr. Shipley is left-handed and that she had never seen him wearing a dark hoody.

119.     In its rebuttal case, the State presented the testimony of Mr. Scott to undermine Mr. Shipley's alibi and cast him in a criminal light. In transit from the Maryland Correctional Institute – Hagerstown, to the trial, BPD officers told Mr. Scott to implicate "Scooter" in the murder and threatened more charges against him for the car thefts if he did not. The substance of this conversation was not disclosed to the prosecution or defense.

120.     Mr. Scott testified that he had lived in Cherry Hill his entire life and knew Mr. Shipley from the neighborhood. When asked about information that he had allegedly provided placing Mr. Shipley in the immediate vicinity of the murder, Mr. Scott testified that he was not at the location he had previously told the police he was at that evening. He was then impeached with his prior inconsistent grand jury testimony. His false account of being robbed on October 25, 1991, by Mr. Shipley shortly before the Kevin Smith murder, in the vicinity of the murder, was read onto the record. His testimony thus falsely placed Mr. Shipley at the scene of the murder during the time Mr. Shipley's alibi witnesses testified he was with his girlfriend.

121.     The trial ended on June 13, 1992, with Mr. Shipley's wrongfully convicted on all counts.

21

122.    On July 13, 1992, a Court sentenced Mr. Shipley to life in prison plus 20 years for "something [he] didn't do."

**J.    Mr. Shipley Fought 27 Years for Freedom**

123.    Mr. Shipley filed numerous motions challenging his conviction in the 27 years of his incarceration.

124.    In January 2014, Mr. Shipley's friends and relatives raised sufficient funds to retain a private investigator to reinvestigate his case.

125.    The investigator referred the case to Michele Nethercott, then the Director of the University of Baltimore Innocence Project Clinic. Ms. Nethercott collaborated with the Office of the Public Defender and the Mid-Atlantic Innocence Project.

126.    Ms. Nethercott requested that the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office review and investigate the case.

127.    At the conclusion of the reinvestigation of the case by the CIU, the CIU took the rare step of joining Mr. Shipley in a Joint Petition for the Issuance of a Writ of Actual Innocence.

128.    On December 18, 2018, the Baltimore City Circuit Court granted the Petition, and the SAO dismissed the charges.

129.    Finally, Mr. Shipley came home to freedom.



**Clarence Shipley in 2019 after winning his 27-Year Fight for Freedom
(Credit: *The Washington Post*)**

**K.** **Since At Least the 1960s, the BPD Has Engaged in a Pattern and Practice of Unconstitutional Misconduct and Failed to Maintain Policies or Training Necessary for Its Officers to Meet Their Constitutional Obligations**

130.    The unconstitutional conduct that led to the wrongful convictions of Mr. Shipley was part of a longstanding pattern and practice within the BPD of unconstitutional conduct in the course of homicide investigations. At the time of Mr. Shipley's wrongful convictions and throughout his incarceration, the practices described in this Complaint were sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which the BPD had actual or constructive knowledge.

131.    The BPD has long maintained a policy, practice, or custom of: using coercive techniques in interviews and interrogations to obtain confessions and false statements; fabricating inculpatory evidence; withholding exculpatory and impeachment evidence from prosecutors, defense attorneys, and judges; and, in bad faith, failing to conduct investigations in order to shield earlier wrongful acts in the course of homicide investigations.

132.    These practices were sufficiently widespread that BPD knew or should have known that its officers engaged in such conduct. Nevertheless, it failed to take action to stop such conduct, including refusing to investigate or discipline officers it knew or should have known had so abused their offices. By deliberately turning a blind eye, BPD condoned, facilitated, and encouraged these practices.

133.    Despite actual or constructive knowledge that its officers required more training on their obligations regarding the disclosure of evidence, interactions with witnesses (including teenagers), and the conduct of investigations in homicide cases (including the need to follow leads that contradicted detectives' prevailing theory of the case), BPD failed to provide adequate training or policies on these topics. Its failures perpetuated the kinds of unconstitutional misconduct in Mr. Shipley's case.

