## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **CLARENCE SHIPLEY,** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **v.** | *   **Civil Case No. SAG-21-3173** |
| | * |
| **DEEMS MARTIN DISNEY, JR.,** *et al.***,** | * |
| | * |
| **Defendants.** | * |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>MEMORANDUM OPINION</u>

This case arises out of the arrest, prosecution, and conviction of Plaintiff Clarence Shipley ("Plaintiff") for the 1991 murder of Kevin Smith. Plaintiff's conviction was vacated in 2018, after their attorneys and the Conviction Integrity Unit of the Baltimore City State's Attorney's Office filed a Joint Petition for Writ of Actual Innocence. On December 14, 2021, Plaintiff filed a Complaint against the Baltimore Police Department ("BPD") and various defendants who served as BPD officers during the investigation of Kevin Smith's murder. In Plaintiff's Amended Complaint, those "Officer Defendants" include Deems Martin Disney Jr., Robert John Bowman, Richard James, Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton. ECF 27. BPD and the Officer Defendants have each filed Motions to Dismiss the Amended Complaint ("the Motions"). ECF 33, 30 (respectively). The Court has reviewed each Motion, along with the related Oppositions and Replies thereto. *See* ECF 37, 40, 44, 45. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, the Officer Defendants' Motion will be granted in part and denied in part and the BPD's Motion will be denied.

I.      **FACTUAL BACKGROUND**

The following facts from the Amended Complaint are accepted as true, and all reasonable inferences are drawn in Plaintiff's favor. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). On October 25, 1991, an armed assailant shot and killed Kevin Smith in an attempted robbery in the Cherry Hill neighborhood of Baltimore City. ECF 27 ¶¶ 28-33. At the time of the incident, Kevin Smith was walking with his brother, Edward Smith, and his friend, Michelle Shipley. *Id.* ¶¶ 25-27. BPD responded to the shooting scene. *Id.* ¶ 35. At the scene, Edward Smith told BPD Officer Laura Duerling that the shooter was a black male, approximately 5'8", with a thin mustache, wearing a black hoodie and blue jeans. *Id.* ¶ 37. Homicide Detectives David John Brown and Deems Martin Disney, Jr., were assigned as the primary and secondary detectives on the case, respectively. *Id.* ¶ 34. They arranged for Edward Smith to be transported to the Homicide Unit, where he was interviewed by Detective Robert John Bowman. *Id.* ¶¶ 38-39. In that interview, which occurred less than an hour after the murder, Edward Smith told Detective Bowman that he had told the shooter, "I know you. I know who you are." *Id.* ¶ 39. He described the shooter to Detective Bowman as being a black male, 5'3", 150-160 pounds, with short, wavy hair, 29 to 30 years old, wearing a black hoodie and jeans. *Id.* ¶ 42. Edward Smith explained to Detective Bowman that he had seen the shooter earlier that night, "on Shellbanks near the rental office." *Id.* ¶ 44.

The day after the murder, on October 26, 1991, Edward Smith called the BPD at 10 a.m. to tell them the shooter's name was "Larry Davis." *Id.* ¶ 46. Edward Smith described Davis as a "junkie" who was in his late 20s and lived in Cherry Hill. *Id.* ¶ 46. The BPD employee who took the call wrote the information in a note to Det. Brown. *Id.* ¶ 47. The detectives did not place the

note in the homicide file for the case.  *Id.* ¶ 48.  Along with Det. Brown, Det. Disney and their unit supervisor, Sgt. Terrence P. McLarney, knew about the note.  *Id.* ¶ 49.

Also on October 26, 1991, Dets. Brown and Disney interviewed Michelle Shipley.  *Id.* ¶ 52.  In their report of the interview, filed on October 27, 1991, the detectives reported that Michelle Shipley told them she would be able to identify a "recent" photograph of the shooter.  *Id.* ¶ 53.  The file does not reflect that Michelle Shipley was ever presented with a photo array including Larry Davis.  *Id.* ¶ 54.

Three days after the murder, BPD officers arrested an 18-year-old suspect, Allan Scott, for car theft.  *Id.* ¶ 55.  During the arrest, the officers hit Scott in the head with a "flapjack," causing a contusion, and left him in an interrogation room for about three hours without providing medical attention.  *Id.* ¶¶ 56-57.  Three BPD officers, Henneman, Gerst, and Stanton, then interrogated Scott.  *Id.* ¶ 58.  The officers reported that Scott told them that on the night of Kevin Smith's murder, a man named "Scooter" had robbed Scott at gunpoint near the murder scene.  *Id.*  The officers reported that Scott identified "Scooter" as Clarence Shipley.  *Id.*  However, the officers had yelled at Scott and told him they would charge him with numerous car thefts unless he identified Clarence Shipley as Kevin Smith's murderer.  *Id.* ¶ 59.  Scott did not know Clarence Shipley's real name until the officers provided it to him.  *Id.* ¶ 60.  The officers wrote out and forged Scott's signature on a statement describing the robbery by "Scooter," which described "Scooter" as wearing a red 49ers coat with a hood, a blue sweatshirt, jeans, and red and white tennis shoes. *Id.* ¶¶ 61-62. The statement also described "Scooter" as 5'10", 170 pounds, and 18-19 years old.  *Id.* ¶¶ 61-64.  The statement also admitted that Scott had stolen approximately six cars. *Id.* ¶ 64.

That same day, Officer Henneman told Det. Brown that Scott had information about the Kevin Smith murder. *Id.* ¶ 66. Det. Brown personally spoke with Scott but did not make any notes or write a report of the conversation. *Id.* ¶ 67. Dets. Brown and Disney then wrote a report that included the narrative Scott had provided to Henneman, Gerst, and Stanton. *Id.* ¶ 68. The report stated that the description of the suspect in the Kevin Smith homicide "closely matched" Scott's description of his robber. *Id.* ¶ 69. In fact, there were myriad differences between Scott's description and either description provided by Edward Smith on the night of the murder. *Id.* ¶ 70.

On November 5, 1991, Det. Brown again interviewed Scott, who then testified before the grand jury consistent with the information he had provided to Henneman, Gerst, and Stanton. *Id.* ¶¶ 72-73. Scott was then charged with and convicted of a single car theft. *Id.* ¶ 74.

