**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **CLARENCE SHIPLEY**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     21-cv-03173-SAG |
| | ) |
| **DEEMS MARTIN DISNEY, JR.,** | ) |
| **et al.** | ) |
| | ) |
| Defendants. | ) |

**OFFICER DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Deems Martin Disney, Jr., Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas

Frank Gerst, and LeRoy Stanton ("Officer Defendants"), by and through their undersigned

counsel, hereby submit the below memorandum of law in support of their motion for summary

judgment.

DATED: May 3, 2024                        Respectfully submitted,


                                         /s/
                                    Shneur Nathan, Bar No. 20707
                                    Avi Kamionski, Bar No. 20703
                                    Alexander S. Rothstein, Bar No. 23228
                                    Ephraim R. Siff, Bar No. 20761
                                    575 S. Charles Street Ste. 402
                                    Baltimore, Maryland 21201
                                    (312) 612-1955
                                    (952) 658-3011
                                    snathan@nklawllp.com
                                    akamionski@nklawllp.com
                                    arothstein@nklawllp.com
                                    esiff@stattorney.org
                                    *Attorneys for Officer Defendants Deems Martin Disney, Jr., Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 2

LEGAL STANDARD ................................................................................................................ 14

ARGUMENT ............................................................................................................................. 14

    I.     Plaintiff's fabrication claim fails because there is no non-speculative evidence that any evidence was fabricated and there is no causal link between the allegedly fabricated evidence and Plaintiff's conviction. .......................................................................................................15

        a.   The October 28th Report cannot serve as the basis for a fabrication claim because its content was true. ..................................................................................................... 16

        b.   Alternatively, Officer Defendants were unaware that Scott's statement was false..... 19

        c.   Allan Scott's written statement and the October 28th Report cannot serve as the basis for a fabrication claim because neither was introduced at trial. ...................................... 20

        d.   Alternatively, Det. Disney was not personally involved in the alleged fabrication.... 21

        e.   Scott has never identified Gerst, or Stanton as the perpetrator of any of the acts alleged in his declaration or deposition testimony and has downgraded his allegations against Henneman to nothing more than speculation. ....................................................... 22

    II.    Plaintiff's *Brady* claim against Disney and McLarney fails because there is no evidence they withheld anything from prosecutors, or, if they did, that the evidence was favorable to Plaintiff or suppressed in bad faith. ..........................................................................................24

        a.   Without Testimony from Plaintiff's Trial Counsel, The Existence of the Trial File, or Any Evidence from the SAO, Plaintiff Cannot Establish that Any Document Was Withheld. ................................................................................................................. 25

        b.   Det. Disney, as the secondary detective, had no duty to ensure that the contents of the H-File were disclosed to the prosecutors. ........................................................... 26

        c.   The Allan Scott Reports are not *Brady* material because Scott's cases were resolved for reasons unrelated to this case and the resolution of Scott's cases was known to ASA Marshall Shure. ......................................................................................................... 26

        d.   There is no evidence that Disney or McLarney withheld any of the evidence that has been produced in this case, and, in the alternative, the produced evidence Plaintiff relies upon was neither favorable nor suppressed in bad faith. .................................................. 28

        e.   Plaintiff is not entitled to an inference that the items whose existence are in dispute were favorable to him or were withheld by Det. Disney in bad faith............................... 29

    III.   Plaintiff's Failure to Investigate claim fails because Officer Defendants investigated Plaintiff's alibi and Larry Davis. ........................................................................................32

IV.    Plaintiff's Failure to Intervene claim fails because there is no evidence that any Officer Defendant observed a constitutional violation compelling a duty to act. ............................... 36

V.    Plaintiff's claim for supervisory liability fails because his underlying claims have been disproven or are purely speculative, or, in the alternative, Plaintiff has not shown that Sgt. McLarney had knowledge of any alleged misconduct. .......................................................... 38

VI.    Alternatively, Officer Defendants are entitled to qualified immunity. .......................... 41

CONCLUSION ...................................................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Supreme Courts**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ........................................................ 14

*Baker v. McCollan*, 443 U.S. 137, 146 (1979)................................................................................ 33

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)................................................................. 14

*District of Columbia v. Wesby*, 138 S.Ct 577, 590 (2018) ........................................................... 42

*Kisela v. Hughes*, 138 S. Ct. 1148, 1153-54 (2018)....................................................................... 41

*Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) ........................................................... 38

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ........................................................................... 42

*Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) ..................................................................... 42

*Scott v. Harris*, 550 U.S. 372, 380 (2007)..................................................................... 16, 18, 24

*White v. Pauly*, 137 S. Ct. 548, 551–52 (2017)............................................................................. 41

**Appellate Courts**

Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999)..................................................................... 16

*Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984)....................................................... 14

*Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) .............................................................. 14

*English v. Clarke*, 90 F.4th 636, 646 (4th Cir. 2024) ................................................................... 16

*Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019).............................................................. 33, 34

*Gomez v. Atkins*, 296 F.3d 253, 264 (4th Cir. 2002) .................................................................... 33

*Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) .................................................................. 33

*Helmig v. Fowler*, 828 F.3d 755, 762 (8th Cir. 2016) .................................................................. 24

*Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)..................................................................... 41

*Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) ............................................................. 30

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)
.................................................................................................................................................. 23

Jenkins v. Keating, 147 F.3d 577, 585 (7th Cir. 1998).................................................................. 16

*Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) ..................................................... 15, 19, 20

*McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir.1996) ........................................................ 24

*Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396–97 (4th Cir. 2014)........... 24

*Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014)..................................................... 19, 20

*Randall v. Prince George's County*, 302 F.3d 188, 203 (4th Cir. 2002)................................... 36, 38

*Shaw v. Straud*, 13 F.3d 791, 799 (4th Cir. 1994) ....................................................................... 39

*Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416–17 (4th Cir. 2014) ................................... 36

Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991) ........................................................... 16

*United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010)....................................................... 24

*United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992)............................................................ 33

*United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) .................................................... 29, 30

*Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir.1992) ..................................................... 24

*Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005)......................................................... 15

*Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985) ........................................................................... 22

**District Courts**

*Blankenship v. United States*, No. 5:18-cv-00591 2020 WL 247313, *8 (S.D.V.V. Jan. 15, 2020) ...................................................................................................................................................... 29

*Bolden v. City of Chi.*, 293 F.Supp.3d 772, 780 (N.D. Ill. 2017) ...................................................... 33

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1159 (N.D. Ill. 2022) ........................................ 21

*Burley v. Balto. Police Dep't.,* 422 F.Supp.3d 986, 1027 (D. Md. 2019)................................. 30, 36

*Howard v. City of Durham*, 487 F. Supp. 3d 377, 404-05 (M.D.N.C. 2020) .......................... 15, 20

*Humbert v. O'Malley*, 2014 WL 1266673, at *13 (D. Md. Mar. 25, 2014) .................................. 33

*Johnson v. Baltimore Police Dep't*, 2022 WL 9976525, at *59-60 (D. Md. Oct. 14, 2022)......... 33

*Johnson v. Baltimore Police Dep't.*, Civil No. ELH-19-00698, 2020 WL 116739, at *24 (D. Md. Mar. 10, 2020)................................................................................................................................ 24

*Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012)........................................................ 15

*McPherson v. Baltimore Police Dep't*, No. CV SAG-20-0795, 2023 WL 5433011, at *18 (D. Md. Aug. 3, 2023)................................................................................. 15, 19, 24, 25, 41

*Salter v. Olsen*, 605 F. Supp. 3d, 1005 (E.D. Mich. 2022) ........................................................ 32

*Washington v. Baltimore Police Dept.*, 669 F.Supp.3d 444, 466 (D. Md. 2023) ....... 14, 25, 30, 32

*Wheeler v. Anne Arundel Cnty.*, 2009 WL 2922877, at *5 (D. Md. Sept. 8, 2009) ...................... 33

*Wilson v. United States*, 332 F.R.D. 505, 518 (S.D. WVa. 2019)................................................. 38

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................................................ 14

**INTRODUCTION**

In June of 1992, a Baltimore City jury convicted Plaintiff Clarence Shipley ("Plaintiff") for murdering Kevin Smith ("Victim") during an attempted robbery. Shipley was arrested on November 2, 1991, after he was identified as the perpetrator by the Victim's brother, Edward Eugene "Gene" Smith. Smith testified at Plaintiff's trial that Plaintiff was the man who shot and killed his brother. A man named Allan Scott was called adversely by the State at Plaintiff's trial and confronted with his grand jury testimony where he testified that Plaintiff robbed him at gunpoint the same night of the Victim's murder. To this day, Smith has not recanted his testimony as to Plaintiff's guilt.

Plaintiff achieved a reversal of his conviction by agreement with then State's Attorney Marylin Mosby after he presented a witness named Dawn Harkless, who told the State (but did not testify under oath) that Davis and not Plaintiff was the shooter. Harkless later gave deposition testimony in this case that she did not actually see the face of the shooter and Plaintiff paid her $500 via "CashApp." In addition, as described below, the State relied upon other questionable hearsay accounts from Scott and Plaintiff's sister that led them to reverse course with Plaintiff's conviction. Nevertheless, the lead prosecutor for the State's reinvestigation testified that she observed no instance of police misconduct; that her decision to join the petition was not based on "police error or… misconduct," but rather on "civilian error." *See* Ex. 17 at 106:20–108:11, 258:21–259:17. The Circuit Court for Baltimore City granted the uncontested Joint Petition for Writ of Innocence in December of 2018 without hearing any testimony.

In this case, Plaintiff brings federal claims against Deems Martin Disney, Jr., Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton alleging (Count I) a due process violation under 42 U.S.C. § 1983 for fabrication of evidence; (Count II) a due process violation under 42 U.S.C. § 1983 for failing to adequately investigate and disclose

1

exculpatory and impeachment evidence; (Count III) failure to intervene under 42 U.S.C. § 1983, and (Count IV) supervisory liability under 42 U.S.C. § 1983. As described more fully below, there was probable cause for Plaintiff's arrest and prosecution based on the eyewitness testimony of Gene Smith and there is no evidence that this account was fabricated. Contrary to Plaintiff's failure to investigate allegations, the undisputed evidence establishes that Det. David Brown (a deceased non-party) went above and beyond his duties in conducting a good faith investigation that pursued legitimate leads. This investigation included interviews with Plaintiff's alibi witnesses in the presence of Plaintiff's counsel and a trial prosecutor; investigation into Plaintiff's theory about a potential alternative suspect; and interviews with witnesses who were known at the time of the investigation. There is simply no admissible evidence that any evidence was fabricated or that exculpatory or impeachment evidence was withheld from Plaintiff or his trial counsel Maynard Rohrback. Finally, Officer Defendants are entitled to qualified immunity.

## FACTUAL BACKGROUND

On October 25, 1991, at 10:55 p.m., BPD broadcasted a call for a shooting in the 700 block of Cherry Hill Road. Officer Laura Deuerling responded to the location and located the victim, Kevin Smith, lying on the ground at the intersection of Cherry Hill Road and Joseph Avenue. *See* Ex. 1 at CS BPD 46 (BPD Homicide File, hereinafter "H-File"[1]). Kevin Smith was pronounced dead at 10:58 p.m. *Id.* Deuerling spoke with the victim's brother, Edward Eugene "Gene" Smith, who reported that they were held up at gunpoint and the assailant shot Kevin as he tried to flee. Deuerling noted in her report that Smith provided a description of the assailant: a black male, approximately 5'8" with a thin mustache and wearing a black hoodie and blue jeans. *Id.* at CS

---

[1] For the Court's edification, Officer Defendants have attached the entirety of Ex. 1 (the H-File produced by BPD), Ex. 2 (the transcripts from Plaintiff's criminal trial), and Ex. 3 (grand jury transcripts).

BPD 48. Smith was transported to the offices of BPD's Homicide Unit (hereinafter "Homicide") to provide a formal statement. *Id.* at CS BPD 49.

Detectives David Brown and Deems Martin Disney, Jr. responded to the scene at 11:15 p.m. *Id.* at CS BPD 35. Det. Brown was assigned as the "primary investigator." *See* Ex. 2 at NK DEF 116. Det. Brown is deceased and was not named as a defendant in this case.

Det. Robert Bowman interviewed Smith at 11:40 p.m. at Homicide where he stated that: (1) he was with "Michelle;" (2) they were coming from "Ruth's" home when they were held up; and (3) he was familiar with the assailant; and (4) he told the assailant that "I know who you are" during the attack. *See* Ex. 1. at CS BPD 73. Smith at this time further described the assailant as a "B/M 5'3 150-160 [lbs.] short wavey hair 29-30 black hoody blue jeans." *Id.* at CS BPD 74. Det. Bowman's notes reflect that at this time Smith described the assailant as 5'4". *Id.* at CS BPD 72.