134.    BPD's long history of unconstitutional misconduct goes back to at least the 1960s.

135.    In 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager. It was later discovered that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman. A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax. Rather than present all evidence to the prosecutors, the BPD officers presented incomplete and fabricated reports. Mr. Lomax was granted a new trial based on these violations, and the State dismissed the charges.

136.    In 1974, Michael Austin was convicted of shooting and killing a private security guard. BPD officers, among other violations, failed to turn over to both prosecutors and the defense a non-identification of Mr. Austin by the eyewitness with the best direct view of the murder. BPD officers also failed to disclose that the same eyewitness again refused to identify Mr. Austin as having been one of the two perpetrators of the crime when they came back and showed the witness a second set of photographs containing at least one photo of Mr. Austin. BPD officers also failed to investigate other potential suspects and buried exculpatory evidence. The trial prosecutor later testified, "[H]ad I known then what I know now, I would have never prosecuted the case."

137.    In 1981, Wendell Griffin was convicted of the murder of James Wise. As part of that investigation, BPD homicide detectives engaged in substantial misconduct, including suppressing the results of two photo arrays shown to an important witness who had *not* identified Mr. Griffin; suppressing witness statements that excluded Mr. Griffin as the murderer; and failing to include material information in an affidavit for a search warrant for Mr. Griffin's car. Donald Kincaid, a BPD homicide detective, also coerced another key witness, Delores Queen, into falsely testifying by

threatening her with a perjury prosecution and possible loss of her children if she did not

"cooperate" with him. Det. Kincaid himself testified:

> Q.     What if anything did you tell Delores Queen when you first picked her up?
>
> A.     I told her I received certain information that she told she know [sic] about this homicide. And if she didn't cooperate with me, under the law and [with] the assistance of the State's Attorney's Office, I could summon her to the Grand Jury, have her put her testimony to the Grand Jury and I would come with the witnesses that gave me the information and this witness would testify. And if the Grand Jury felt she was lying, the State's Attorney's Office could bring perjury charges against her. If perjury charges were brought, she could be arrested and lose her children.

138.    In 1984, Alfred Chestnut, Andrew Stewart, and Ransom Watkins were wrongfully convicted of the murder of a 14-year-old. They were arrested as teenagers and spent a combined 108 years wrongly incarcerated. In 2019, evidence came to light that BPD officers had coerced four middle school students into falsely implicating Mr. Chestnut, Mr. Stewart, and Mr. Watkins; coached the four middle schoolers so their stories would match at trial; concealed their coercive conduct that had extracted the false statements; withheld witness statements that supported the teens' innocence; and deliberately failed to investigate—and later concealed—evidence identifying the likely perpetrator of the murder.

139.    In 1987, Gary Washington was convicted of murder. Twenty-five years later, it was discovered that BPD officers had procured the conviction by coercing false witness testimony and fabricating two statements, including one from a thirteen-year-old. The officers also suppressed exculpatory evidence, including evidence of their own misconduct during the investigation.

140.    James Owens' February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives had fabricated inculpatory evidence from the star witness and withheld evidence of several earlier, inconsistent statements made by that witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

25

141.    Also in 1988, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder. In post-conviction proceedings, counsel for Mr. Coleman elicited testimony from the BPD detective investigating the homicide, Detective Sydnor, that BPD detectives used their discretion to decide which documents to share with state prosecutors. When asked whether he forwarded copies of everything in his file to the prosecutor, Det. Sydnor responded that, "It depends on what it's about. Yeah, if it's pertinent to the investigation, yeah, I would. If it's something between me and another detective I may not."