On November 2, 1991, Detectives Disney, Bowman, and Brown showed a photo array to Edward Smith at his house. *Id.* ¶ 76. Edward Smith reportedly identified Plaintiff as the shooter. *Id.* ¶ 76. Edward Smith testified at trial that he did not know Plaintiff as "Scooter" until one of the officers told him. *Id.* That same day, Dets. Brown and Disney obtained an arrest warrant for Plaintiff and a search warrant for his residence. *Id.* ¶ 79. The application for the statement of charges stated that Plaintiff was 5'10" and 20 years old. *Id.* ¶ 80. It omitted BPD's promise to give Scott a lenient sentence and also omitted Edward Smith's initial descriptions of the shooter and his assertion that the shooter was Larry Davis. *Id.* In the affidavit in support of the search warrant, Det. Brown stated that both Edward Smith and Allan Scott had described the shooter as being 20 years old, which contradicted both witnesses' statements. *See id.* ¶ 42 (Smith stating he was 29-30 years old); *id.* ¶ 62 (Scott saying 18-19 years old). Also, the affidavit stated that a witness (apparently Scott) reported that the robber was wearing a dark hoodie, when in fact Scott

had said he was wearing a red coat and blue sweatshirt.  *Id.* ¶ 62.  As a result of these documents, Plaintiff was charged with murder, assault, attempted robbery, and related gun offenses.  *Id.* ¶ 82.

On that same day, BPD received a call from an anonymous woman who stated that Larry Davis had killed Kevin Smith.  *Id.* ¶ 83.  The caller described where Davis was living and said that the murder weapon was in his apartment.  *Id.*  She also said that Edward Smith would identify Davis once Davis was "off the street."  *Id.*  She described Davis as 5'4" and 130 pounds.  *Id.*  Dets. Brown and Disney received the notes from the call but did not follow up.  *Id.*  The Amended Complaint asserts, by inference, that the prosecution and defense did not receive the notes either. *Id.* ¶ 84.

Plaintiff turned himself into BPD on November 3, 1991 after learning of the arrest warrant. *Id.* ¶ 85.  The search of his home on that same day revealed no physical evidence linking Plaintiff to Kevin Smith's murder.  *Id.*  Dets. Brown and Disney interrogated Plaintiff, who told them he had been at the home of his girlfriend at the time of the shooting and also told them that his sister, Michelle Shipley, told him that the shooter was "Larry from Cherry Dale."  *Id.* ¶ 86.  Dets. Brown and Disney reported that "it appears that Shipley will use 'Larry Davis did it' as an alibi defense" and noted he made "a brief exculpatory statement, in which inconsistencies are noted."  *Id.* ¶ 87. Again, the detectives did not attempt to locate or interview Larry Davis or to investigate Plaintiff's alibi.  *Id.* ¶¶ 88-89.

Det. Brown re-interviewed Michelle Shipley on November 7, 1991.  *Id.* ¶ 90.  She named other potential witnesses and reiterated that she could identify the shooter from a recent photograph.  *Id.*

On November 27, 1991, Larry Reginald Davis was arrested for an armed assault and robbery about two blocks from the scene of Kevin Smith's murder.  *Id.* ¶ 91.  While Dets. Brown

and Disney reviewed his arrest records, they did not interrogate or investigate Davis until January 2, 1991. *Id.* ¶¶ 91-92. On that date, Det. Brown and Det. Richard James interviewed Davis, who denied shooting Kevin Smith but admitted to going to the murder scene minutes later. *Id.* ¶ 93. He said he had heard that Edward Smith and "Scooter" had set up the robbery. *Id.* He also claimed he had then gone to the home of his girlfriend, Lachette Goodwin. *Id.* Davis consented to a polygraph and to a line-up but BPD never conducted either. *Id.* ¶ 97. BPD also did not investigate Davis's alibi until months later when urged by Plaintiff's counsel and did not re-interview Edward Smith. *Id.* ¶¶ 98-99.

The Amended Complaint alleges that the supervising officer, Sgt. McLarney, signed off on the case review form, knew that certain documents were left out of the homicide file, knew that the officers had failed to investigate Larry Davis's involvement, and knew that BPD officers had coerced Scott's testimony. *Id.* ¶ 103.

Plaintiff's trial began on June 10, 1992. *Id.* ¶ 105. The prosecution's case in chief consisted of one eyewitness, Edward Smith. *Id.* ¶ 107. He testified that he did not see Plaintiff on the night of the murder before the shooting. *Id.* ¶ 109. He testified that after the shooting, Plaintiff fled toward "where he said his girlfriend live at" despite claiming earlier that he did not know Plaintiff personally. *Id.* ¶ 111. Det. Brown testified at trial that Michelle Shipley had told him that she had not seen anything. *Id.* ¶ 113. He also testified that Larry Reginald Davis was not involved in the murder and that the persons accusing Davis "were likely Shipley's friends trying to throw him off track." *Id.* ¶ 114. Det. Brown also testified that Scott had given BPD Plaintiff's full name. *Id.* ¶ 116. The Amended Complaint infers, based on the lack of cross examination on these various points, that certain information about the earlier investigation had not been provided to the prosecution and the defense. *Id.* ¶¶ 112, 115.

In the defense case, Plaintiff presented six alibi witnesses who testified that he was in the residence of his girlfriend, Khadijah Webb, at the time of the murder. *Id.* ¶ 117. His mother also testified that he is left-handed, although the shooter had fired the gun with his right hand. *Id.* ¶ 118.

Scott testified for the State in rebuttal. *Id.* ¶ 119. On his way from his place of incarceration to trial, "BPD Officers" threatened additional charges against Scott unless he implicated "Scooter" in the murder. *Id.* Scott testified that he had not been in the vicinity of the murder that evening, but was impeached with his prior grand jury testimony, which was read into the record. *Id.* ¶ 120. At the conclusion of the trial, the jury convicted Plaintiff on all counts. *Id.* ¶ 121. In July, 1992, he received a sentence of life in prison plus 20 years. *Id.* ¶ 122.

The Amended Complaint alleges that the following information was not provided to the prosecutor or the defense in Plaintiff's case: (1) Edward Smith's statement to Det. Bowman at the Homicide Unit the night of the murder, ¶ 45; (2) the note reflecting Edward Smith's identification of Larry Davis as the murderer, ¶ 49; (3) the fact that Scott had been assaulted by BPD officers before his interview and promised a lenient sentence in exchange for information, ¶ 66; (4) any records from Det. Brown's interview with Scott on October 28, 1991, ¶ 67; (5) the notes from the interview of Larry Davis on January 2, 1991,[1] ¶ 95; and (6) information about the threats made to Scott on the way to the trial, ¶ 119.