Det. Christopher Beiling interviewed George Boddy at 11:45 p.m. at Homicide. Boddy stated that: (1) he was walking nearby; (2) he heard one shot and saw people gathering; (3) he saw "Jean" chasing a black male who fled through the St. Veronica parking lot; (4) "Michelle Shipley saw everything;" (5) "Jean" (sic) witnessed the shooting; and (6) the shooter was a short black male wearing dark colored clothing. *Id.* at CS BPD 85.

The H-File contains a note dated October 26 at 10:00 a.m. written by "Sgt. L." and directed to Det. Brown, which reflects a call made to Homicide by Gene Smith. *Id.* at CS BPD 196 ("the Smith Note"). The note states, "…Edward Smith, called in and stated the "shooter is a Larry Davis, B/M, late 20's, lives somewhere in Cherry Hill. Supposed to be a junkie. NFI…" *Id.*[2]

---

[2] As set forth *infra*, Det. Brown clarified this point in his progress report, stating that Smith was merely reporting what the neighborhood was saying, not that Smith personally thought that this was true. *See* Ex. 1 at CS BPD 38. Further, Smith testified at trial that he neither knew Larry Davis nor said anything about him. *See* Ex. 2 at NK DEF 90:17–23.

Det. Brown briefed Homicide command on the progress of the investigation on October 27, 1991. *Id.* at CS BPD 35–39 (the October 27th Report).  The report reflects that Smith was in regular contact with investigators. *Id.* at CS BPD 36–38 (Smith called Homicide to identify "Michelle" as Michelle Shipley and provided her address). *Id.* Dets. Brown and Disney responded to Ms. Shipley's home and interviewed her. *Id.* at CS BPD 37. Det. Brown noted: (1) Michelle was still upset; (2) she advised "she became hysterical upon seeing the gunman and her friend being shot; and (3) she fled the scene because she was "upset." *Id.* The report reflects that Ms. Shipley stated that she could identify the suspect "if she saw a 'recent' photograph" *Id.* Det. Brown further noted that Ms. Shipley "appears reluctant to talk with us;" "grand jury action is planned…" *Id.*

The October 27th Report reflects that Smith "received information from the neighborhood that the shooter was Larry Davis," whom Smith described as a "B/M/28-30" who lived in the Cherry Hill Section. *Id.* at CS BPD 38. Smith stated that he did not know the name, Larry Davis, however, he knew the shooter by sight, having previously seen the shooter in the vicinity of the Cherry Hill Recreation Center. *Id.* At trial, Det. Brown testified that Smith was conveying information he had heard from the neighborhood. *See* Ex. 2 at NK DEF 118:20–119:21. Smith testified at trial that he never said that Larry Davis was the shooter. *Id.* at NK DEF 89:20–90:23. Det. Brown searched BPD arrest files and located one person named Larry Davis with an official residence in Cherry Hill—Larry Darnell Davis. *Id.* at NK DEF 119:22–120:14; Ex. 1 at CS BPD 38. Det. Brown prepared a photo array for Smith that included Larry Darnell Davis, but Smith did not make any identification from this photo array. *See* Ex. 1. at CS BPD 38.

On October 28, 1991, Det. Brown was contacted by Officer Ed Henneman of the Southern District. *Id.* at CS BPD 40–41 (the October 28th Report). Det. Brown reported that uniformed officers arrested Allan Paul Scott for multiple stolen vehicle offenses. *Id.* The October 28th Report

4

reflects that Scott told Henneman that he was held up at gunpoint by "Scooter" approximately 50 minutes prior to the murder of Kevin Smith and at approximately the same location.[3] *Id.* The report provides that "Scooter" was identified as Plaintiff, Clarence Shipley. *Id.* This identification also served to confirm that Michelle Shipley was Plaintiff's older sister. *Id.*

On November 2, 1991, at 8:25 a.m., Det. Brown showed a photo array containing Plaintiff's picture to Smith at his home and in the presence of Det. Disney. *Id.* at CS BPD 42, 53, 75–76. Smith unequivocally identified Plaintiff from this photo array. *Id.* at CS BPD 45, 53, 75. At approximately 11:00 a.m., Officer Histon of the Southern District spoke to an anonymous caller who reported that the shooter was "Larry Davis." *Id.* at CS BPD 52. Histon wrote a report containing the details of the anonymous call; this report is contained in the H-File. *Id.; see also id.* at CS BPD 194 (Det. Brown's note reflecting some of the details of the Histon report). In addition to identifying Davis as the shooter, the anonymous caller provided: (1) a physical description of Davis; (2) the home address of his girlfriend, Lachette Goodwin; (3) a claim that the gun was still in the apartment; and (4) a claim that Gene Smith was in the car with Davis and that Gene would come forward when Davis was off the street. *Id.* at CS BPD 52. On November 2, 1991, Det. Disney submitted an application for Statement of Charges against Plaintiff and Det. Brown obtained a search warrant for Plaintiff's residence. *Id.* at CS BPD 63–69, 171–175.

On November 3, 1991, at 5:00 a.m., Det. Brown, Det. Disney, Sgt. McLarney, and uniformed patrol officers executed a search and seizure warrant at Plaintiff's home. *Id.* at CS BPD 54–55. Plaintiff's sister, Antoinette Shipley, permitted entry. *Id.* Officers seized one pair of sneakers with suspected blood stains and a shoebox containing a handgun holster from the bedroom closet and three items of personal papers from the bedroom dresser. *Id.*

---

[3] At trial, Scott testified that he had known Plaintiff from for 16-17 years. *See* Ex. 2 at NK DEF 310:14–311:16.

Plaintiff turned himself in to the police on the morning of November 3, 1991. *Id.* at CS BPD 42–43. Det. Brown read Plaintiff his rights at 8:10 a.m.; Plaintiff signed and initialed a form to this effect. *Id.* at CS BPD 59. At trial, Det. Brown testified that Plaintiff read the rights "out loud and indicated…that he understood..." *See* Ex. 2 at NK DEF 147:1–16. Det. Brown testified that Plaintiff stated that he was "at his girlfriend's house at 902 Cherry Hill Road when he heard one gunshot. His sister Michelle came down crying. She said she saw who did it. She didn't want to talk to the police." *Id*. at NK DEF 149:18–24. After Plaintiff's arrest, Det. Brown continued his investigation in tandem with ASA Ilene Nathan of the SAO's Violent Crimes Unit ("VCU").

On November 5, 1991, at 10:00 a.m., Det. Brown transported Scott from the Baltimore City jail to meet with him and ASA Nathan. *See* Ex. 1 at CS BPD 87. Det. Brown completed an information sheet with Scott at 10:30 a.m. *Id.* at CS BPD 88. Scott testified before the grand jury at 10:38 a.m.[4] *See* Ex. 3 at NK DEF 9103–06. Scott testified at the grand jury that Scooter attempted to rob him at approximately 10:00 p.m. on the night of the shooting with a silver .32 or .38 caliber revolver and that Scooter had previously and separately robbed both him and his cousin at gunpoint. *Id.* at NK DEF 9105–06. The H-File contains grand jury summonses issued to Det. Brown and Det. Worden, but not to Det. Disney. *See* Ex. 1 at CS BPD 178–83.

On November 7, 1991, Det. Brown and ASA Nathan interviewed Michelle Shipley at SAO/VCU.[5] The H-File contains two pages of notes written by Det. Brown that documented this interview. *Id.* at CS BPD 78–82. ASA Nathan also documented this interview in two pages of

---

[4] At trial, Scott presented as a classic recanting witness. *See* Ex. 2 at NK DEF 311:23–317:13 (Scott: (1) testified that he "[did not] want to answer" whether his grand jury transcript refreshed his recollection because he "[did not] feel up to it;" (2) that he "[did not] want to read the transcript; (3) attempted to deny ever testifying before the grand jury; and (4) finally conceded that no one else "recorded this" and confirmed his grand jury testimony). Since then, Scott claims that he never testified before the grand jury or that he does not recall doing so. *See* Ex. 8 at 8996 (Hoover note from his phone call with Scott); Ex. 11 at Plaintiff 3; Ex. 20 at 231:9–13, 232:13–237:8 (testifying that he recognized the substance of his grand jury testimony as his trial testimony). Plaintiff agrees that he did. *See* ECF 27 at ¶ 73.

[5] At that time, the State's Attorney's Office for Baltimore City was headquartered within the Baltimore City Circuit Courthouses, occupying office space in both courthouse buildings on Calvert Street.

notes. *See* Ex. 4 at SAO MPIA 320–321. During this interview, Ms. Shipley was shown a photo array containing the photo of Larry Darnell Davis. *See* Ex. 2 at NK DEF 126:2–128:14. Ms. Shipley was unable to identify the assailant. *Id.* at NK DEF 127:22–128:1. After the interview, at 9:30 a.m., Ms. Shipley testified before the grand jury. *See* Ex. 3 at 9107–24.

Ms. Shipley testified before the grand jury that: (1) she bumped into Gene and Kevin Smith as she walked to the shopping center to get some dinner for her son; (2) as the group walked back, someone "came behind us," pulled a gun from his jacket and said, "you know what it is;" (3) "[i]t looked like I had seen him before, but I just glanced at his face;" (4) she ran to the bus stop as soon as the assailant "said what he said;" and (5) she did not speak to police on the scene *Id.* at NK DEF 9115:1–9121:19. ASA Nathan did not ask Ms. Shipley if Plaintiff was the assailant, nor did Ms. Shipley ever mention Larry Davis.

On November 27, 1991, Larry Reginald Davis was arrested for an armed robbery occurring in the Southern District. *See* Ex. 1 at CS BPD 6, 104–106. Det. Brown accessed Davis's arrest history on December 3, 1991, at 8:01 p.m. *Id.* at 104–105. At trial, Det. Brown testified that he eventually learned that Davis was detained in the City jail. *See* Ex. 2 at NK DEF 121:15. On January 2, 1992, Det. Brown transported Larry Reginald Davis to VCU. *See* Ex. 1 at CS BPD 99–103. Det. Richard James reviewed the explanation of rights form with Davis. *Id.* at CS BPD 100. Det. Brown witnessed Det. James' explanation and Davis signed the form indicating he understood his rights. *Id.* Det. Brown and ASA Nathan interviewed Larry Reginald Davis. *Id.* at 101–103; Ex. 2 at NK DEF 121:20–122:9. Davis stated that: (1) he was at his girlfriend's home at the time of the shooting; (2) he walked to the scene and was approached by "Derrick" who told him that there was already a rumor that he shot the victim; (3) the rumors persisted in the coming days; and (4) he heard that Gene Smith and Scooter set up the victim to be robbed. *See* Ex. 1 at CS BPD 101–

102. Det. Disney was not present for this interview. Det. Brown testified that Larry Reginald Davis testified before the grand jury after the interview. *See* Ex. 2 at NK DEF 122:8–9.

On January 3, 1992, Plaintiff was indicted for the murder of Kevin Smith, the attempted robbery of Kevin and Gene Smith, and Michelle Shipley, and related firearms offenses. *See* Ex. 5 at SAO MPIA 302–308. Around this time, the SAO assigned the case to ASA Vicki Wash for trial. *See* Ex. 38 at 28:18–29:10; Ex. 40 at 17:5–19:12. On May 5, 1991, Det. Brown interviewed Plaintiff's alibi witnesses in the presence of ASA Wash and Plaintiff's trial attorney, Maynard Rohrback.[6] *See* Ex. 1 at CS BPD 236–245. Det. Brown and ASA Wash spoke to Plaintiff's then-girlfriend, Khadijah Webb, and her siblings, Latrice, Tarik, and Hanif. *Id.* On May 21, 1991, Det. Brown, also in the presence of ASA Wash and Mr. Rohrback, interviewed Earl Griffin, Kevin Hawes, and Theresa Hawes. *Id.* at CS BPD 235.

**Plaintiff is Convicted After Trial Despite his Alibi and Alternative Suspect Defenses.**

The State called Gene Smith as its first witness. *See* Ex. 2 at NK DEF 38:21. Smith testified that: (1) he and his brother Kevin were home watching television and drinking beer at 6:00 p.m. when Kevin went outside to speak with Michelle Shipley; (2) minutes later, the three of them walked to Ruth's home in a nearby apartment complex where they socialized and drank beer for around two hours, and that the only other person present was "Reginald;" (3) the three left around 10:00 p.m. to go to Gene's aunt's house where they stayed for about a half hour before walking to the shopping center; (4) after visiting the liquor store, the group reunited and started walking up Cherry Hill Road; and (5) he noticed a man approaching who put his hood over his head. *Id.* at NK DEF 40:1–22, 44:14–50:9. Smith identified Plaintiff as the man. *Id.* at NK DEF 50:15–24.