142.    In a later exchange, Det. Sydnor answered affirmatively when asked, "isn't it fair to say that you do not always photocopy every information sheet and every set of notes that you take but, in fact, you usually concentrate on the ones that you believe are relevant to this offense?" The detective admitted that police did not copy and give to the prosecution everything in Anthony Coleman's case file—rather, the officers presented incomplete or falsified information to prosecutors. Later, during direct examination, the detective explained that "sometimes" he would have witnesses review his notes of their conversation, sign the notes, and adopt them. When witnesses gave "important" statements, he would write them down, but he did not document everything a witness told him.

143.    After determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel, the Court of Special Appeals vacated the judgment denying post-conviction relief and remanded Mr. Coleman's case for further proceedings.

144.    In 1989, Jerome Johnson was wrongly convicted of the murder of Aaron Taylor. In that case, BPD officers concealed a police report containing a statement from the state's star witness (a 15-year-old girl)—the only person to implicate Mr. Johnson at trial—that contradicted her trial testimony. Mr. Johnson uncovered the suppressed police reports while incarcerated. In 2018, he was released after serving 30 years in prison for a murder he did not commit.

26

145.    In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. BPD officers fabricated gunshot residue evidence and suppressed notes and other evidence of an alternate perpetrator. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him were dismissed. In 2017, a federal court jury found that an officer had violated Mr. Burgess's constitutional rights and awarded him $15 million. The evidence at that trial included testimony from BPD detectives that BPD policies and practices did not require the proper documentation and recording of evidence or require officers to disclose evidence to state prosecutors.

146.    Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that BPD officers failed to disclose eyewitness statements and other exculpatory evidence. An independent investigation by *The Baltimore Sun* uncovered additional undisclosed evidence. Not only was this information never disclosed to Mr. Pettiford's trial counsel, it had never been disclosed to Mr. Pettiford's post-conviction counsel. At a hearing on Mr. Pettiford's motion to re-open post-conviction, Judge Ellen M. Heller found that a BPD detective knew he had to disclose a witness statement and that his failure to disclose to do so was "egregious." Mr. Pettiford's plea was ultimately vacated and charges against him were dismissed.

147.    In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that exculpatory witness statements had been withheld and the sole witness recanted her testimony at a post-conviction proceeding.

148.    In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit. Mr. Bryant was exonerated in 2016. Mr. Bryant's post-conviction proceedings uncovered that BPD officers fabricated witness identifications and failed to disclose several key pieces of

evidence exculpating Mr. Bryant and pointing to another suspect, including undisclosed witnesses and witness statements.

149.    In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the shooting death of a 15-year-old boy. At trial, the state presented evidence that a witness identified Jones in a photo array and that Mr. Jones had a particle of gunshot residue on his hand. During the post-conviction phase of Mr. Jones' case, his counsel discovered evidence in the BPD file that the witness who identified Mr. Jones at trial had told a BPD officer that he had not seen the shooting or the murderer. Further, internal BPD documents revealed that gunshot residue results were unreliable because of widespread contamination of police department facilities. Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their production. Ultimately, Mr. Jones' conviction was vacated, and the state nolle prossed the charges against him.

150.    In addition to the instant case and cases dating from the sixties to the nineties demonstrating BPD's pattern and practice of unconstitutional conduct, Lieutenant Stephen B. Tabeling completed a report in 2000 about BPD's Homicide Unit as requested by then-BPD Commissioner Ronald L. Daniel. Lieutenant Tabeling's report found, among other things, that: there is "an apparent mutual lack of confidence and a serious divisive deficiency in teamwork" between the BPD and the SAO; BPD homicide detectives kept case folders in "abysmal condition—that is, when they can be located"; and homicide detectives lacked appropriate processes and protocols for recording information gathered during their investigations. On information and belief, these deficiencies dated to before and during the period when the Officer Defendants committed the misconduct in Mr. Shipley's case.

151.    The BPD's policy, pattern, and practice of misconduct in murder investigations described above was perpetuated by the BPD's failure to train, supervise, and discipline its police officers, even though BPD knew or should have known that further training, supervision, and

discipline was necessary. Instead, BPD sanctioned and facilitated the kind of misconduct that Defendants committed against Mr. Shipley.