Approximately twenty-seven years later, on December 18, 2018, following investigation by the SAO's Conviction Integrity Unit, the Mid-Atlantic Innocence Project, the University of

---

[1] The Amended Complaint is unclear in several places when it refers to "notes" from an interview not having been retained or provided to counsel. It appears that Plaintiff concedes that the officers wrote and submitted reports documenting these interviews, but is suggesting that any underlying contemporaneous notes should have been provided as well.

Baltimore School of Law's Innocence Project, and the Office of the Public Defender, the Circuit Court granted a Writ of Actual Innocence, and the State of Maryland dismissed the charges.  *Id.* ¶¶ 125-128.  Plaintiff was released from prison after serving approximately 27 years.  *Id.* ¶¶ 123, 128.

This action followed.  Plaintiff contends that the Officer Defendants engaged in misconduct and actively pursued his wrongful conviction, in accordance with policies and practices maintained by BPD.  Plaintiff further contends that BPD failed to train, supervise, and discipline its employees with respect to investigating crimes and disclosing exculpatory evidence.  Plaintiff seeks recovery of compensatory damages, punitive damages, and reasonable attorneys' fees based on six specific claims for relief.  Count I alleges that the Officer Defendants deprived Plaintiff of his Fourteenth Amendment right to due process, in violation of 42 U.S.C. § 1983, by fabricating evidence.  *Id.* ¶¶ 168-171.  Count II asserts a similar substantive due process claim for failure to adequately investigate and disclose exculpatory evidence by the Officer Defendants, also under § 1983.  *Id.* ¶¶ 172-175.  Count III alleges that the Officer Defendants failed to intervene in the other officers' deprivation of Plaintiff's constitutional rights, again in violation of his due process rights under § 1983.  *Id.* ¶¶ 176-179.  Count IV asserts a § 1983 claim that McLarney is subject to supervisory liability for the violations of his due process rights.  *Id.* ¶¶ 180-185.  Count V asserts a claim against BPD, alleging its liability for the various constitutional violations described above, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *Id.* ¶¶ 186-193.  Finally, Count VI seeks to compel the BPD to indemnify the Officer Defendants, upon a finding of their liability to Plaintiff.  *Id.* ¶¶ 194-97.

## II.     LEGAL STANDARDS

Defendants have filed motions to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), which permits defendants to test the legal sufficiency of a complaint's allegations.  ECF 30, 33; *see, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  Rather, to satisfy the

minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435 at 440 (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, a court is not required to accept legal conclusions drawn from the facts. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## III.   ANALYSIS

### A.  The Officer Defendants' Motion

Plaintiff essentially alleges two substantive due process claims against the individual officers: for fabrication of evidence and for *Brady* disclosure violations. In cases like this, which allege unconstitutional action by an arm of the executive branch of government, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" such that a substantive due process violation lies. *County of Sacramento v. Lewis*, 532 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Specifically, the Supreme

Court in *Lewis* reaffirmed that only official conduct that "shocks the conscience" will give rise to a substantive due process violation. *Id.* at 846-47; *see also, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" (citations omitted)); *Temkin v. Frederick Cty. Comm'rs*, 945 F.2d 716, 720 (4th Cir. 1991) ("[C]onduct which 'amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience,' violates the substantive guarantees of the Due Process Clause . . . ." (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980))). The "most likely" sort of conduct to "shock the conscience," the Court noted, was "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 532 U.S. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Both a *Brady* violation and the manufacturing or falsification of evidence, when they deprive a plaintiff of the right to a fair trial and result in a deprivation of liberty, can constitute substantive due process violations. *See, e.g.*, *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) ("[A] police officer who withholds exculpatory information does not violate the Fourteenth Amendment unless the officer's failure to disclose plausibly deprived the defendants of the 'right to a fair trial.'") (internal citation omitted); *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) ("Demonstration of a violation of Washington's constitutional rights requires, in this context, proof that Wilmore fabricated evidence and that the fabrication resulted in a deprivation of Washington's liberty.").

### 1. Adequacy of Plaintiff's Claims Against Disney

#### a. *Brady* Claim

Plaintiff's first substantive due process claim is that the Officer Defendants deprived him of his liberty interests by failing to disclose exculpatory evidence, as required by *Brady v.*

11

*Maryland*, 373 U.S. 83 (1963).   To plead a *Brady* claim, a plaintiff must allege "(1) that the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued."   *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396-97 (4th Cir. 2014).   When, as alleged here, police officers fail to disclose exculpatory evidence, the court can infer bad faith.   *Johnson v. Balt. Police Dep't.*, Civil No. ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020) ("A plaintiff need not demonstrate bad faith directly; it can be inferred through gross deviations from routine police conduct . . . Moreover, bad faith can be inferred when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence.").   Taken as true at the motion to dismiss phase, Plaintiff's allegations implicating Det. Disney, as the second detective on the case, in the withholding of notes from various interrogations, *see e.g.*, ECF 27 ¶ 49, 52, 72, the failure to disclose Edward Smith's inconsistent suspect descriptions, *Id.* ¶ 69, and the withholding of information suggesting Larry Davis as an alternative suspect, *Id.* ¶ 49, 96, are more than sufficient to plausibly infer bad faith suppression of evidence in violation of *Brady*.

### b.   Fabrication of Evidence

Similarly, Plaintiff's Amended Complaint adequately states a claim for a substantive due process violation, premised on the fabrication of evidence by Disney.   The law requires Plaintiff to plead that the defendant fabricated evidence, and that the fabrication caused a deprivation of liberty.   *Washington*, 407 F.3d at 282.   Here, Plaintiff specifically alleges that Disney participated in creating a report that said the eyewitness description of the suspect in the Scott robbery "closely matched" the suspect in the Kevin Smith homicide, where he knew they did not.   ECF 27 ¶ 69.   It is true, of course, that Disney may have a fact-based argument later in the proceeding that the report may not have even been used to arrest or convict Plaintiff, such that it was not the cause of

his deprivation of liberty.  That factual dispute, though, is inappropriate for resolution at a motion to dismiss, where all facts are accepted as true and all inferences are drawn in the plaintiff's favor. On the basic question of whether Plaintiff has plausibly stated a claim for fabrication of evidence against Disney, the claim survives dismissal.

### c.  Failure to Intervene

Finally, Plaintiff's claim for failure to intervene survives as to Disney, because Plaintiff has adequately alleged that Disney was privy to and present for constitutional violations being committed by the now-deceased lead detective on the case, Det. Brown.  *See Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1030 (D. Md. 2019) (noting that a failure to intervene claim requires the officer to know that a constitutional deprivation is taking place and to have a realistic opportunity to intervene to prevent it).  Thus, it is plausibly alleged that even if Disney was not personally engaged in violating Plaintiff's rights, he would have had the opportunity to intervene to prevent Brown's unconstitutional acts.