---

[6] In April and May of 1992, Mr. Rohrback sent three letters to ASA Wash disclosing the names of his witnesses and arranging for them to be interviewed by Det. Brown and ASA Wash. *See* Ex 6 at NK DEF 688–89, 695.

Smith further testified that: (1) he, Kevin, and Michelle Shipley walked beside each other when Plaintiff approached within two steps, reached into his hoody, pulled out a gun and said, "you know what it is;" (2) the gun was "silver with a barrel;" (3) Plaintiff pointed the gun at his brother Kevin and Michelle ran; (4) he "kept on telling [Plaintiff] I knew who he was," meaning "I knew his face. I recognized his face" from around the neighborhood; (5) his brother tried to flee, but Plaintiff shot him as he ran; (6) he began to chase Plaintiff, telling him that he "was going to get him when I see him;" and (7) that there was no question in his mind that he recognized the shooter. *Id.* at NK DEF 51:9–57:6. Eventually, Smith returned to Kevin, who fell into his arms. *Id.* Smith stayed with his brother until the ambulance came and then went to Homicide and gave a statement. *Id.*; Ex. 1 at CS BPD 71–74. Smith identified the photo array that was shown to him by Det. Brown on November 2, 1991, affirmed his signature and the statement he made in support of his identification of Plaintiff as the shooter. *See* Ex. 2 at 61:1–62:8. Smith testified that Ms. Shipley came by his house to speak with his mother on the following Sunday, but that he did not speak with her at that time or since. *Id.* at NK DEF 62:21–63:5.

Mr. Rohrback cross-examined Smith about his familiarity with Plaintiff and why he was unable to provide additional details about the assailant during his initial interview with detectives. *Id.* at NK DEF 63:19–66:14. Smith cited the shock over watching his brother die but stated that detectives advised him of Plaintiff's name only **after** he identified Plaintiff; Smith testified that he replied, "that's Michelle's brother." *Id.* at 66:19–25 (emphasis added). Smith also denied seeing Ms. Shipley the day after it happened and denied "know[ing] or say[ing] anything about Larry Davis." *Id.* at NK DEF 89:20–90:23.

Plaintiff called Michelle Shipley, his then-girlfriend, Khadijah Webb, three of her siblings, and Earl Griffin, to support his alibi and alternative suspect theories. Ms. Shipley provided an

9

account at trial that deviated significantly from her grand jury testimony. She testified that: (1) she met Gene and Kevin and they walked to "Ruth's" apartment; (2) that Ruth and "Regi" were present—she did not mention Larry Davis; (3) that the group stayed for around 90 minutes drinking beer and using cocaine before leaving to go to the store for more alcohol and cocaine; (4) the assailant approached as they walked on Cherry Hill Road; and (5) she and Kevin ran. *Id.* at NK DEF 185:6–191:7. Ms. Shipley further testified that: (1) as she ran to the bus stop, she heard one gunshot and turned to observe the ensuing chaos, including Gene attending to Kevin; (2) she saw Earl Griffin, who went to get Plaintiff from his girlfriend's home; and (3) when she went to Kevin Smith's mother's house the next day to pay her respects, Gene stated to his mother that the shooter was "Larry Davis." *Id.* at NK DEF 193:4–203:25. On cross-examination, Ms. Shipley acknowledged that she had previously stated that she might be able to identify the shooter if shown a recent picture, but then admitted that she did not look at the shooter's face and that she unequivocally could not identify him. *Id.* at NK DEF 211:16–214:5 (agreeing that there is no way she would recognize his face). Despite Plaintiff's alibi and alternative suspect defenses, the jury convicted him of all counts. *Id.* at NK DEF 369:20–371:19.

**Plaintiff's Efforts to Overturn His Conviction**

In February of 2014, Plaintiff, through Randolph "Bo" Smallwood, retained investigator Gary Hoover to interview witnesses on Plaintiff's behalf with the goal of eventually obtaining post-conviction relief. *See* Ex. 7 at UB Nethercott 1260–61; Ex. 47 at 35:15–36:6 (Plaintiff testifying that Smallwood was one of his best friends in 1991). Hoover attempted to interview Gene Smith but never obtained a recantation from Smith. *See* Ex. 8 at NK DEF 8995. According to Hoover's report, Dawn Harkless told him that Larry Reginald Davis was the shooter but that she never told that to the police or anyone else because she was "young and using narcotics at the

10

time."[7] *Id*. Hoover documented a phone call with Allan Scott. *Id.* at 8996; Ex. 10 at 97:10–98:22. According to Hoover's report, Scott told him in a phone call that he gave false testimony against Plaintiff to "ease his time for the stolen vehicles," "that the investigators promised him lesser time for his cooperation," and that the investigators brought up the name "Scooter" to him. *See* Ex. 8 at NK DEF 8996. Scott further denied ever going before the grand jury or speaking to the homicide detectives until they transported him for trial.[8] *Id.* Hoover's note also reflects that Scott did not recall giving the October 28 statement, but also "regrets" giving it and denies it now as "false."[9] *Id.*; Ex. 10 at 131:16–132:7. Eventually, Hoover presented his case materials and his conclusion to Michelle Nethercott of the University of Baltimore Innocence Clinic, who then presented the case to CIU. *See* Ex. 12 at SAO 146.

In July of 2018, CIU began its reinvestigation into Plaintiff's conviction. CIU Chief, Lauren Lipscomb, presented her findings to then-State's Attorney Marilyn Mosby. *Id.* at SAO 146–153. CIU interviewed Randolph Smallwood, Dawn Harkless, Diallo Jackson, William Ricks, Antoinette Shipley, and Michelle Shipley.[10] *Id.* at SAO 150–52. It did not interview Gene Smith, the sole trial witness who identified Plaintiff as the shooter. *Id.* at 150; Ex. 17 at 221:19–222:8. Harkless stated to CIU that she saw Larry Davis running up Joseph Avenue after she heard the shot. *See* Ex. 12. at SAO 150. ASA Lipscomb reported that Harkless "was deep into drugs at the

---

[7] On December 1, 2015, Harkless executed an affidavit: (1) stating her familiarity with Larry Reginald Davis; (2) identifying herself as a witness who heard the shot and saw Davis running away; and (3) stating that she did not remain at the scene and did not tell anyone until 2014, including police, out of fear for her safety. *See* Ex. 9 at UB Nethercott 33–34. At his deposition, Mr. Hoover testified that he had no role in its creation. *See* Ex. 10 at 129:19–130:2.

[8] Scott contradicts this point in his declaration. *See* Ex. 11 at Plaintiff 3 (Scott alleging that "many officers" tried to coerce him into implicating Plaintiff in the murder throughout his time in custody from arrest through trial).

[9] At his deposition, Hoover testified that Scott did not raise these allegations or that he had no recollection of Scott raising same. *See* Ex. 10 at 99:6–12; 112:17–116:8.

[10] CIU recorded these interviews and produced, in response to this Court's order to compel, recordings of the interviews of Michelle Shipley, Antoinette Shipley, and Diallo Jackson. *See* Ex. 14 at NK DEF 9061. SAO informed Officer Defendants that the recordings of Dawn Harkless and William Ricks could not be located. *Id*. SAO produced CIU's notes from its interview of Harkless. *See* Ex. 15 at NK DEF 9128–30.

time," and did not know Plaintiff had been charged and convicted."[11] *Id.* at SAO 150–51, n. 12. At her deposition, Harkless admitted that she never saw the shooter's face but believed it was Davis based on Davis's build and gait. *See* Ex. 13 at 165:13–166:16 (As described below, Plaintiff later paid Harkess $500 directly and another $500 indirectly). ASA Lipscomb reported that Antoinette Shipley, who had never spoken with police or testified at trial said, "[the shooter] was not her brother." *See* Ex. 12 at SAO 151. Michelle Shipley testified at her deposition that she identified Davis as the shooter during her interview with CIU based on "what I heard from **what I was told**," and that she was "unable to see the face of the shooter." *See* Ex. 16. at 217:17–218:19 (emphasis added).

ASA Lipscomb and CIU never interviewed Gene Smith or Scott. *See* Ex. 12 at 150; Ex. 17 at 221:19–222:8. At her deposition, ASA Lipscomb admitted that CIU: (1) did not consider subpoenaing Smith to appear before the grand jury; (2) was unable to locate Scott, relying instead on Hoover's investigation; and (3) interviewed Hoover but did not document the interview because she did not consider him to be a witness. *See* Ex. 17 at 200:2–202:5, 218:20–222:22, 252:22–253:19; *See also* Ex. 12 at SAO 152; Ex. 8 at NK DEF 8996.

On December 17, 2018, ASA Lipscomb and Michelle Nethercott filed a Joint Petition for Writ of Actual Innocence, which the court granted the following day without hearing testimony; the State promptly dismissed the case. *See* Ex. 18.

In 2019, Plaintiff and Smallwood, visited Harkless at her home on one or two occasions. *See* Ex. 45 at 452:10–453:9; Ex. 13 at 198:5–199:1.[12] Plaintiff admitted that after his release both

---

[11] This information is not contained in the notes preserved by CIU from its interview of Harkless, however it was verified by Harkless at her deposition. *See* Ex. 15 at NK DEF 9128–30; Ex. 13 at 29:8, 55:9–11, 62:9–18.

[12] Notably, Harkless testified that she had no communication with Smallwood without Plaintiff. *See* Ex. 13 at 198:16–199:14; *but see* Ex. 13 at 211:16–17 (testifying that "I didn't talk to Scooter as much as I… talked to [Smallwood].").

he and Smallwood paid Harkless approximately $500 each.[13] *See* Ex. 44 at 5 (interrogatory response stating that Plaintiff sent Harkless $500 after Smallwood "relayed" to him that "[Harkless] needed it for rent."); Ex. 45 at 469:15–470:15 (testifying that both he and Smallwood gave her $500 each because "Dawn need[ed] help with her rent."). At her deposition, Harkless confirmed that Plaintiff, but not Smallwood, sent money to her daughter as a gift through Plaintiff's wife, but they did not "need[]" it. *See* 13 at 122:12–131:18, 132:8–135:14, 203:12–207:15 (testifying that she may have mentioned her difficult situation but did not ask for money); *see id.* at 126:17–127:2 (testifying that the money was sent directly to her daughter via CashApp); *but see* 210:18–21 (testifying that the money was sent to "my CashApp.").

On February 26, 2020, Scott signed a declaration recanting his grand jury testimony and accusing BPD officers of: (1) assault; (2) denial of medical attention and counsel; (3); additional charges unless he implicated Plaintiff; (4) fabrication of his written statement and "[apparent]" falsification of his signature and initials; and (5) continued coercion from "BPD officers" to implicate Plaintiff during his detainment. *See* Ex. 11 at Plaintiff 1–3. Scott speculates, "[w]hile I

---

[13] On October 17, 2022, Officer Defendants propounded three interrogatories asking Plaintiff to identify any witness who sought from Plaintiff or whom Plaintiff offered monetary or other benefits after his conviction for the murder of Kevin Smith was vacated. *See* Ex. 46 at 1, 18–20. On December 2, 2022, Plaintiff responded to Def. Henneman's interrogatories relating to witness benefits stating that "he has no responsive information," but reserved the right to "amend and/or supplement" his response. *Id*. On September 5, 2023, the evening of the close of fact discovery and five days after Plaintiff's deposition, Plaintiff supplemented the interrogatories and provided, *inter alia*¸ that: (1) in 2019 he gave his sister Antoinette Shipley $10,000 by check to assist her with purchasing a car; and (2) he made the payment to Harkless. *See* Ex. 44 at 3–5. As a result, Plaintiff's counsel agreed to reopen Plaintiff's deposition for one hour so that these payments could be explored. During Plaintiff's reopened deposition, Plaintiff revealed for the first time that: (1) his payment of $500 to Harkless coincided with an additional $500 payment to her made by Smallwood; (2) he paid Smallwood $8,000 in three installments from the money he received from the Board of Public Works after his release; and (3) he had provided monetary payments since his release to his other sister, Michelle Shipley, who testified at Plaintiff's trial. *See* Ex. 45 at 469:15–471:12, 495:3–499:16. Plaintiff's counsel was adamant not to go over the additional five minutes he granted for inquiry into these payments to witnesses in his case, however, Plaintiff testified that his failure to identify Ms. Harkless as receiving benefits was because she did not testify at his criminal trial. *See* Ex. 45 at 514:18–515:14; *but see* Ex. 48 at 4 (defining the term "witness" to include one identified as a witness in any party's interrogatory response, or who you may call at trial); Ex. 49 at 3–4 (identifying Dawn Harkless as a person "likely to have personal knowledge of any fact alleged in the pleadings…").

cannot be certain, I believe the BPD officers who **might** have been involved included [Det. Brown, Henneman, Gerst, and Stanton]. There could be other[s]."[14] *Id.* at Plaintiff 3 (emphasis added).