152.    For example, there was a failure during the relevant period to train police officers on disclosing exculpatory and impeachment evidence and complying with their obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), despite the obvious necessity of such training, as shown by the public testimony and reports from BPD officers that BPD did not require officers to turn all *Brady* and *Giglio* information over to prosecutors.

153.    In addition to failing to train officers on their obligations to disclose exculpatory and impeachment evidence, BPD maintained no written policies at the time of the Kevin Smith murder investigation instructing officers on those obligations.

154.    BPD maintained no written policies at the time of the Kevin Smith murder investigation instructing officers on appropriate techniques for interviewing witnesses to avoid unconstitutional coercion and/or the extraction of false testimony.

155.    The BPD also failed to properly supervise and discipline its police officers. Evidence disclosed in Jerome Johnson's case revealed that BPD did not discipline a single officer for failing to disclose exculpatory and impeachment evidence, for fabricating evidence, or for improperly influencing witness testimony from 1983 to 1990. On information and belief, no such disciplinary actions occurred prior to the Kevin Smith murder investigation.

156.    Despite actual or constructive knowledge of the pattern of misconduct, including, but not limited to, the repeated failure to disclose exculpatory and impeachment evidence to prosecutors, the defense, and on applications for warrants; the fabrication of evidence, including by improper interrogations; and cover-ups of misconduct in the course of investigations, the BPD and its supervising officials did not act to remedy the abuses described in the preceding paragraphs. They

29

thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to prevent or remedy Mr. Shipley's injuries.

157.    These failures were a direct and proximate cause of the injuries suffered by Mr. Shipley.

**L.    The 27-Year Cost of Clarence Shipley's Wrongful Conviction**

158.    Defendants' misconduct robbed Mr. Shipley of the best years of his life. Only after decades of imprisonment did he regain the freedom that had been stolen from him at age 20.

159.    Mr. Shipley spent more than 27 years caged in Maryland prisons, suffering immense physical and emotional pain throughout his imprisonment. He awoke each day to the torture of being trapped inside a small cell for a murder he did not commit.

160.    He encountered and experienced the violence and degradation inherent to prison life.

161.    For example, while incarcerated, Mr. Shipley lost his youngest son in a tragic fire. He was left to grieve alone, in a dark cage, after every prisoner went to bed.

162.    Today, Mr. Shipley has no relationship with his oldest son due to his decades-long absence.

163.    The aftermath of confinement in Maryland's prisons causes Mr. Shipley to experience flashbacks, night terrors in which he wakes up screaming, anxiety, depression, and post-traumatic stress disorder. He has constant back pain from an assault in prison.

164.    He missed out on seeing the birth of his grandsons. He married his current wife in prison, behind bars.

165.    Today, he struggles with technology and assimilating to life outside of prison. He no longer knows his family, and his family no longer knows him.

166.    Mr. Shipley's injuries and damages were foreseeable to Defendants at the time of their acts and omissions.

167.    All the acts and omissions committed by Defendants were done intentionally, unlawfully, wantonly, recklessly, negligently, and/or in bad faith.

## FEDERAL CLAIMS

### Count I – 42 U.S.C. § 1983
### Violation of Due Process (Fourteenth Amendment)
### Fabrication of Evidence
### (Against Officer Defendants)

168.    Each foregoing paragraph is incorporated as if restated fully herein.

169.    In the manner described above, by their conduct and under the color of state law, the Officer Defendants fabricated evidence against Mr. Shipley.

170.    The Officer Defendants performed the above-described acts in bad faith and under color of state law, deliberately, recklessly, and indifferent to Mr. Shipley's clearly established constitutional rights and innocence. No reasonable officer in 1991 or 1992 would have believed this conduct was lawful.