### 2.    Adequacy of Plaintiff's Allegations as to Defendants Bowman and James

The Amended Complaint, as pled, fails to state a substantive due process or failure to intervene claim against two of the Officer Defendants: Bowman and James.  Other than the introductory paragraphs of the Amended Complaint establishing the identities of the parties, the individual allegations naming those officers are limited to establishing:

- Detective Bowman's interview of Edward Smith at the Homicide Unit about an hour after the murder, ECF 27 ¶¶ 39-44.

- Detective Bowman's participation, with Detectives Disney and Brown, in showing a photo array to Edward Smith on November 2, 1991, *id.* ¶¶ 76-77.

- Detective James's participation, with Detective Brown, in interviewing Larry Reginald Davis at the Baltimore City detention Center on January 2, 1991, *id.* ¶ 92.

Essentially Bowman and James are alleged to have accompanied the primary and secondary investigating detectives to certain interviews.  While the Amended Complaint alleges that "notes" from some of those interviews were not provided to the prosecutor or defense attorney, there are no allegations suggesting that these accompanying detectives, who were not assigned to the case, had any duty to produce case-related documentation to any party or even knew which documents were or were not provided.[2]

Other than those allegations specifically describing innocuous actions taken by Bowman and James, the remainder of the Amended Complaint refers generally to actions by "the BPD Officer Defendants."  In light of the other allegations in this case, that generic phrasing is insufficient to justify an inference, even taken in the light most favorable to Plaintiff, that relief could be granted against Bowman or James.  The most problematic accusations against the other Officer Defendants have to do with their alleged concealment of certain facts from the file and misrepresentations in various filings.  The Amended Complaint does not allege that Bowman or James had any independent knowledge of any of the prior facts in the case that would suggest any intent to frame Plaintiff or to create a false narrative regarding his guilt.  While group pleading can be permissible in certain circumstances, it must be "plausible that each defendant was involved in all of the facts as alleged."  *See Sprint Nextel Corp. v. Simple Cell, Inc.*, Civil No. CCB-13-617, 2013 WL 3776933, at *2 (D. Md. July 17, 2013).  Plaintiff here simply attempts to use group pleading to extend his conspiracy allegations to officers who had no specifically alleged

---

[2] As explained in footnote 3, below, this Court has some doubt about whether, even if the Amended Complaint adequately alleged wrongdoing against Bowman and James, that wrongdoing would support a § 1983 claim against them predicated on a *Brady* violation.  Regardless, though, the Amended Complaint simply does not adequately allege conduct by Bowman and James that arises to a constitutional violation.

involvement in the problematic portions of the investigation, without pleading any plausible factual basis to do so.

Plaintiff's attempt to analogize his case to *Burgess v. Balt. Police Dep't.*, Civil No. RDB-15-0834, 2016 WL 795975 (D. Md. Mar. 1, 2016), is misplaced.  In response to the defendants' charge of "group pleading," the *Burgess* Court credited the Plaintiff's representation that "his use of the collective noun is not an effort to name 'everyone that could have been involved,' but rather a calculated decision to accuse all named parties."  *Id.* at *10 (internal quotation omitted).  Here, Plaintiff has not pled facts from which this Court can plausibly infer Bowman's or James's knowledge of the allegedly false information, their participation in a decision not to disclose exculpatory information, or even their awareness that any other Officer Defendants engaged in any unconstitutional actions.

Further, the failure to intervene count in Count III similarly fails against Dets. Bowman and James.  That Count contains no additional factual allegations, but simply alleges that "[i]n the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the BPD Officer Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so."  ECF 27 ¶ 177.  Other than improper group pleading, the Amended Complaint's factual allegations do not even put Bowman or James in a position where they could have observed the alleged violations of Plaintiff's constitutional rights, or "stood by" while they occurred.  Therefore, all of Plaintiff's claims will be dismissed, without prejudice, as to those two defendants.

### 3.  Adequacy of Plaintiff's Allegations Against Henneman, Gerst, Stanton

Taking the allegations in the Amended Complaint as true, it contains sufficient allegations to plead (1) a fabrication of evidence claim and (2) a failure to intervene claim against Defendants Henneman, Gerst, and Stanton.  The Amended Complaint suggests that those three officers, who were aware that the witness, Scott, had been assaulted and deprived of medical attention, fed him false information and threatened to charge him more severely unless he implicated Plaintiff in the Kevin Smith murder.  It also alleges that those three officers forged a statement purportedly from Scott implicating Plaintiff.  Those allegations are sufficient, at this early stage in the proceeding, to state claims for fabrication of evidence and failure to intervene, because each officer would have been in a position to observe the other two violating Plaintiff's constitutional rights.  They do not suffice, though, to state *Brady* claims against these three officers.  The facts Plaintiff alleges do not establish any duty on the part of these officers to investigate the Kevin Smith homicide or to transmit evidence to the prosecutor or defense attorney in Plaintiff's case, which was not assigned to them.[3]  Accordingly, Count II will be dismissed as to these three defendants.

---

[3] While the parties' briefing does not address it, the claims in this case raise a difficult question about the scope of *Brady* obligations as they relate to police misconduct and attendant § 1983 claims.  While there is "some question as to the exact nature of the duty of police officers with regard to exculpatory evidence" the Fourth Circuit has "attempted to clarify the ambiguity by articulating two necessary characteristics that a § 1983 plaintiff must prove to be entitled to relief on such claims: (1) the officer intentionally, and in bad faith, withheld exculpatory evidence from the prosecution; and (2) the suppression led to a wrongful conviction that was subsequently overturned based upon the alleged *Brady* violation."  *Hash v. Close*, 968 F. Supp. 2d 825, 830 (W.D. Va. 2013) (citing *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc) (Wilkinson, C.J. concurring in affirming the district court's decision due to an equally divided *en banc* panel)).  That said, the Fourth Circuit has also recognized that there is an outer limit to *Brady* obligations with respect to police misconduct and the degree to which knowledge of such misconduct is imputed to the prosecutor, triggering an obligation to disclose it.  *See United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010) ("We draw no hard and fast lines here about the scope of *Brady* imputation, and we reiterate that prosecutors have a duty to learn of exculpatory evidence gathered by those acting on the government's behalf.  But on the facts of this case—where the affected officers and the prosecutors worked across state/federal lines, where no one other than the officers