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To determine whether there is a genuine issue of material fact, courts construe the record in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49. If a plaintiff is unable to satisfy the legal requirements necessary to establish a cognizable claim, summary judgment is not only proper, but mandated. *See Celotex*, 477 U.S. at 322.

"Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Washington v. Baltimore Police Dept.*, 669 F.Supp.3d 444, 466 (D. Md. 2023) (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984)); *see also Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that the nonmoving party "must rely more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.").

## ARGUMENT

---

[14] Notably, Det. Disney is not mentioned in Scott's declaration. *See* Ex. 11 at Plaintiff 1–3.

**I.**     **Plaintiff's fabrication claim fails because there is no non-speculative evidence that any evidence was fabricated and there is no causal link between the allegedly fabricated evidence and Plaintiff's conviction.**

To survive summary judgment Plaintiff must adduce evidence that (1) the Officer Defendants fabricated evidence, and (2) the fabrication caused a deprivation of Plaintiff's liberty. *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014); *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005); *McPherson v. Baltimore Police Dep't*, No. CV SAG-20-0795, 2023 WL 5433011, at *18 (D. Md. Aug. 3, 2023); *Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012) ("…unsupported allegations and speculation are insufficient."). To qualify as fabricated evidence, the defendants must have "deliberately" generated false evidence or accepted it despite having "entertained serious doubts as to [its] truth or [having] obvious reasons to doubt the accuracy of the information [they] reported." *Massey*, 759 F.3d at 357; *Howard v. City of Durham*, 487 F. Supp. 3d 377, 404-05 (M.D.N.C. 2020) (quotation omitted). Further, a plaintiff must establish that the conviction and incarceration was a foreseeable result of the fabrication. *Massey*, 759 F.3d at 354

Here, Plaintiff alleges that Officer Defendants fabricated Scott's statement that Plaintiff robbed him less than an hour before the murder and that this account was included in the October 28th Report. *See* Ex. 34 at 7–8 (alleging that the October 28th Report omitted "critical details" regarding the "fabrication of the story that was fed to [Scott]."). Plaintiff also alleges that the application for statement of charges and affidavit in support of a search warrant were fabricated. *Id.* at 8–9; ECF 27 at ¶¶ 79–82; Ex. 1 at CS BPD 62–66, 68–69, 170–75. Notably, Plaintiff does not allege that Officer Defendants fabricated any portion of Gene Smith's statement or his identification of Plaintiff in the photo array. *See* Ex. 1 at 53, 75–76 (Smith stated, "that's him right there, looks just like him. Never forget that face."). Thus, there is no dispute that the police had

15

probable cause to arrest Plaintiff based on Smith's identification.[15] Officer Defendants are entitled to summary judgment on Plaintiff's fabrication claim because he has not shown any non-speculative or unrefuted evidence that Officer Defendants fabricated any evidence or that such evidence was the but-for or proximate cause of his convictions.

### a. The October 28th Report cannot serve as the basis for a fabrication claim because its content was true.

The undisputed evidence does not support Plaintiff's claim that October 28th Report was false. In summary, the October 28th Report reflects that Scott told police that Plaintiff held him up at gunpoint earlier the same evening that the Victim was killed. *See* Ex. 1 at CS BPD 40–41, 93–94. At the close of discovery, Plaintiff cannot piece together evidence that any Officer Defendant actually fabricated the account of Scott.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). At his deposition, Scott admitted that "it was truthful when [he] told [police] that [he] committed numerous auto thefts." *See* Ex. 20 at 222:2–11. Indeed, more than half of his written statement is allocated to the details of those crimes. *See* Ex. 1 at CS BPD 91–94. He also confirmed at his deposition that he had previously been arrested with his cousin, Stanley Harrison, as the police reported. *See* Ex. 20 at 175:14–16, 183:22–24. Further, when asked specifically what the interrogating officers told him to say, Scott replied: "I saw Kevin get shot by Scooter. That's what they told me to say."[16] *Id.* at 257:19–258:23. While Scott clearly was trying to help Plaintiff in his

---

[15] "A victim's "reliable identification of [his] attacker" almost always suffices to establish probable cause." *English v. Clarke*, 90 F.4th 636, 646 (4th Cir. 2024) (citing *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999).

[16] Scott also testified at deposition that he told police officers "anything they wanted me to say," but that he "[did not] know verbatim what [he] said." *See* Ex. 20 at 217:11–16. He also stated that he told them "[w]hatever we had rehearsed

deposition testimony, this brand-new assertion does not match the information attributed to Scott in the October 28th Report, his grand jury testimony, or trial testimony. He never claimed that he witnessed the murder. *See* Ex. 1 at CS BPD 90–95; Ex. 2 at NK DEF 309:21–317:13; Ex. 3 at NK DEF 9103–9106. Thus, Scott's testimony does not support Plaintiff's claim that the October 28th Report was fabricated.

Scott's deposition testimony fatally undermines his 2020 declaration, the document upon which Plaintiff bases much of his fabrication claim. Therein, Scott alleges that his October 28, 1991, statement "is false," that he "never signed" it, and speculates that "it **appears** that BPD officer Heneman [sic]" forged his signature and initials. *See* Ex. 11 at Plaintiff 2–3, 10, 13 (emphasis added). At his deposition, Scott downgraded his allegation pertaining to the Statement Continuation form from "I never signed [it]" to "I don't recall signing it," and that it "could be" his signature. *See* Ex. 11 at Plaintiff 2, 10; Ex. 1 at CS BPD 95, Ex. 20 at 259:19–260:13. He downgraded his allegation related to the explanation of rights from "falsification" to "I just don't recall signing it." *See* Ex. 11 at Plaintiff 2, 13; Ex. 1 at CS BPD 89, Ex. 20 at 294:24–295:20.

Scott's declaration incorporated a redacted version of his statement and explanation of rights, which he agreed were identical to those contained in the H-File aside from the redactions. *See* Ex. 20 at 289:22–291:23; *compare* Ex. 1 at CS BPD 89–95 *with* Plaintiff 5–10, 13. At his deposition, Scott admitted that the signature and initials appearing on the explanation of rights form "look[ed] like" his own.[17] *See* Ex. 20 at 209:10–210:20; Ex. 11 at Plaintiff 13; Ex. 1 at CS BPD 89. Scott denied signing the Statement Continuation page on the basis that he "never" signs

---

for them to tell me – for me to say… I told them that Scooter came up to me and pulled out a gun and said something to me, and I hopped the fence… I watched him shoot the victim… I watched him do it." *Id.* at 220:19–221:6. Notably, Scott said that he did not know which officer "asked him to say it." *Id.* at 221:9–10.

[17] Notably, Scott attempted to distance himself from the explanation of rights when he noticed the date was written by Henneman as "[19]81." *See* Ex. 20 at 210:18–25 Ex. 1 at CS BPD 89; Ex. 11 at Plaintiff 13. However, any claim based on this clerical error is specious considering Scott included it as an exhibit to his own declaration.

his middle initial, however, Scott authenticated his handwriting and signatures on his 1999 Petition for Change of Name, which includes two examples of his middle initial in his signature.[18] *Compare* Ex. 1 at CS BPD 95 *with* Ex. 21 at NK DEF 7377–83; Ex. 20 at 68:8–75:12, 293:6–18. At his deposition, Scott was shown additional exemplars of his own signature, handwriting, and initials from 1991-2010. He arguably authenticated most of them.[19] The similarities among the exemplars gathered over a nineteen year period from multiple Maryland counties are evident, even to a layperson, and, combined with Scott's deposition testimony, "blatantly contradict[]" Scott's equivocal claims of "[apparent]" forgery. *See Scott*, 550 U.S. 372 at 380.

Scott's declaration is further undermined by his testimony that Plaintiff's counsel, Kobie Flowers, incorporated the names of the Officer Defendants into the allegations in the absence of Scott's personal knowledge. *See* Ex. 11 at Plaintiff 2; Ex. 20 at 292:6–22 ("Kobie" put the officers' names into ¶ 7, stating that it "appears that BPD officers Heneman [sic], [] Gerst, and [] Stanton 'interviewed' me for this false statement," because Scott did not know who interviewed him), 293:21–294:20 ( "Kobie" put in Henneman's name as the officer who "falsified my signature and initials," because "I didn't say [he] falsified anything. I don't know who [he] is"), 297:1–5 ("I just told you I did not know any of the officers' names, so obviously, Kobie…put the names in there"), 351:2–352:4 (Scott still unsure where the officers names came from despite reading an exhibit attached to his declaration during questioning—and arguable coaching—by his own attorney).

---

[18] Notably, this document includes two variations of Scott's signature and he authenticated both. *Compare* Ex. 21 at NK DEF 7377, 7379 *with* Ex. 21 at NK DEF 7378, 7380, 7382; *See* Ex. 20 at 68:8–70:24; *see also* Ex. 50

[19] *Compare* Ex. 22 at NK DEF 7371 *with* Ex. 20 at 72:3–21 (identifying signature on NK DEF 7371 as "mine," and confirming he signed it); *Compare* Ex. 22 at NK DEF 7372 *with* Ex. 20 at 73:1–75:3 (equivocating between confirming his signature and lack of memory; equivocating between the initials "look[ing] like my handwriting," but expressing uncertainty over whether he or anyone else wrote them); *Compare* Ex. 22 at NK DEF 7373 *with* Ex. 20 at 75:12–24 (testifying that the signature "looks like my handwriting"); *Compare* Ex. 23 at NK DEF 7607 *with* Ex. 20 at 80:4–83:12 (authenticating his signatures and his printed name); *Compare* Ex. 24 at NK DEF 7609 *with* Ex. 20 at 83:13–24 (authenticating signature); *Compare* Ex. 24 at NK DEF 7613 *with* Ex. 20 at 85:21–86:15 (authenticating signature); *Compare* Ex. 25 at NK DEF 7230 *with* Ex. 20 at 88:14–89:14 (authenticating signature); *Compare* Ex. 26 at NK DEF 7217 *with* Ex. 20 90:8–92:2 (authenticating print, did not recognize signature); *see also* Ex. 50.

In sum, Scott: (1) admitted that much of what appears in his statement to police was true; (2) undermined, if not rejected, his earlier, equivocal allegation against Henneman; and (3) points to Plaintiff's counsel as the source of the names appearing in his declaration. Since Scott himself has eviscerated the allegations that originated with him, there is simply no remaining basis upon which to allege that Officer Defendants had any reason to believe that his statement was false.

### b. Alternatively, Officer Defendants were unaware that Scott's statement was false.

An essential component of a fabrication claim is that the defendants must have known that the evidence was false. *Massey*, 759 F.3d at 357. As this Court has previously held, a plaintiff seeking to establish a fabrication must demonstrate that the alleged fabrication was deliberate. *McPherson v. Baltimore Police Dep't*, No. CV SAG-20-0795, 2023 WL 5433011, at *18 (D. Md. Aug. 3, 2023); see *Petty v. City of Chicago,* 754 F.3d 416, 422 (7th Cir. 2014) (for a witness statement to qualify as fabricated evidence the officer who created it must have known it was false). Here, Plaintiff has no evidence that Officer Defendants knew that the content of the October 28th Report or Scott's statement on October 28, 1991, was false.

Even assuming that Scott's statement was false, there is no evidence that Henneman, Gerst, or Stanton knew of its falsity or had any motivation to fabricate it. At his deposition, Henneman testified, "[i]f during the course of my interrogation it come to be anything do with a homicide… We wouldn't touch it. It would just be, here you go, it's yours." *See* Ex. 19 at 144:4–8. He further testified that if a suspect did not want to talk, they would be taken "right back in the cellblock and [] on to the next." *Id.* at 28:9–12. Stanton testified that "you either want to talk to me or you don't… if you didn't…then we just took him to the back." *See* Ex. 27 at 153:16–18. Gerst stated that if a suspect did not want to talk "they go back to the cell block." *See* Ex. 28 at 187:6–12.

Even if Scott's statement was procured under either the threat of additional charges or with an offer to speak to the prosecutor, this does not amount to an actionable fabrication claim under

19

the 14ᵗʰ Amendment as there is no evidence that either approach was deployed in reckless disregard for the truth. *See Howard*, 487 F. Supp. 3d at 404–05; *see also Petty*, 754 F.3d at 422 ("[c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial," because "[e]vidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true") (internal quotation omitted). Scott flip flopped in his trial testimony from denying that Plaintiff was the man who robbed him before the Victim was shot to ultimately admitting the truth of the account he gave to police and the grand jury that inculpated Plaintiff. Even if the Court assumes that Scott's grand jury account was false, there was no way for the Officer Defendants to know that. Accordingly, the Officer Defendants are entitled to summary judgment on the fabrication claim.

### c. Allan Scott's written statement and the October 28th Report cannot serve as the basis for a fabrication claim because neither was introduced at trial.