171.    As a direct and proximate result of the fabrication of evidence of the Officers Defendants, including fabrication of witness testimony, Mr. Shipley suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

### Count II – 42 U.S.C. § 1983
### Violation of Due Process (Fourteenth Amendment)
### Failure to Adequately Investigate and Disclose Exculpatory and Impeachment Evidence
### (Against Officer Defendants)

172.    Each foregoing paragraph is incorporated as if restated fully herein.

173.    In the manner described above, by their conduct and under color of state law, the Officer Defendants deprived Mr. Shipley of his constitutional right to be free from deprivation of

31

liberty without due process of law. The Officer Defendants individually, jointly, and in conspiracy with one another and others, deliberately withheld exculpatory and impeachment evidence. The Officer Defendants also in bad faith failed to adequately investigate the crime, including pursuing leads pointing to the true perpetrator, in order to shield their wrongful acts. In doing so, the Officer Defendants violated their clearly established duty to report to prosecutors all exculpatory and impeachment materials. No reasonable officer in 1991 or 1992 would have believed this conduct was lawful.

174.    Absent the misconduct of the Officer Defendants, the prosecution of Mr. Shipley could not and would not have been pursued, and he would not have been convicted. The misconduct of the Officer Defendants directly led to the unjust and wrongful criminal conviction of Mr. Shipley and his continuing wrongful imprisonment. The Officer Defendants thus denied him of his constitutional rights to be free from deprivation of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

175.    As a direct and proximate result of this violation of his constitutional right to be free from deprivation of liberty without due process of law, Mr. Shipley suffered injuries, including but not limited to the loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

### Count III – 42 U.S.C. § 1983
### Failure to Intervene (Fourteenth Amendment)
### (Against Officer Defendants)

176.    Each foregoing paragraph is incorporated as if restated fully herein.

177.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, the Officer Defendants stood by without intervening to prevent the violation of Mr. Shipley's constitutional rights, although each of the Officer Defendants had the opportunity to do so.

178.   The misconduct described in this Count was objectively unreasonable and was undertaken in bad faith, intentionally, recklessly, and with willful indifference to Mr. Shipley's clearly established constitutional rights.

179.   As a direct and proximate result of the Officer Defendants' failure to intervene to prevent the violation of Mr. Shipley's clearly established constitutional rights, Mr. Shipley suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

**Count IV – 42 U.S.C. § 1983**
**Supervisory Liability (Fourteenth Amendment)**
**(Against Defendant Terrence P. McLarney)**

180.   Each foregoing paragraph is incorporated as if restated fully herein.

181.   Sgt. Terrence P. McLarney was personally involved in the investigation of Mr. Shipley and directly supervised other officers in the investigation.

182.   Detectives involved in the investigation of Kevin Smith's murder acted with impunity in an environment in which they were not adequately supervised by Sgt. McLarney, both in this case and as a matter of practice and custom. Sgt. McLarney had actual or constructive knowledge that Detectives David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, and Richard James were engaging in the unconstitutional conduct described above in the investigation of the Kevin Smith murder. Sgt. McLarney had actual or constructive knowledge that Dets. David John Brown, Sr., Deems Martin Disney, Jr., Robert J. Bowman, and Richard James had previously engaged in similar unconstitutional conduct in the course of murder investigations. Sgt. McLarney had the power to discipline the officers or take other action to prevent these abuses of power but failed to do so.

183.   Sgt. McLarney acted recklessly and intentionally in violation of Mr. Shipley's constitutional rights by failing to adequately supervise Detectives David John Brown, Sr., Deems

33

Martin Disney, Jr., Robert J. Bowman, and Richard James, thereby allowing and causing those detectives to deprive Mr. Shipley of his clearly established constitutional rights, including his right to be free from deprivation of liberty without due process of law.

184. The reckless and deliberately indifferent conduct of Sgt. McLarney violated his clearly established duty, in 1991 and 1992, to supervise the detectives and take action to remediate constitutional violations, and no reasonable police supervisor in 1991 and 1992 would have believed that reckless supervision in the fact of actual or constructive notice of misconduct by their subordinate officers was lawful.