#### 4.  Adequacy of Supervisory Liability claims against McLarney

Plaintiff alleges that McLarney, the homicide unit supervisor, is liable for the constitutional violations by the detectives he oversaw.  Courts in this district have used the same standard—originally set forth by the Fourth Circuit in *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)—to analyze both *Monell* failure to supervise claims and personal capacity supervisory liability claims.  *Compare Brown v. Bratton*, No. ELH-19-1450, 2020 WL 886142, at *34 (D. Md. Feb. 21, 2020) (analyzing *Monell* failure to supervise claim under the Fourth Circuit's *Shaw* standard for supervisory liability) *with Proctor v. Wells Fargo Bank, N.A.*, 289 F. Supp. 3d 676, 690-91 (D. Md. 2018) (analyzing personal capacity supervisory liability claim under the *Shaw* standard).  The difference, however, is that a *Monell* claim turns on whether the municipal defendant has adopted a widespread practice or custom of failing to supervise its officers, whereas a personal capacity supervisory liability claim turns on whether an individual supervising defendant knew about, was deliberately indifferent to, and—through his or her inaction—caused the constitutional injury alleged.  *See King v. Rubenstein*, 825 F.3d 206, 223-24 (4th Cir. 2016) (explaining the difference between supervisory liability standard for official capacity claims including *Monell* claims and personal capacity supervisory liability claims); *Pratt-Miller v. Arthur*, 701 F. App'x 191, 192-94 (4th Cir. 2017) (same); *see also Washington v. Baltimore Police*

---

themselves had any idea of any impropriety, and where the misconduct evidence was unrelated to Robinson's own investigation—the principle of imputed knowledge cannot be said to apply."). While this Court declines to tread new ground on this issue, the Amended Complaint here (at least as alleged against Bowman, James, Henneman, Gerst, and Stanton) appears closer to the facts of *Robinson* than it does to *Hash* because the officers against whom misconduct is alleged were not officers who were directly involved in investigating Plaintiff's case, thus raising the question whether their alleged misconduct could be imputed to the prosecutor such that the prosecutor's failure to disclose it would constitute a *Brady* violation.  Regardless, to the extent Henneman, Gerst, and Stanton violated Plaintiff's constitutional rights, they will be held accountable through Plaintiff's fabrication of evidence and failure to intervene theories of liability.

*Department*, 457 F. Supp. 3d 520, 537 (D. Md. 2020) ("A failure to supervise gives rise to municipal liability 'only in those situations in which there is a history of widespread abuse.'") (quoting *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)).

Plaintiff has not plausibly alleged widespread misconduct, or even any previous misconduct, by any of the officers involved in this case. He has also not plausibly alleged prior misconduct by any supervisees of McLarney's. He has, though, alleged that McLarney had knowledge of his subordinates' misconduct in this case and failed to act on it. *See* ECF 27 ¶ 68 (alleging that McLarney approved a report containing a false narrative); ¶ 103 (alleging that McLarney knew various information, including facts about the alternative suspect, had been omitted from the homicide file and not transmitted to the prosecutor). The allegations that McLarney knew about the misconduct and failed to act on it suffice, at this early stage of the litigation, to state a plausible claim for supervisory liability.

### B. BPD's Motion to Dismiss

BPD's Motion contains four arguments. ECF 33-1. Its first argument, that it cannot be held liable because the case against all of the Officer Defendants is subject to dismissal, is unpersuasive because the claims against several of the officers survive the motion to dismiss.[4] BPD's remaining three arguments, that Plaintiff failed to state a *Monell* claim, that the indemnification claim is not justiciable and premature, and that it enjoys Eleventh Amendment immunity, are addressed in greater detail below.

---

[4] BPD's argument appears limited to the lack of a predicate constitutional injury at the hands of the Officer Defendants, and does not evidently incorporate an argument that the officers' conduct fell outside any BPD policy or custom. ECF 33-1 at 3-6. The Court therefore declines to address that issue.

1. ***Monell* Claim**

Count V of the Amended Complaint alleges that the BPD (1) failed to adequately train its officers on their *Brady* obligations, (2) condoned policies and practices of failing to turn over exculpatory evidence and relying on fabricated evidence in investigating cases; and (3) failed to supervise its employees to prevent constitutional violations.  ECF 27 ¶ 189.  If any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, he may be liable in a suit for money damages.  42 U.S.C. § 1983 (2018).  In *Monell*, 436 U.S. at 690, the Supreme Court held that municipalities may be liable for a plaintiff's constitutional harms pursuant to § 1983.  There are three necessary elements for *Monell* liability. First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).  As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).  Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality.  *Spell*, 824 F.2d at 1389; *see also Owens*, 767 F.3d at 402 ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of *Monell* liability.").  Third, the plaintiff must allege an

affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff.  *Spell*, 824 F.2d at 1389.

### a.  Plaintiff's Failure to Train Theory

The BPD argues that Plaintiff fails to allege *Monell* liability through a failure to train.  ECF 33-1 at 7-14.  A plaintiff can establish the requisite "policy" for *Monell* liability through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" not to provide the training. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Training policy deficiencies can include (1) "express authorizations of unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, and (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty."  *Spell*, 824 F.2d at 1390.  No matter which theory is alleged, the plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training."  *Id.*; *see also, e.g.*, *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018).  Second, a plaintiff must establish that the municipality's failure to train showed a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original).  Deliberate indifference is shown if "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights."  *Harris*, 489 U.S. at 390; *accord Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).  Finally, the plaintiff must show that "the officer's conduct resulted from said training," or lack thereof. *McDowell*, 2018 WL 3756727, at *4 (quoting *Jones v. Chapman*, No. ELH-14-2627, 2015 WL 4509871, at *18 (D. Md. July 24, 2015)).

The BPD first argues that Plaintiff insufficiently alleges a failure to train claim because the Amended Complaint lacks specific allegations regarding the nature of BPD's training programs,

and regarding the specific deficiency in training.  ECF 33-1 at 8-11.  This argument lacks merit.

In this context, it is important to note that, oftentimes, "a plaintiff lacks specific details regarding

the municipal actor's internal policies and training procedures before discovery."  *Johnson*, 2020

WL 1169739, at *34.   Nonetheless, Plaintiff has, in fact, alleged that the BPD's training on

officers' duty to disclose exculpatory evidence pursuant to *Brady* was insufficient.  ECF 27 ¶ 152.