Yet another reason Plaintiff's fabrication claim fails is because Scott's written statement and the October 28ᵗʰ Report did not proximately cause Plaintiff's conviction. At trial, Scott was confronted with his grand jury testimony, not his written statement. *See* Ex. 2 at NK DEF 312:13–316:6. At most, the October 28ᵗʰ Report was an update to command summarizing new evidence and identifying the next investigative steps. The October 28ᵗʰ Report and the written statement were never introduced at trial and Officer Defendants still needed Smith's identification of Plaintiff as the assailant to proceed with charges. The mere authorship of a false statement does not create liability. It must cause the deprivation of the Plaintiff's liberty and without using it in the prosecution cannot be said to have caused a deprivation of liberty. *See Massey*, 759 F.3d at 354.

20

In *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1159 (N.D. Ill. 2022), the court ruled that a fabrication claim cannot be predicated on a mere police report that was not introduced at trial. The same reasoning applies to the October 28th Report in this case. Moreover, the reasoning in *Brown* applies with even greater force in this case because the Officer Defendants did not even testify about the contents of the report at trial.[20] Accordingly, the October 28th Report cannot serve as a predicate for Plaintiff's fabrication claim.

### d. Alternatively, Det. Disney was not personally involved in the alleged fabrication.

There is no evidence to support the claim that Det. Disney fabricated any evidence or that Det. Disney drafted the application for statement of charges with knowingly fabricated or coerced information.[21] *See* ECF 27 at ¶¶ 79–80, Ex. 1 at CS BPD 63–69; Ex. 34 at 8–9. At trial, Det. Brown testified that as the primary investigator, he had "the ultimate responsibility for the investigation" and that in this case that responsibility belonged to him and not Det. Disney. *See* Ex. 2 at NK DEF 115:22–116:3. Both Det. Disney and Maj. Derek Loeffler reiterated this delineation at their depositions.[22] Ex. 29 at 39:17–40:21, 70:9–18; Ex. 30 at 41:1–4, 149:19–152:1. Det. Disney was not present during Scott's arrest or at any point during his statement to Henneman. The record reflects that Det. Brown spoke to Scott on October 29, and met with him on November 5. *See* Ex. 2 at NK DEF 131:5–16; Ex. 1 at CS BPD 88. However, there is no evidence that Det. Disney accompanied him or that Det. Brown briefed him on these encounters. To the contrary, it appears that Det. Brown was accompanied by Det. Worden on November 5. *See* Ex. 1 at CS BPD 182. Scott has consistently denied that he testified before the grand jury. Thus, any allegation that there

---

[20] Notably, neither Det. Disney, nor Officers Henneman, Gerst, or Stanton testified at Plaintiff's trial. The application for statement of charges drafted by Det. Disney was not entered into evidence at trial and therefore did not proximately cause Plaintiff's conviction. *See*, discussion, *supra* at Section I.c.

[21] At deposition, Det. Disney testified that Det. Brown "no doubt dictated what was to be put in the statement of charges." *See* Ex. 29 at 205:13–206:2.

[22] Maj. Loeffler testified as the corporate designee for BPD pursuant to Fed. R. Civ. P. 30(b)(6).

21

was any impropriety connected to this testimony is purely speculative. Finally, there is no evidence that Det. Disney accompanied Det. Brown during the transport of Scott from the jail to the courthouse for his testimony on June 11, 1992, as Scott does not remember who transported him. *See* Ex. 20 at 237:9–22. Thus, even if, as Scott claims in his declaration, it was "made [] clear that [he] was to implicate [Plaintiff] in the murder" under threat of being charged with additional car thefts, there is simply no evidence that Det. Disney was present or aware of it. *See* Ex. 11 at Plaintiff 2. *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985) (discussing the requirement of personal involvement as a predicate for liability under Section 1983).

   e.  **Scott has never identified Gerst, or Stanton as the perpetrator of any of the acts alleged in his declaration or deposition testimony and has downgraded his allegations against Henneman to nothing more than speculation.[23]**

In his Declaration, Scott accuses "BPD officers," generally, of threatening to charge him with "numerous car thefts" unless he implicated Plaintiff in the murder; revealing Plaintiff's identity to him; and fabricating his statement. *See* Ex. 11 at Plaintiff 1–2. Scott identified Henneman, Gerst, and Stanton only as the interviewers, but alleged that "[i]t appear[ed] that one of these BPD Officers" falsified his signature on the written statement, and that Henneman forged his signature and initials on the explanation of rights. *Id.* at Plaintiff 2. At deposition, Scott testified that he could not describe any of the officers and that he did not know who they were or know their names. *See* Ex. 20 at 203:22–204:5.

Plaintiff alleges that Scott was "assaulted" during his arrest on October 28, 1991. *See* ECF 27 at ¶ 56. Scott was arrested by Officer Hinner, not Officer Defendants. *See* Ex. 33 at NK DEF 7591. At his deposition, Scott admitted that he was arrested by a single, uniformed officer in a

---

[23] Plaintiff alleges that Henneman, Gerst, and Stanton were aware that Scott had been assaulted and deprived of medical attention, fed him false information, threatened to charge him more severely unless he implicated Plaintiff in the Kevin Smith murder, and ultimately forged his statement. *See* ECF 27 at ¶¶ 56–63.

marked cruiser around 6:30 or 7:00 a.m. after a "high-speed chase in a residential neighborhood." *See* Ex. 20 at 191:1–192:17. Scott testified that he was caught after trying to flee. *Id.* at 192:22. Notwithstanding the allegation that Scott was assaulted at the time of his arrest, there is no evidence that Officer Defendants were present during his arrest and transport to the Southern District or ignored his alleged injuries.[24] *See* Ex. 20 at 197:5–198:22, 203:10–24. Henneman did not encounter Scott until 9:45 a.m. when he advised Scott of his rights. *See* CS BPD 89; Plaintiff at 13. Thus, there is no evidence that any alleged misconduct occurring prior to 9:45 a.m. is attributable to Officer Defendants.

Plaintiff is not entitled to an inference that Officer Defendants committed any of Scott's evolving allegations of misconduct because Scott's deposition undermined such claims. Although the Statement Form lists Gerst and Stanton as present for Scott's statement, Scott described his experience as one involving at least six or seven "white cops" that would perform the "good cop-bad cop routine" and come into the room in varying groups of two or three.[25] *See* Ex. 20 at 204:6–205:9, 215:15–216:2. Scott was asked specifically to whom he directed his request for counsel and medical treatment; Scott replied that he did not remember, but that it was either to unknown officers upon arrival to the station or, later, to "a white shirt, a white shirt being a supervisor" in uniform. *Id.* at 198:62; 216:20–217:7. When specifically asked who threatened him, Scott stated that he "[did not] think it was the white shirt[], but I'm not sure."[26] *Id.* at 218:1–11. Henneman, Gerst, and Stanton were plain clothes officers, not supervisors. *See* Ex. 27 at 36:5–18. Ex. 28 at

---

[24] Even if force was used to subdue Scott, it is equally plausible that it was necessary given the details of his arrest. Further, Scott's arrest photograph from October 28, 1991, shows no evidence of injury. *See* Ex. 31 at NK DEF 8978.

[25] Stanton is black and is entitled to summary judgment based on this testimony alone. *See* Ex. 32 at NK DEF 2738; Ex. 30 at 157:19–21.

[26] In this instance, Plaintiff asks this Court to resolve the inference that it was not a white shirt, but rather a plain clothes officer who threatened him, then resolve the inference that it was Henneman, Gerst or Stanton. *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (nonmovant not entitled to build inference upon inference in attempting to generate a dispute of fact).

23

112:2–4. *See Scott*, 550 U.S. at 380 (a court should not adopt a version of the narrative when it is "blatantly contradicted" by the record).

**II.**    **Plaintiff's *Brady* claim against Disney and McLarney fails because there is no evidence they withheld anything from prosecutors, or, if they did, that the evidence was favorable to Plaintiff or suppressed in bad faith.**

In Count II, Plaintiff brings a *Brady* claim against Defendants Disney and McLarney.[27] To establish a *Brady* violation, Plaintiff must prove "(1) that the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396–97 (4th Cir. 2014). Bad faith may be inferred when police officers fail to disclose "especially pertinent exculpatory evidence." *McPherson v. Baltimore Police Dep't*, No. CV SAG-20-0795, 2023 WL 5433011, at *21 (D. Md. Aug. 3, 2023) (citing *Johnson v. Baltimore Police Dep't.*, Civil No. ELH-19-00698, 2020 WL 116739, at *24 (D. Md. Mar. 10, 2020) (internal quotation omitted). However, a police officer's *Brady* duty is satisfied through disclosure to prosecutors. *See United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010); *See also Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir.1992) cert denied, 507 U.S. 961 (1993); *Helmig v. Fowler*, 828 F.3d 755, 762 (8th Cir. 2016) "turn[ing] over exculpatory evidence to the prosecution… normally discharges the duty of law enforcement officers under Brady;" *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir.1996) ("Investigators satisfy their obligations under Brady when they turn exculpatory and impeachment evidence over to the prosecutor.").

Here, Plaintiff alleges that the following items were withheld from the prosecutor: (1) Gene Smith's statement at Homicide to Det. Bowman; (2) the Smith Note regarding Larry Davis as a potential suspect; (3) notes from Michelle Shipley's interview on October 26; (4) the alleged

---

[27] This Court dismissed Count II as to Defendants Henneman, Gerst, and Stanton. ECF 47. Bowman and James were previously dismissed from the case entirely. ECF 47.

circumstances surrounding Scott's arrest and interrogation; (5) any documentation from Det. Brown's encounters with Scott on October 28 or 29, and November 5; (6) the October 28th Report about Scott's statement; (7) BPD reports from Allan Scott's arrest; (8) a statement and notes from Plaintiff's interrogation on November 3; (9) notes from Det. Brown's and ASA Nathan's interview of Larry Davis on January 2, 1992; and (10) information about the alleged threats made to Scott on the way to trial. *See* ECF 27 ¶¶ 45, 49, 66–67, 84, 95, 119; Ex. 34 at 4–5.

   a. **Without Testimony from Plaintiff's Trial Counsel, The Existence of the Trial File, or Any Evidence from the SAO, Plaintiff Cannot Establish that Any Document Was Withheld.**

As a threshold matter, Plaintiff's trial counsel is deceased; his file and recollections are not part of the record.[28] ASA Wash testified that she fulfilled her obligations under *Brady*, in part, by "looking through the homicide file" which would contain notes from "any officers that are involved in the case." *See* Ex. 38 at 57:7–58:2, 149:5–15. Without any evidentiary basis to conclude that evidence was withheld by Officer Defendants from prosecutors, Plaintiff's claims that any specific document was not disclosed is mere speculation and cannot escape summary judgment. *See McPherson*, 2023 WL 5433011 at *21 ("The age of this case and lack of available witnesses makes it challenging to prove that the Officer Defendants suppressed any evidence. [The] defense attorney from 1995 has no memory of the case and did not retain his case file."); *Washington v. Baltimore Police Dept.,* 669 F.Supp.3d 444, 466 (D. Md. April 12, 2023) ("The relevant events in this case happened decades ago, and unsurprisingly most of the files and the relevant recollections no longer exist. The defense file is unavailable… The defense attorney has no recollection of what evidence he did or did not receive. The prosecutor has no recollection of the case at all, including what evidence she collected or produced.").

---

[28] www.simplicitycfs.com/obituaries/Maynard-R-Rohrback?obId=9546014

### b. Det. Disney, as the secondary detective, had no duty to ensure that the contents of the H-File were disclosed to the prosecutors.

Even if, *arguendo*, Plaintiff could establish that a specific piece of evidence was withheld from the prosecutor, Plaintiff has adduced no evidence that Det. Disney, as the secondary detective, had the duty to ensure that these items were disclosed. Maj. Loeffler testified as the corporate designee for BPD that: (1) "…it's ultimately the [] primary detective's case folder and their material that they're going to use for that investigation; and (2) "it is the primary detective's responsibility" to put the relevant investigative materials into the case file. *See* Ex. 30 at 41:1–4, 149:19–150:20. ASA Wash testified that the primary detective had the full responsibility for the case…the secondary would take guidance or direction from the primary…" Ex. 38 at 41:10–43:2.[29] Det. Disney testified that the secondary is a "backup to the primary," "do[es] things at the primary's direction and request," serves as "another pair of eyes and overall assist in the initial stages of the investigation." *See* Ex. 29 at 39:17–40:5. Further, there is no evidence that Det. Disney—and certainly not McLarney—had any role whatsoever in the creation or collection of these items. There is simply no evidence that Det. Disney was responsible for maintaining the H-File or providing the investigative materials directly to the prosecution. Consequently, Plaintiff cannot make the requisite showing of bad faith here as is required to establish civil liability against a police officer for an alleged *Brady* violation.