185. As a direct and proximate result of the acts and omissions of Sgt. McLarney, Mr. Shipley suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and he continues to suffer emotional distress.

### Count V – 42 U.S.C. § 1983
### *Monell* Claim (Fourteenth Amendment)
### (Against the Baltimore Police Department)

186. Each foregoing paragraph is incorporated as if restated fully herein.

187. The unconstitutional actions of the Officer Defendants were undertaken pursuant to policies that were ratified by policymakers with final policymaking authority and/or pursuant to persistent and widespread patterns of practice. These policies and practices included regularly failing to disclose exculpatory and impeachment evidence to the defense, prosecutors, and in applications for warrants; fabricating evidence; improperly interrogating witnesses; and in bad faith failing to conduct investigations in order to shield earlier wrongful acts.

188. These policies and practices were so widespread within the BPD as to constitute a "custom or usage" of which BPD policymakers and supervisors had actual or constructive knowledge.

189.    BPD's illegal policies and practices also included the failure to adequately train police officers in the homicide unit on their obligations regarding disclosure of exculpatory and impeachment evidence; fabrication of evidence; interrogations, including of minors; and proper investigation. BPD also failed to maintain clear policies regarding officers' obligations to disclose exculpatory and impeachment evidence to prosecutors regarding appropriate techniques for interviewing witnesses, and regarding the preservation of negative photo arrays, despite the obvious necessity of such policies. BPD also illegally failed to supervise officers in the homicide unit and to supervise and discipline police officers in the homicide unit who engaged in violations similar to those described above.

190.    The BPD's policy, custom, and/or pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative actions, and its policy, custom, and/or pattern and practice of failing to adequately supervise, discipline, and train BPD detectives and officers, is reflected by the multiple acts of misconduct and illegality committed by multiple BPD detectives and officers as described above, and the testimony and reporting of BPD detectives and officers that these practices constituted the official or unofficial policies of the BPD.

191.    BPD maintained the policies, practices, and omissions described in this Count with deliberate indifference to Mr. Shipley's constitutional rights.

192.    The BPD is therefore liable for the misconduct committed by certain Officer Defendants.

193.    As a direct and proximate result of the BPD's actions, Mr. Shipley's constitutional rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and he continues to suffer emotional distress.

## STATE LAW CLAIMS

### Count VI
### Indemnification
### (Against the Baltimore Police Department)

194.    Each foregoing paragraph is incorporated as if restated fully herein.

195.    Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for acts or omissions within the scope of their employment activities.

196.    The Officer Defendants are or were employees of the BPD who acted within the scope of their employment in committing the misconduct described in this Complaint.

197.    Accordingly, the BPD should be ordered to indemnify the Officer Defendants for any judgment entered against them in this matter and to pay such judgment to Mr. Shipley.

### Demand for Damages

Plaintiff Clarence Shipley requests that this Court enter judgment in favor of him and against Deems Martin Disney, Jr., Robert J. Bowman, Richard James, Terrence McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, Leroy Stanton, and the Baltimore Police Department and award him:

1.    Compensatory damages, attorneys' fees, and costs against all Defendants, jointly and severally;

2.    Punitive damages against each Officer Defendant; and

3.    Any and all other relief this Court deems appropriate.

### JURY DEMAND

Plaintiff Clarence Shipley demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues of fact.

36

Dated: March 28, 2022                                Respectfully submitted,

Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com
Andrew D. Freeman (Bar No. 03867)
adf@browngold.com
Chelsea J. Crawford (Bar No. 19155)
ccrawford@browngold.com
Anthony May (Bar No. 20301)
amay@browngold.com

Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21201
Tel: (410) 962-1030
Fax: (410) 385-0869

*Attorneys for Plaintiff Clarence Shipley*