Plaintiff has supplemented this allegation with specific examples, both before and after his

wrongful conviction, demonstrating the results of that failure to train.  *See id.* ¶¶ 137-146.  This is

sufficient to satisfy Rule 8's notice requirement, with regards to the nature of the challenged

training program.  *See Estate of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571,

at *39 (D. Md. Feb. 10, 2020) (finding that specific allegations regarding the BPD's failure to train

officers on disclosing evidence pursuant to *Brady* plausibly alleged the BPD's *Monell* liability to

the plaintiff for the alleged actions of evidence suppression leading to his wrongful conviction for

felony murder); *Jones v. Jordan*, No. GLR-16-2662, 2017 WL 4122795, at *6-7 (D. Md. Sept. 18,

2017) (finding that allegations that the BPD's training on the use of force, de-escalation, searches

and seizures, and supervising misconduct sufficiently stated a *Monell* claim); *see also Johnson*,

2020 WL 1169739, at *34 ("[A]t the motion to dismiss stage, courts should not expect the plaintiff

to possess a rich set of facts concerning the allegedly unconstitutional policy . . . .").  Indeed,

Plaintiff's allegation that the BPD insufficiently trained on officers' *Brady* obligations "during the

relevant [time] period[,]" ECF 27 ¶ 152, places the BPD on notice that its *Brady* training, during

the investigation that led to his wrongful conviction, caused his constitutional harm.

Next, the BPD argues that the Amended Complaint fails to plausibly establish the BPD's

deliberate indifference to the rights of individuals such as Plaintiff.  ECF 33-1 at 12-13.  This

argument is unpersuasive.  In the context of failure to train, deliberate indifference can be shown

through policymakers' choice to retain a training program, despite "'actual or constructive notice' that an omission in the program causes officers 'to violate citizens' constitutional rights.'" *Jones*, 2017 WL 4122795, at *7 (quoting *Connick*, 563 U.S. at 61).

Here, Plaintiff has alleged that from 1968 through 1999, individuals were convicted for murder and other serious crimes in Baltimore City, and that in each of those cases, BPD officers withheld exculpatory evidence.  ECF 27 ¶¶ 135-49.  Several of these individuals have since been exonerated of their charges.  *Id.*  One BPD homicide detective in one post-conviction proceeding allegedly testified "that BPD detectives used their discretion to decide which documents to share with State prosecutors."  *Id.* ¶ 141.  Plaintiff finally asserts that BPD policymakers had "actual . . . knowledge" of this pattern of misconduct, *id.* ¶ 156, which the Court must accept as true at the pleading stage.

Considering all of this, the Court finds that Plaintiff has drawn a sufficient connection between the previous alleged incidents of *Brady* violations, and the violation that he alleges led to his wrongful conviction.  *Compare with Chapman*, 2015 WL 4509871, at *20 (dismissing a failure to train complaint because the plaintiff "failed to identify a particular BPD training practice or any specific defect," and failed to connect the plaintiff's three examples of alleged use of excessive force with the plaintiff's alleged constitutional violation).  Considering even just these allegations, Plaintiff has plausibly established the BPD's deliberate indifference to homicide detectives' repeated *Brady* violations, and its failure to modify its *Brady* training program.  *See Estate of Bryant*, 2020 WL 673571, at *39.

Finally, the BPD challenges the sufficiency of Plaintiff's allegations regarding causation. ECF 33-1 at 13-14.  This argument similarly fails at the motion to dismiss stage.[5]  As noted, Plaintiff must plausibly allege that the condoned policy or custom has an affirmative causal link to their particular constitutional violation.  *E.g.*, *Spell*, 824 F.2d at 1391.  This causal link is satisfied "if occurrence of the specific violation [alleged] was made reasonably probable by permitted continuation of the custom," such that the specific violation was "almost bound to happen, sooner or later, rather than merely likely to happen in the long run."  *Id.* (internal quotations omitted); *see also, e.g.*, *Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).

Here, Plaintiff has alleged such an "affirmative link" between his wrongful conviction caused by a *Brady* violation, and the BPD's failure to address the deficiency in its *Brady* training.  *See Spell*, 824 F.2d at 1387.  Plainly, a deficient *Brady* training program has a "close fit" to a due process violation stemming from unlawfully withheld exculpatory evidence. Of course, as has been recognized, "the Law of Large Numbers" makes it likely that, at some point, *Brady* violations may occur.  *See Connick*, 563 U.S. at 73 (Scalia, J., concurring).  However, Plaintiff's allegations, supplemented by specific examples of *Brady* violations contemporaneous with the time of his investigation and prosecution, make it plausible that the BPD's failure to address its training deficiency made Plaintiff's alleged due process violation "reasonably probable."  *See Jones*, 2017 WL 4122795, at *9 (finding a "close fit" between an alleged deficiency in the BPD's training on the use of force, de-escalation, stops, and arrests, and the officer's alleged unlawful seizure of, and use of force on, the plaintiff).  Thus, the BPD's motion to dismiss the failure to train *Monell* claim will be denied.

---

[5] Of course, when the factual record is fully developed, the BPD will be free to seek summary judgment.  At that stage, its contention that there were causes of Plaintiff's wrongful conviction unrelated to a lack of *Brady* training can be properly considered.

### b. Plaintiff's Condonation Theory

The BPD also seeks to dismiss Plaintiff's condonation theory of *Monell* liability.  ECF 33-1 at 15-17.  A municipality is liable under a condonation theory "if municipal policymakers fail 'to put a stop to[,] or correct[,] a widespread pattern of unconstitutional conduct.'"  *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389).  To plausibly allege *Monell* liability by condonation, a plaintiff must state facts showing "a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference."  *Id.* at 402-03 (internal alterations and quotations omitted) (quoting *Spell*, 824 F.2d at 1386-91).  In the Fourth Circuit's words: "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."  *Id.* at 403.

The BPD first asserts that Plaintiff has failed to plausibly establish a widespread practice of *Brady* violations at the time of his wrongful conviction, and thus has failed to establish the BPD's deliberate indifference to that practice.  ECF 33-1 at 15-16.  This argument attempts to place far too great of a burden on Plaintiff at the pleading stage.  In *Owens*, the plaintiff – similarly claiming to have been wrongfully convicted due to the BPD's failure to turn over exculpatory evidence – plausibly alleged the BPD's *Monell* liability by condonation through two factual allegations: (1) that "[r]eported and unreported cases from the period of time before and during the events complained of" showed a practice of knowingly suppressing exculpatory evidence; and (2) that "a number of motions were filed and granted during [the relevant] time period," demonstrating the BPD's knowledge of the practice.  767 F.3d at 403-04.  The Fourth Circuit found that Owens's "brief, but non-conclusory, allegations" buttressed his legal conclusion that the BPD adhered to an impermissible custom.  *Id.* at 403.