### c. The Allan Scott Reports are not *Brady* material because Scott's cases were resolved for reasons unrelated to this case and the resolution of Scott's cases was known to ASA Marshall Shure.

Plaintiff asserts that the various arrest reports associated with Scott and the resolution of his criminal cases through the State charging some but not others constituted withheld *Brady*

---

[29] Here, Plaintiff has only alleged the withholding of the Smith Note but made no allegation regarding the rest of the notes contained in the H-File. *Compare* Ex. 1 at CS BPD 186–97 *with* Ex. 35 at UB 2474–77, Ex. 43 at 1131–34.

26

evidence. This allegation fails for multiple reasons. First, there is no evidence that Scott received leniency in exchange for his rebuttal testimony in Plaintiff's case. In fact, Det. Larry Salmond's report regarding the disposition of Scott's cases suggests that no leniency was provided. *See* Ex. 33 at NK DEF 7591–2 (noting the basis for "multiple clear-up" as "[o]ther than the suspect's admission of thefts, there were no fingerprints, witnesses, etc. to involve the suspect with the thefts;" there is no mention of a cooperation agreement); Ex. 34 at 4–5.[30] Second, any disposition of Scott's cases was known to the prosecutors and therefore any *Brady* duty by Officer Defendants was discharged. Det. Salmond's report attributes direct knowledge of the resolution of Scott's cases to Marshall Shure, the stalwart Southern District prosecutor whose approval was required before leniency could be provided to a suspect. *See* Ex. 17 at 208:21–209:9; Ex.19 at 47:3–48:15; Ex. 27 at 147:9–151:17, 260:20–261:13, 263:7–265:1; Ex. 41 at 246:8–12.

Third, there is no evidence that Officer Defendants were involved in the disposition of Scott's cases. Det. Salmond's November 15, 1991, report is the first documented reference to the resolution of Scott's cases. *See* Ex. 33 at NK DEF 7591–2. There is no evidence that Henneman, Gerst, and Stanton had any interaction with Scott after October 28, 1991. However, ASA Nathan presented Scott before the grand jury on November 5, 1991, and it was her practice to interview witnesses before putting them on the stand.[31] Further, the only evidence of a cooperation agreement, aside from Scott's declaration, shows that if there was such an agreement, ASA Wash knew about it. At his deposition, Scott testified that ASA Wash "prepped" him before his trial testimony when he was allegedly told "[y]ou going to say this...I want you to say this. You don't

---

[30] ASA Wash testified that "one purpose of an exceptional clearance was that it [] wasn't beneficial" to pursue multiple offenses when the suspect was charged with [other] offenses..." *See* Ex. 38 at 76:7–14. Stanton testified that the ASA would decide which case to pursue when a suspect admitted multiple [property] crimes. *See* Ex. 27 at 150:1–16.

[31] At her deposition, ASA Nathan testified that she does not remember the case, but would "absolutely" interview every witness in her office before they appeared before the grand jury. *See* Ex. 40 at 21:5–13, 24:13–15.

say this, then [] you getting more [] charges…" *See* Ex. 20 at 238:8–239:16, 347:1–10 (testifying that there "were quite a few people in the room" when detectives brought him to the courthouse, "I know Vicki was in there."). Therefore, any deal provided to Scott would have been known to prosecutors and would not have been provided by any Officer Defendant.

**d. There is no evidence that Disney or McLarney withheld any of the evidence that has been produced in this case, and, in the alternative, the produced evidence Plaintiff relies upon was neither favorable nor suppressed in bad faith.**

The H-File in this murder case contains numerous documents, none of which Plaintiff established was withheld. In Plaintiff's complaint, he references police documents that he claims were withheld: (1) Smith's statement to Det. Bowman; (2) the Smith Note; (3) the October 28th Report; (4) the November 2 anonymous tip; and (5) notes from Plaintiff's interrogation. *See* ECF 27 at ¶¶ 45, 48–50, 83–84; Ex. 34 at 4–5. Contrary to Plaintiff's allegations, all of these documents are contained within the H-File that was produced by BPD during this case. These documents are similarly contained in multiple SAO productions—including to the Innocence Project in February of 2016, which predated CIU's reinvestigation.[32] *See* Ex. 1 at CS BPD 40–41 (Oct. 28 Report), 52 (Nov. 2 tip), 71–74 (Smith statement to Bowman), 196 (the Smith Note); Ex. 35 at UB 2166 (Letter from SAO to UB Innocence Clinic), 2379–80 (Oct. 28 Report), 2390 (Nov. 2 tip), 2402–2405 (Smith statement to Bowman), 2475 (the Smith Note); Ex. 36 at SAO MPIA 389–406 (State's Version of Offense with attached offense reports signed by ASA Wash on August 10, 1992); Ex. 43 at 1007–08 (Oct. 28 Report), 1019 (Nov. 2 tip), 1036–39 (Smith statement to Bowman), 1133 (the Smith Note).[33]

---

[32] Det. Brown's notes from Plaintiff's interrogation are not contained within the H-File but they were entered into evidence at trial as discussed below. *See* discussion, *infra*.

[33] Ex. 43 is the SAO's copy of the H-File produced pursuant to Officer Defendants' subpoena.

In short, the document productions by BPD and the SAO flatly disprove Plaintiff's *Brady* claim. His claim is rendered even more specious considering that there was no objection from his trial counsel when Smith testified to giving a statement to detectives after leaving the murder scene. *See* Ex. 2 at NK DEF 58:8–59:7. Det. Brown's note from his interrogation of Plaintiff is not part of the H-File today because it was entered into evidence during trial.[34] *Id*. at NK DEF 149:12–151:16 (note shown to defense counsel who made no objection). Further, the note has been produced by the SAO, which the SAO produced in discovery to Plaintiff's trial counsel. *Compare* Ex. 37 at SAO 4, 89 *with* Ex. 35 at UB 2327.[35]

### e.  Plaintiff is not entitled to an inference that the items whose existence are in dispute were favorable to him or were withheld by Det. Disney in bad faith.

Plaintiff has failed to adduce any non-speculative evidence that: (1) notes from Michelle Shipley's interview on October 26, 1991; (2) the allegations surrounding Scott's arrest and interrogation; (3) any documentation from Det. Brown's encounters with Scott (October 28 or 29, or November 5); (4) notes from Det. Brown's and ASA Nathan's interview of Larry Davis on January 2, 1992; and (5) information about the threats made to Scott on the way to trial, existed, were favorable to him, or were withheld from the prosecutor. ECF 27 at ¶¶ 52, 65–67, 72, 93–95, 119; Ex. 34 at 4–6.

Plaintiff speculates that the October 27th Report was an insufficient memorialization of Det. Brown's interview of Ms. Shipley at her home on October 26. At her deposition, Ms. Shipley

---

[34] The Fourth Circuit has "firmly established" that the *Brady* rule does not apply where "suppressed evidence is both available to the defendant and in a source where a reasonable defendant would look." *Blankenship v. United States*, No. 5:18-cv-00591 2020 WL 247313, *8 (S.D.V.V. Jan. 15, 2020) (citing *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)); *see also*, discussion, *infra*, at Section II.e. Thus, Plaintiff cannot raise a *Brady claim* based on his own statement because it was known to him at the time and his attorney would have been obligated discuss with him his encounter with Det. Brown on November 3, 1991.

[35] Notably, in SAO's production, Det. Brown's note from his interrogation of Plaintiff appears within ASA Wash's case file, as indicated by her written notes, her handwritten trial evidence list, ASA Nathan's notes, and other case materials. *See* Ex. 39 at SAO 4–7, 89–136; Ex. 4 at SAO MPIA 317–321.

agreed that she has "no memory of meeting homicide investigators" on that date. *See* Ex. 16 at 118:17–20. Plaintiff asks this Court to: (1) infer that Ms. Shipley provided favorable information on October 26—in the presence of Det. Brown, no less; (2) further infer that the information was not discussed during the November 7 meeting with ASA Nathan; and (3) agree that it is an issue of material fact whether Det. Disney is liable. *See* discussion, *supra*, at Section II.a.

Additionally, there is no *Brady* violation when the alleged exculpatory material is available from "a source where a reasonable defendant would have looked." *Burley v. Balto. Police Dep't.,* 422 F.Supp.3d 986, 1027 (D. Md. 2019) (quoting *United States v. Wilson*, 901 F.2d 378, 380–81 (4th Cir. 1990)); *see also Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) (*Brady* is not violated if information or exculpatory material allegedly withheld by prosecutors was "reasonably available to the defendant" or could be located "where a reasonable defendant would have looked.") (quoting *Wilson*, 901 F.2d at 381). Ms. Shipley is Plaintiff's sister and testified as a defense witness at trial. *See* Ex. 2 at NK DEF 183. Further, on March 5, 1992, ASA Wash provided notice to Mr. Rohrback that "[Ms.] Shipley, has given information…which indicates that [Plaintiff] is not the individual who accosted her, Edward Smith and Kevin Smith..." *See* Ex. 35 at UB 2327–2330. By this point, reasonable diligence would require Mr. Rohrback to interview Ms. Shipley regarding her encounters with BPD and SAO.

Assuming, *arguendo*, this Court infers "in a light most favorable to the nonmoving party" that the remaining disputed items existed and were favorable, the inference that Det. Disney had any duty akin to the primary investigator's regarding document preservation and disclosure is an "inferential leap…without factual basis or reason." *Washington*, 669 F.Supp.3d at 466. Det. Disney was the secondary detective and was not present for any encounter with Davis or Scott. It

30

was not his H-File. Det. Disney cannot be held liable for evidentiary material that may or may not have been generated in his absence or any other allegation stemming from these encounters.

As stated, an officer's obligations under *Brady* are satisfied through disclosure to prosecutors. *See* discussion, *supra*, at Section II. Here, anything Scott said in the presence of ASA Nathan was instantly disclosed to the State as it pertained to Det. Brown. Further, Plaintiff merely speculates that Scott provided information favorable to him on October 28 or 29, 1991, then requires this Court to further infer that such information was not discussed during the November 5, 1991, meeting with ASA Nathan; or before the grand jury eight minutes later; or in an apparent second interview with ASA Nathan in December of 1991 where Scott adds additional detail to his description of the robbery not present in his statement to Henneman. *Compare* Ex. 1 at CS BPD 93–94 *with* Ex. 4 at SAO MPIA 317; Ex. 39 at SAO 127.

This analysis applies equally to the material provided by Davis in the presence of Det. Brown, Det. James, and ASA Nathan on January 2, 1992.[36] *See* Ex. 1 at 100–103. Further, Plaintiff has not alleged that Davis's identity was withheld from his defense in a manner that would have prevented Mr. Rohrback from exercising reasonable diligence in speaking with him about his interactions with BPD and the SAO. *See* discussion, *supra*, at Section II.d. Finally, there is no evidence that Det. Disney was present for the transport of Scott to the courthouse for his trial or grand jury testimony. If Det. Brown was accompanied by a detective during these transports, it could have been with any member of his squad.[37] *See* CS BPD 100–101, 182 (indicating Det. Worden and Det. James each accompanied Det. Brown during the investigation).

---

[36] *See* Ex. 2 at NK DEF 122:4–8. This adds an additional layer of speculation as Plaintiff asks this Court to first infer that the notes existed, then infer that they contained material favorable to Plaintiff not otherwise found in Davis's January 2 interview, his "absolutely" likely interview with ASA Nathan, or, perhaps, before the grand jury. *See* Ex. 40 at 21:5–13.

[37] Det. Disney testified that during this time his squad included Dets. David Brown, Donald Worden, Donald Waltemeyer, Rick James, and possibly Ed Brown. *See* Ex. 29 at 40:22–41:4.

"It is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that rests merely upon speculation and conjecture." *Washington*, 669 F.Supp.3d at 466 (internal citation omitted). Here, Plaintiff argues that the absence of specific cross-examination of Det. Brown, Scott, and Smith referencing the produced and disputed documents, and their speculative substance, is evidence of suppression. *See id.*; ECF 27 at ¶¶ 84, 112, 115; Ex. 34 at 5–8. Plaintiff makes this allegation in the face of multiple H-File productions containing the produced documents. Plaintiff further speculates that the State's use of Scott on rebuttal is evidence that the disputed November 5 notes were withheld despite ASA Wash's testimony that the defense would have to "open the door" to rebuttal testimony. *See* Ex. 34 at 8; Ex. 38 at 84:20–88:4.