24

Plaintiff's factual allegations exceed those in *Owens*. He alleges that the BPD maintained a policy of fabricating evidence and suppressing exculpatory evidence. ECF 27 ¶ 131. He further buttresses these factual allegations with specific examples, including six from the 1980s, just before his arrest and conviction. *Id.* ¶¶ 137-44. The BPD is alleged to have failed to act to remedy these wrongful acts. Plaintiff has therefore easily satisfied his burden to establish that a widespread practice of evidence fabrication and suppression existed in the BPD, and that BPD policymakers were deliberately indifferent to that practice in failing to address it. *See Owens*, 767 F.3d at 403-04; *Estate of Bryant*, 2020 WL 673571, at *41-42.

The BPD next argues that Plaintiff fails to allege sufficient facts to "establish any widespread misconduct or temporal proximity to Plaintiff's case." ECF 33-1 at 17. This argument is unconvincing. As the Fourth Circuit has recognized, at the pleading stage, "[t]here is no requirement that" the plaintiff "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish ... causation." *Jordan by Jordan*, 15 F.3d at 339. Indeed, in holding that only the notice pleading requirements of Federal Rule of Civil Procedure 8 applied to *Monell* claims, the Supreme Court stated, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993); *accord Jordan by Jordan*, 15 F.3d at 340. Courts in this District have heeded this call, and held that a plaintiff need only allege that the municipality "was aware of ongoing constitutional violations," and that this awareness allowed the custom of unconstitutional practices to continue developing. *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); *see also, e.g.*, *McDowell*, 2018 WL 3756727, at *6; *J.A. v. Miranda*, No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017). Plaintiff here has done just that. As noted above, Plaintiff

has supplemented these allegations with the type of specific examples that will later be necessary to establish liability, *see, e.g.*, *id.* ¶¶ 137-44. Plaintiff has therefore sufficiently alleged a condonation theory of *Monell* liability. *See Burgess v. Balt. Police Dep't*, No. RDB-15-0834, 2016 WL 795975, at *2, *12-13 (D. Md. Mar. 1, 2016) (concluding that a plaintiff wrongfully convicted in 1995 plausibly alleged a condonation theory of *Monell* liability against the BPD by including three specific examples of alleged *Brady* violations by the BPD in 1981, 1988, and 1995).

### c. Plaintiff's Failure to Supervise and Discipline Theory

The BPD additionally seeks to dismiss Plaintiff's "failure to supervise and discipline" theory of *Monell* liability. ECF 33-1 at 14-15. This position also lacks merit. The Amended Complaint specifically alleges that, "Evidence disclosed in Jerome Johnson's case revealed that BPD did not discipline a single officer for failing to disclose exculpatory and impeachment evidence, for fabricating evidence, or for improperly influencing witness testimony from 1983 to 1990." ECF 27 ¶ 155.

When read in conjunction with the other well-pleaded factual allegations, Plaintiff's failure to supervise and discipline claim properly states a claim for relief. A failure to supervise gives rise to municipal liability "only in those situations in which there is a history of widespread abuse." *Wellington*, 717 F.2d at 936. As noted above, Plaintiff has pled such a history here. And Plaintiff has alleged that, at the time of his wrongful conviction, the BPD condoned a widespread practice of evidence suppression and fabrication. Having had knowledge of this pattern, but failing to act to remedy it, it is plausible that the BPD was also deliberately indifferent to the need to properly supervise and discipline its officers for engaging in those acts. Thus, the BPD's motion to dismiss Count V will be denied.

### 2.      Indemnification Claim

Next, the BPD argues that the indemnification claim asserted against it in Count VI, ECF 27 ¶¶ 194-97, must be dismissed.  ECF 33-1 at 17-20.  It argues that it has state sovereign immunity to the indemnification claim.  *Id.* at 5-6.  It also asserts that the indemnification claim is not ripe because is no judgment against any Officer Defendant.  *Id.* at 17-18.  Both contentions lack merit at this stage.

The LGTCA provides that any "local government," which includes the BPD, "shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment."  Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1); *see id.* § 5-301(d)(21) (including the BPD in the LGTCA's definition of "local government").   Importantly, the LGTCA bars the relevant entity from asserting sovereign immunity as a defense to its indemnification obligation.  *See id.* § 5-303(b)(2); *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 323, 780 A.2d 410 (Md. Ct. Spec. App. 2001) ("[T]he General Assembly waived the BCPD's common law State sovereign immunity only to the extent of the statutory duties to defend and indemnify.").  Further, in *Johnson v. Francis*, the Maryland Court of Special Appeals considered, and rejected, the argument that no individual plaintiff may sue the BPD directly for indemnification.  239 Md. App. 530, 549, 554-55, 197 A.3d 582 (Md. Ct. Spec. App. 2018), *cert. denied*, 463 Md. 155, 204 A.3d 194 (2019).  The Court of Special Appeals reasoned that "[w]hen read in the context with the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff."  *Id.* at 551, 197 A.3d 582. The court therefore specifically held that the LGTCA permits plaintiffs to sue local government agencies directly for indemnification of harms caused by one of the agency's employees acting within the scope of his employment.  *Id.* at 555.

First, the BPD's assertion of state sovereign immunity as to the indemnification claim fails at this stage.  The Court recognizes, of course, that issues of sovereign immunity should be decided "as soon as possible after the State asserts its immunity."  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 & n.4 (4th Cir. 2005).  Determinations of sovereign immunity at the pleading stage are most common in cases in which the entity's sovereign immunity hinges upon whether the relevant statute providing the cause of action properly waives sovereign immunity.  *See, e.g.*, *Robinson v. Pa. Higher Educ. Assistance Agency*, 917 F.3d 799, 802 (4th Cir. 2019) (considering whether the Fair Credit Reporting Act contains a waiver of sovereign immunity); *Constantine*, 411 F.3d at 484-86 (considering whether Congress properly abrogated states' sovereign immunity in passing Title II of the Americans with Disabilities Act).