Further, Mr. Rohrback's passing and the absence of his file means that the record is devoid of the evidence he did or did not receive. The record is consequentially silent as it pertains to his "general practice or his litigation strategy." *Washington*, 669 F.Supp.3d at 467 (citing *cf Salter v. Olsen*, 605 F. Supp. 3d, 1005 (E.D. Mich. 2022) (inference of withholding of a close-up photo was appropriate based on testimony of both plaintiff's trial defense attorney and habeas attorney). As in *Washington*, Plaintiff "has failed to present any evidence aside from speculation that it was Officer Defendants (as opposed to the prosecutor) who withheld the produced or disputed evidence." *Id.* That Mr. Rohrback failed to ask certain questions 32 years ago cannot support a *Brady* claim like this one, when the record contains no evidence of what was in Mr. Rohrback's file, and the allegedly withheld items are either present in multiple productions of the H-File or, simply, do not exist. *See id.* Thus, Plaintiff's *Brady* claim must fail.

### III.    Plaintiff's Failure to Investigate claim fails because Officer Defendants investigated Plaintiff's alibi and Larry Davis.

Officer Defendants are entitled to summary judgment for Plaintiff's failure to investigate claim because there are no genuine issues of material facts as to whether Defendant Officers failed

to adequately investigate Larry Davis as an alternative suspect and Plaintiff's alibi. Further, failure to investigate it is not a remediable claim under § 1983.

Police officers do not owe citizens a constitutional duty to "investigate independently every claim of innocence" or to "perform an error-free investigation[.]" *Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019) (quoting *Baker v. McCollan*, 443 U.S. 137, 146 (1979)); [38] *see also Gomez v. Atkins*, 296 F.3d 253, 264 (4th Cir. 2002) (an officer is "entitled to disbelieve [a suspect's] alibi" and "[a] reasonable officer … [is] not obligated to credit [a suspect's] exculpatory story."); *Bolden v. City of Chi.*, 293 F.Supp.3d 772, 780 (N.D. Ill. 2017) (finding that a failure to investigate claim does not "constitute[] a due process violation" because "there is generally no due process right to a specific investigation by the police.") (citing *Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992)). There is also not a recognized "independent constitutional right to investigation of a third party." *Gilliam*, 932 F.3d at 240. Mere "negligent police failures to investigate do not violate the Fourteenth Amendment." *Humbert v. O'Malley*, 2014 WL 1266673, at *13 (D. Md. Mar. 25, 2014) (citing *Wheeler v. Anne Arundel Cnty.*, 2009 WL 2922877, at *5 (D. Md. Sept. 8, 2009)); *see also Johnson v. Baltimore Police Dep't*, 2022 WL 9976525, at *59-60 (D. Md. Oct. 14, 2022) (granting motion to dismiss "failure to investigate" claim because "there [was] no basis to conclude that the failure to investigate … was the product of bad faith;" mere "sloppy" conduct "does not equate to bad faith.").

There are no genuine issues of material fact as to whether Det. Disney, assigned as secondary, failed to adequately investigate Larry Davis as an alternative suspect; there is similarly no evidence of bad faith. Unlike in *Gilliam* where defendants inexplicably cancelled a latent print comparison between an identified alternative suspect and evidence from the crime scene, Det.

---

[38] An officer may not forego investigative steps as a means to cover up wrongdoing. *Gilliam*, 932 F.3d at 241.

Disney here aborted no such investigative task. *Gilliam*, 932 F.3d at 228. At trial, Det. Brown testified that after speaking with Smith, he quickly searched the police arrest files. *See* Ex. 2 at NK DEF 119:4-121:9; Ex. 1 at CS BPD 166 (Larry Darnell Davis's arrest history accessed on October 26 at 10:38 a.m.). Det. Brown assembled a photo array which he showed to Smith and Michelle Shipley. *See* Ex. 1 at CS BPD 7 (booking photo of Larry Darnell Davis); Ex. 2 at NK DEF 120:15-121:9; 127:17-128:14. Det. Brown coordinated with ASA Nathan to interview Larry Reginald Davis less than one month after his arrest. *See* Ex. 1 at CS BPD 101, 104; Ex. 2 at NK DEF 122:4–8. As stated, Det. Brown testified that Davis testified before the grand jury—a clear sign that prosecutors were aware of Davis and were directing investigative decisions.[39] *See* Ex. 2 at 122:8–9; Ex. 1 at 178–183; Ex. 35 at UB 2425–29; Ex. 39 at SAO 4–7, 89–136; Ex. 43 at NK DEF 1066–1073. Plaintiff inexplicably claims that "there is no documentation suggesting the presence of a prosecutor" during the interview of Davis despite Det. Brown's testimony to the contrary and the statement itself providing that the interview occurred "in the Violent Crimes Unit of the State's Attorney's Office." *See* Ex. 1 at CS BPD 101; Ex. 2 at NK DEF 122:4–8, ECF 27 at ¶ 94.

There are similarly no genuine issues of material fact as to whether Det. Disney failed to adequately investigate Plaintiff's alibi. As stated, Det. Brown interviewed each of Plaintiff's alibi witnesses on May 5 and May 21, 1991, and did so in the presence of ASA Wash and Plaintiff's trial counsel. *See* Ex. 1 at CS BPD 234–45; Ex. 39 at SAO 93–109. Despite Plaintiff's claim that Det. Brown was somehow resistant to doing so, the record shows that ASA Wash and Mr. Rohrback discussed Plaintiff's alibi as early as April 2. *See* ECF 27 at ¶ 99; Ex. 6 at NK DEF 688–89, 695. Further, although Plaintiff claims that "[a]t the time of his arrest, [he] provided the names of several alibi witnesses, including Latrice Webb [and her siblings, Tarik, Khadijah, and Hanif]," the exhibit

---

[39] As of this filing and despite the Parties best efforts, Larry Davis's grand jury transcript has not been located.

to which he cites provides only that Plaintiff stated that he was "at his girlfriend's"[40] *See* Ex. 34 at 14 (citing Ex. 42 at SAO MPIA 445); *See also* Ex. 35 at UB 2327; Ex. 37 at SAO 4. Since the interviews occurred in the presence of ASA Wash and Mr. Rohrback, Plaintiff cannot allege that they were withheld. Rather, Plaintiff speculates that the incomplete information sheets, the duration of the interviews, and length of time that passed since Plaintiff (allegedly) provided "Det[s.] Disney and Brown" with his alibi witnesses "reveal[s] that they had already determined Plaintiff's guilt and were not interested in objectively reviewing the evidence." *See* Ex. 34 at 14. Such speculation ignores the reality that ASA Wash took extensive notes, and that these interviews were not conducted during the pre-arrest investigation thereby requiring diligent preservation so that they could be disclosed by the State. *See* Ex. 39 at SAO 93–109. Rather, these interviews were coordinated with Mr. Rohrback so that the State could evaluate Plaintiff's alibi. *See* Ex. 6 at NK DEF 688–89, 695.

Finally, as with Plaintiff's fabrication claim regarding the October 28th Report, Allan Scott's statement to Officer Henneman, and with Plaintiff's *Brady* claims, there is simply no evidence that Det. Disney, as the secondary detective, was present for the interview of Larry Reginald Davis, Plaintiff's alibi witnesses, or obstructed any effort to investigate either. Notwithstanding the fact that Det. Brown investigated Davis and interviewed Plaintiff's alibi witnesses, Plaintiff has offered no evidence that Det. Disney bore any obligation to investigate these components in the manner that they speculate was required for a secondary detective whose documented involvement with the investigation appeared to end after Plaintiff's home was searched on November 3, 1991, at 5:00 a.m. *See* Ex. 1 at CS BPD 55.

---

[40] Plaintiff even goes so far as to speculate, without any evidence, that Det. Disney was present for Det. Brown's interrogation of Plaintiff. *Compare* Ex. 34 at 14 *with* Ex. 1 at CS BPD 57–59 (identifying only Det. Brown as present).

**IV.    Plaintiff's Failure to Intervene claim fails because there is no evidence that any Officer Defendant observed a constitutional violation compelling a duty to act.**

The Fourth Circuit has recognized a cause of action for failure to intervene, or bystander liability, as premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Burley*, 422 F. Supp. 3d at 1030 (citing *Stevenson v. City of Seat Pleasant,* 743 F.3d 411, 416–17 (4th Cir. 2014) (quoting *Randall v. Prince George's County,* 302 F.3d 188, 203 (4th Cir. 2002)). "Such a duty attaches when an officer observes or has reason to know that a constitutional violation [is being] committed by other officers and possesses a realistic opportunity to intervene to prevent the harm from occurring." *Id.* "The theory of bystander liability permits relief against an officer who (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act." *Id.* On the other hand, "if the bystander lacks … specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." *Id.* at 1030–31.

Plaintiff generally claims that "[e]ach Defendant was present at a time when misconduct occurred and could have, but did not, intervene…" *See* Ex. 34 at 16. However, Plaintiff has adduced no non-speculative evidence sufficient to generate a genuine issue of material fact as to whether any Officer Defendant observed constitutional harm.

As stated, Det. Disney was assigned as the secondary detective.[41] He was not present for any interaction with Scott nor has Plaintiff shown that he had any role in drafting the October 28th Report. He was not present for any interaction with Davis nor has Plaintiff shown that Disney had any knowledge of whether any extraneous notes were generated during either interview. He was not responsible for the maintenance of the H-File nor has Plaintiff shown that Disney knew what

---

[41] The Amended Complaint contains a string of speculative allegations stating that because Det. Disney was the secondary detective, he was privy to all the evidence, information, and actions taken by all other detectives involved in the Smith investigation. *See* ECF 27 at ¶ 49.

was in it, what was allegedly missing, or that he had any role in its disclosure to prosecutors. There is no evidence to establish that Disney was present for or aware of any misconduct during the investigation. There is no evidence that Disney was aware that Scott's statement had allegedly been fabricated and coerced, or that any exculpatory evidence was withheld. This is further supported by Det. Disney's testimony that he did not witness any detective lie to or threaten a witness or suspect in this investigation, or any other investigation. *See* Ex. 29 at 84:3–7. As such, Disney is entitled to summary judgment on Plaintiff's failure to intervene claim.

Sgt. McLarney's documented participation in this case belies any claim that he was present to observe any of the alleged misconduct. Plaintiff alleges that because McLarney approved case reports, he was aware of all the evidence collected, whether it was lawfully collected, and allegedly withheld. *See* ECF 27 at ¶¶ 102, 103. However, McLarney's involvement in the Smith investigation consisted of supervising the raid at Plaintiff's home on November 3, 1991, and reviewing the case file to ensure all essential documents were present. *See* Ex. 1 at CS BPD 55, 226; Ex. 41 at 98:15–99:5; 100:16–101:13; 135:15–136:1; 141:7–142:13. Further, there are insufficient facts in the record to establish that McLarney had any knowledge that Det. Brown allegedly improperly documented his investigation and that evidence was being withheld sufficient to trigger a duty to intervene. Similarly, while Plaintiff tries to push a speculative narrative that McLarney was aware that Scott's written statement was fabricated and coerced, the record is completely silent as how and when McLarney became aware of this and made the decision not to intervene. Given the absence of non-speculative evidence, McLarney is entitled to summary judgment on this claim.

Last, the record is devoid of material facts to support Plaintiff's claim that Officers Gerst and Stanton had any basis to intervene during Henneman's interrogation of Scott.[42] As stated, Scott

---

[42] Neither Henneman, Gerst, or Stanton have any memory of Henneman's interaction with Scott. *See* Ex. 19 at 109:18–110:1 (Henneman testified that he did not recall the Scott interview on October 28, 1991), Ex. 27 at 156:21–157:3

admitted to his grand jury testimony at trial and admitted at his deposition that he told officers about his auto thefts. *See* Ex. 2 at NK DEF 315:15–317:13; Ex. 20 at 222:2–11. Although Plaintiff alleges that Henneman, Gerst, and Stanton coerced Scott to implicate Plaintiff in the murder, and then fabricated this fact, there is simply nothing in the record to suggest that this occurred. *See*, discussion, *supra*, at Section I.b; ECF 27 at ¶ 59. Further, Scott's deposition testimony undermined his allegations of forgery and affirmed his lack of knowledge about which officer(s) committed an alleged illegal act. *See*, discussion, *supra*, at Section I.b. Scott's recanted testimony is further supported by Henneman's deposition testimony that he never signed or initialed for a witness nor ever observed another office do so.[43] *See* Ex. 19 at 135:16–136:2, 164:15–165:7. There is also no evidence that Gerst or Stanton were privy to Henneman's update to Det. Brown. Henneman, Gerst, and Stanton were not involved in any other aspect of Det. Brown's investigation. Plaintiff has adduced no non-speculative evidence that Officer Defendants observed any misconduct triggering a duty to intervene. Thus, Officer Defendants are entitled to judgment as a matter of law.