However, the assertion of sovereign immunity in this instance is fact-dependent.  *See also, e.g.*, *Pele v. Pa. Higher Educ. Assistance Agency*, 13 F. Supp. 3d 518, 527-28 (E.D. Va. 2014) (deferring ruling on an assertion of "arm of the state" sovereign immunity two of the four factors in the analysis were unclear at the motion to dismiss stage); *Palmer v. Kokosing W. Va., LLC*, No. Civ. A. 2:05-0091, 2006 WL 890009, at *2 (S.D. W. Va. Mar. 29, 2006) ("[I]t is too early in the discovery process to be able to determine whether the doctrine [of derivate sovereign immunity] should apply to each of Plaintiffs' claims because there are material issues of fact regarding the nature of the work and Kokosing's obligations under the contract.").  At the Rule 12(b)(6) stage, the Court must construe all facts and reasonable inferences in Plaintiff's favor.  Under that lenient standard of review, and based on the allegations in the Amended Complaint, the Court finds that it is plausible that the Officer Defendants will be found liable, and that they were acting within the scope of their employment when they committed the acts alleged.  Of course, the BPD may raise

its sovereign immunity defense again at a later stage if the Officer Defendants are found not liable, or if the Officer Defendants are found to have acted outside the scope of their employment.

As to the BPD's second argument, the decision of the court in *Johnson*, 2020 WL 1169739, is on all fours. In that case, an exonerated Baltimore City prisoner, Jerome Johnson, sued the BPD and four BPD detectives for his wrongful murder conviction. *Id.* at *1. Mr. Johnson brought § 1983 claims against the detectives, and a *Monell* claim against the BPD. *Id.* Mr. Johnson also pled an indemnification claim against the BPD. *Id.* The BPD argued that the indemnification claim was premature, because there was no judgment against any detective, or a finding that any detective was acting within the scope of their employment with the BPD. *Id.* at *37.

The court rejected these arguments. *Id.* at *38. Collecting a number of cases from Maryland's appellate courts, the court first concluded that there is no case law "preclud[ing] a plaintiff from pleading an indemnification claim before final judgment." *Id.* (citations omitted). Next, the court found that, while some courts have dismissed indemnification claims against the BPD as premature, under the circumstances of Mr. Johnson's case, "permitting [him] to plead an indemnification claim against the BPD at the outset avoids the possibility of redundant litigation, thereby facilitating the efficient resolution of this case." *Id.* The court continued:

> Indeed, for that reason, courts in this District have permitted the BPD to file a cross-claim for indemnification against an officer under [Federal Rule of Civil Procedure] 13(g), seeking a declaration that it has no duty to indemnify despite the officer's liability not having been established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting BPD's Cross-Claim to proceed directly behind [the plaintiff's] claims serves the purposes of Rule 13(g)"); *Harrod v. Mayor & City Council of Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md. July 24, 2019) (same). That approach makes good sense where, as here, "[d]etermining whether [the] Officer Defendants were acting within the scope of their employment will, in turn, determine whether BPD is liable for [the] Officer Defendants' actions." *Bumgardner*, 2019 WL 4115414, at *11.

*Id.*

Similarly, here, Plaintiff has lodged a *Monell* claim directly against the BPD, as well as a number of federal claims against individuals allegedly employed by the BPD at the time of Plaintiff's arrest and conviction. Thus, to facilitate an efficient resolution of this case, and to avoid "the possibility of redundant litigation," the Court concludes that dismissal of Plaintiff's indemnification claim would be improper at this time. *Id.* The motion to dismiss Count VI will therefore be denied. However, to the extent that any discovery would be required solely for the adjudication of the indemnification claim, it makes sense to stay the claim pending resolution of the claims against the BPD employee officers, absent specific permission from this Court to conduct the discovery sooner. *See, e.g.*, *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 288 (D. Md. 2020).

### 3.      Eleventh Amendment Immunity

The BPD argues that it enjoys Eleventh Amendment immunity. ECF 33-1 at 18-21. In several decisions, United States District Judges in this District have rejected the BPD's contention. *See, e.g.*, *Washington*, 457 F. Supp. 3d 520; *Burley*, 422 F. Supp. 3d 986; *Lucero v. Early*, No. GLR-13-1036, 2019 WL 4673448, at *3-5 (D. Md. Sept. 25, 2019); *Parks v. Balt. Police Dep't*, No. TDC-18-3092, ECF 86 (D. Md. Sept. 9, 2019). Having deemed the rationales in those decisions persuasive, this Court hereby adopts them as it has in other cases, and concludes that the BPD is not entitled to sovereign immunity from Plaintiffs' § 1983 claims, at this stage in the litigation. *See, e.g.*, *Johnson v. Balt. Police Dep't.*, 452 F. Supp. 3d 283 (D. Md. 2020), *Washington*, 457 F. Supp. 3d 520. This Court further concurs with the recent explanation given by United States District Judge Catherine C. Blake:

> While state law claims against BPD directly are thus barred, Mr. Earl's § 1983 claim remains viable. BPD asserts it cannot be sued because it is an "arm of the state," entitled to sovereign immunity under the Eleventh Amendment even for the purpose of a § 1983 claim, relying on the established four-factor analysis. In its

reply, however, BPD acknowledges that the Fourth Circuit, while never having ruled directly on whether BPD may claim sovereign immunity to § 1983 actions, has assumed (without substantial discussion) that this immunity does not attach. *Wiley v. Mayor of Baltimore*, 48 F.3d 773, 776 (4th Cir. 1995) (holding "BPD may be held accountable" in a § 1983 action).  In subsequent decisions, judges in this court ha[ve] frequently found BPD to be sufficiently concerned with local matters, independently funded, interconnected with local government, and autonomous from state government so as not to retain Eleventh Amendment immunity. *Alderman v. Balt. City Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997) (applying this analysis to BPD to conclude it was not an arm of the state); *Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 548 (D. Md. 2003) (finding BPD to be "too interconnected with the government of the City" to enjoy immunity from § 1983 actions); *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1026 (D. Md. 2019); *Fish* [*v. Mayor & City Council of Baltimore*, No. CCB-17-1438], 2018 WL 348111, at *3 [(D. Md. Jan. 10 2018)].  Therefore, the court determines BPD does not retain Eleventh Amendment sovereign immunity and is a "person" subject to suit under § 1983.

*Earl v. Taylor*, Civ. No. 1:20-cv-01355-CCB, 2021 WL 4458930, at *3-4 (D. Md. Sept. 29, 2021).

## IV.   CONCLUSION

For the reasons set forth above, the Officer Defendants' Motion to Dismiss, ECF 30, is GRANTED in its entirety as to Defendants Bowman and James, and as to Count II against Defendants Henneman, Gerst, and Stanton, and DENIED as to the remaining claims, and the BPD's Motion to Dismiss, ECF 33, is DENIED.  A separate implementing Order follows.

Dated:  July 15, 2022                                    _____/s/_____
                                                                      Stephanie A. Gallagher
                                                                      United States District Judge