**V.    Plaintiff's claim for supervisory liability fails because his underlying claims have been disproven or are purely speculative, or, in the alternative, Plaintiff has not shown that Sgt. McLarney had knowledge of any alleged misconduct.**

To start, § 1983 does not allow actions against individuals merely for their supervisory role of others. *Wilson v. United States*, 332 F.R.D. 505, 518 (S.D. WVa. 2019); *see also Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978). Supervisory liability is a species of bystander liability like a failure to intervene claim and is similarly disfavored. *Randall*, 302 F.3d at 206. "[W]hen on notice of subordinates' tendency to act outside the law," a supervisor cannot remain

---

(Stanton testified that he could not remember having ever interacted with Scott while working in the Southern District), Ex. 28 at 215:16–17 (Gerst testified that "I don't even remember anything about Mr. Scott".).

[43] At his deposition, Stanton testified that he would never initial an explanation of rights form on behalf of a suspect, nor did he ever observe Henneman or Gerst do so. *See* Ex. 27 at 169:18–170:14. At his deposition, Gerst testified that he never observed Henneman forge the name of a suspect. *See* Ex. 28 at 213:19–22.

deliberately indifferent. *Id.* This is a rigorous standard that requires a showing "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'" and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* (citing *Shaw v. Straud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Plaintiff alleges that Sgt. McLarney approved the allegedly false October 28th Report and that he "knew various information, including facts about [Larry Davis] ha[ving] been omitted from the [H-File] and not transmitted to the prosecutor."[44] *See* ECF 27 at ¶¶ 68, 103; ECF 46 at 18. Plaintiff's supervisory liability claim based on the October 28th Report fails because he did not adduce any evidence to show that it was false. *See* discussion, *supra*¸ at Section I.a–b. Further, the discovery in this case failed to establish that McLarney had actual or constructive knowledge about any alleged misconduct committed by his detectives in this case. Notably, McLarney does not remember this case, nor the October 28th Report. *See* Ex. 41 at 220:2–221:14, 248:11–18.

Plaintiff has also adduced no evidence that Sgt. McLarney's practice of relying on verbal updates or from his detectives or that his review of case files to ensure that "there are documents in those sections" was improper or inadequate.[45] *Id.* at 101:14–106:10, 112:13–113:22, 141:7–142:6, 216:18–221:14, 246:13–247:20. At his deposition, Maj. Loeffler testified generally that

---

[44] In its ruling on Officer Defendants' and BPD's Motions to Dismiss, this Court noted that "Plaintiff has not plausibly alleged widespread misconduct, or even any previous misconduct, by any of the officers involved in this case. He has also not plausibly alleged prior misconduct by any supervisees of McLarney's." *See* ECF 46 at 18. Thus, Plaintiff may only prove his supervisory liability claim by showing that he "knew about the misconduct and failed to act on it." *Id.*

[45] At deposition, McLarney testified that he trusted his detectives to conduct "normal investigative steps," but would not expect updates at each step. *See* Ex. 41 at 224:18–22; *see id.* at 209:17–210:1 (his signed reports to indicate that that it exists and that "these are the facts;" "it would be unworkable every time you were given a report to conduct your own little investigation on it."), 254:9–12 (testifying that "the detective would keep me apprised of the steps in the investigation… I would not then go back…and read [the report] because he just told me what I need to know.").

supervisors "reviewed the case file and documented their review of it…" [] "and had a responsibility to ensure that cases are thoroughly investigated and documented." *See* Ex. 30 at 43:6–13; 106:19–107:8. Plaintiff has adduced no evidence that McLarney failed to review Det. Brown's case file or non-speculative evidence that Det. Brown failed to thoroughly investigate and document his case. Thus, Plaintiff cannot support his claim on these bases.

Plaintiff's claim based on the withholding of the Smith Note and Smith's statement to Det. Bowman fails because he did not adduce any evidence that these items were withheld. *See* discussion, *supra*, at Section II.c; ECF 27 at ¶ 103.

Assuming, *arguendo*, that Det. Brown was aware of the alleged circumstances surrounding Scott's interrogation, Plaintiff has adduced no evidence that McLarney was also. *See* ECF at ¶ 103. McLarney was not there. Det. Brown's passing leaves the record void of his recollection of what he learned from Henneman or what he discussed with McLarney, who does not remember the case. Plaintiff has also adduced no evidence that McLarney "knew that BPD officers. . . failed to record information" from Scott's interview at the [SAO] on November 5, 1991. *Id.*; Ex. 1 at CS BPD 88. Plaintiff has adduced no credible that such notes existed, or if they did, that they were favorable to him or withheld in bad faith. He has produced no evidence that McLarney knew that Det. Brown allegedly took notes or that they were allegedly withheld. Notably, McLarney reviewed Det. Brown's file on November 4, the day after Plaintiff's arrest, and the day before Scott's November 5 interview and grand jury testimony (which Scott may not credibly inform). *See* discussion*, supra*, at 6 n. 4; Ex. 1 at CS BPD 226. Thus, Plaintiff's claim against McLarney on this point must fail.

Plaintiff has adduced no non-speculative evidence that McLarney "withheld exculpatory and impeachment evidence that Larry Reginald Davis was a more plausible suspect than Det.

40

Disney represented to the prosecutor."[46] *See* Ex. 34 at 9. Instead, Plaintiff points to testimony regarding McLarney's "hand-on" management style and McLarney's own written objection to his performance evaluation on July 30, 1991, as evidence that he was aware of any misconduct related to the Larry Davis component of Det. Brown's investigation. *Id.* at 15–16. (internal citations omitted). Det. Brown was described by McLarney as "solid, organized, [and] disciplined." *See* Ex. 41 at 91:20–22. Det. Disney repeatedly testified that the expectation was that "everything in the file…would go to the prosecutor." *See* Ex. 29 at 66:16–67:21; *see also id.* at 78:5–13, 131:16–20, 178:11–179:15. Thus, just as Plaintiff cannot substantiate his underlying *Brady* claim, Plaintiff's claim for supervisory liability must also fail. *See* discussion, *supra*, at Section II.c–d.

Finally, the record is clear that at the time of this case, Henneman, Gerst, and Stanton were assigned to the Special Operations Unit in the Southern District under the command of Sgt. Kirchenbauer followed by Sgt. Eagan. *See* Ex. 19 at 68:1–19. Sgt. McLarney testified that he only supervised homicide detectives. *See* Ex. 41 at 88:17–89:9. Thus, McLarney cannot be held liable for any misconduct allegedly committed by Henneman, Gerst, and Stanton.

## VI.    Alternatively, Officer Defendants are entitled to qualified immunity.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011 (en banc); *McPherson*, 2023 WL 5433011 at *26. If no case can be identified wherein an officer acting under similar circumstance was held to have violated the constitution, the officer is entitled to qualified immunity. *See White v. Pauly*, 137 S. Ct. 548, 551–52 (2017); *Kisela v. Hughes*, 138 S. Ct. 1148, 1153-54 (2018) (per curiam)). The

---

[46] Plaintiff inexplicably alleges that all Officer Defendants, including Henneman, Gerst, and Stanton withheld this evidence. *See* Ex. 34 at 9.

Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S.Ct 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether there was a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As discussed above, Plaintiff cannot meet the first prong with respect to any of the alleged violations. As such, Officer Defendants are entitled to summary judgment.

## CONCLUSION

For these reasons, Officer Defendants respectfully request that this Honorable Court grant their motion for summary judgment and dismiss Plaintiffs' claims against them in their entirety.

DATED: May 3, 2024

Respectfully Submitted,

_____/s/_____

Shneur Nathan, Bar No. 20707
Avi Kamionski, Bar No. 20703
Alexander S. Rothstein, Bar No. 23228
Ephraim R. Siff, Bar No. 20761
575 S. Charles Street Ste. 402
Baltimore, Maryland 21201
(312) 612-1955
(952) 658-3011
snathan@nklawllp.com
akamionski@nklawllp.com
arothstein@nklawllp.com
esiff@stattorney.org

*Attorneys for Deems Martin Disney, Jr., Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton*

42

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2024, I caused the foregoing document to be electronically filed with the Court's CM/ECF system, which will send an electronic copy of the same to all counsel of record.

*/s/ Alexander S. Rothstein*

**EXHIBIT LIST**

| Exhibit # | Title -- *indicates Officer Defendant | Bates Number(s) |
|---|---|---|
| | | |
| 1 | Official BPD Homicide File - CONFIDENTIAL | CS BPD 1–248 |
| 2 | Trial Transcript, June 10-12; July 13, 1992 | NK DEF 1–390 |
| 3 | Grand Jury Transcripts -- CONFIDENTIAL | NK DEF 9097–9127 |
| 4 | Notes – ASA Ilene Nathan | SAO MPIA 317–321 |
| 5 | Indictments | SAO MPIA 302–308 |
| 6 | Correspondence – Rohrback to ASA Wash | NK DEF 688–689, 695 |
| 7 | Investigator Gary Hoover Time Sheet | UB Nethercott 1260–1261 |
| 8 | Excerpted File – Investigator Gary Hoover | NK DEF 8993–8996 |
| 9 | Affidavit – Dawn Harkless | UB Nethercott 33–34 |
| 10 | Deposition – Investigator Gary Hoover | |
| 11 | Allan Scott/Malik Abdul-Aziz Declaration with exhibits | Plaintiff 1–13 |
| 12 | CIU Memorandum to State's Attorney Mosby | SAO 146–153 |
| 13 | Deposition – Dawn Harkless | |
| 14 | Correspondence – OAG to Officer Defendants | NK DEF 9061–9062 |
| 15 | Notes – SAO-CIU from Harkless Interview | NK DEF 9128–9130 |
| 16 | Deposition – Michelle Shipley Green | |
| 17 | Deposition – CIU Chief, Lauren Lipscomb | |
| 18 | Joint Petition for Writ of Actual Innocence | |
| 19 | Deposition – Edward Nelson Henneman, Jr.* | |
| 20 | Deposition – Malik Abdul-Aziz f.k.a. Allan Paul Scott | |
| 21 | Allen Scott Exemplar – 1999 Petition for Name Change | NK DEF 7377–7383 |
| 22 | Allen Scott Exemplar – July 1995 | NK DEF 7370–7376 |
| 23 | Allen Scott Exemplar – April 2010 | NK DEF 7607 |
| 24 | Allen Scott Exemplar – March 1995 | NK DEF 7609, 7613 |
| 25 | Allen Scott Exemplar – March 2008 | NK DEF 7230 |
| 26 | Allen Scott Exemplar – May 2001 | NK DEF 7217 |
| 27 | Deposition – LeRoy Stanton* | |
| 28 | Deposition – Thomas Gerst* | |
| 29 | Deposition – Deems Martin Disney, Jr.* | |
| 30 | Deposition – Maj. Derek Loeffler | |
| 31 | Booking Photo – Allan Scott – Oct. 28, 1991 | NK DEF 8978 |

| 32 | Personnel Record – LeRoy Stanton--CONFIDENTIAL | NK DEF 2738 |
|----|------------------------------------------------|-------------|
| 33 | Arrest Reports – Allan Paul Scott | NK DEF 7587–7593 |
| 34 | Excerpts from Plaintiff's 2nd Suppl. Interrogatory Response to Defendant Thomas Gerst – Oct. 19, 2023 | |
| 35 | Excerpts from SAO MPIA Request to UB (Feb. 2016) | UB 2166, 2327–30, 2379–80, 2390, 2402–05, 2425–29, 2474–77 |
| 36 | State's Version with Offense Reports | SAO MPIA 389–406 |
| 37 | Note – Det. Brown from Plaintiff's Interrogation, Nov. 3, 1991 | SAO 4, 89 |
| 38 | Deposition – ASA Vicki Wash | |
| 39 | Excerpts from ASA Wash Trial File | SAO 4–7, 89–136 |
| 40 | Deposition – ASA Ilene Nathan | |
| 41 | Deposition – Terrence P. McLarney* | |
| 42 | State's Disclosure – Mar. 5, 1992 | SAO MPIA 445–447 |
| 43 | Excerpts from SAO's copy of the H-File produced in response to Officer Defendants' subpoena | NK DEF 1007–08, 1019, 1036–39, 1066–73, 1131–34 |
| 44 | Excerpts from Plaintiff's 1st Suppl. Interrogatory Response to Defendant Edward Henneman – Sept. 5, 2023 | |
| 45 | Deposition – Plaintiff Clarence Shipley, Vol. 2 | |
| 46 | Excerpts from Plaintiff's Interrogatory Response to Defendant Edward Henneman – Dec. 2, 2022 | |
| 47 | Deposition – Plaintiff Clarence Shipley, Vol. 1 | |
| 48 | Excerpts from Defendant Edward Henneman's First Set of Interrogatories to Plaintiff – Oct. 17, 2022 | |
| 49 | Excerpts from Plaintiff's Interrogatory Response to Defendant Deems Disney – Dec. 2, 2022 | |
| 50 | Combined Allan Scott Exemplars and Deposition Citations Pulled from Exhibits 20–26. | *See* Ex. 20–26 above. |