## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **CLARENCE SHIPLEY** | * |
| | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **v.** | * |
| | * |
| **DEEMS MARTIN DISNEY, JR.,** | * |
| ***et al.,*** | * |
| | * |
| **Defendants.** | * |
| | * |

Civil Case No.: SAG-21-03173

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## <u>MEMORANDUM OPINION</u>

This Section 1983 lawsuit arises from the arrest, prosecution, and conviction of Plaintiff Clarence Shipley ("Plaintiff") for the 1991 murder of Kevin Smith. The Circuit Court for Baltimore City vacated Plaintiff's conviction in 2018. Plaintiff now seeks damages from five Defendant-Officers: Deems Martin Disney, Jr., Terrence P. McLarney, Edward Nelson Henneman, Sr., Thomas Frank Gerst, and LeRoy Stanton ("Officer Defendants"), alleging that their conduct during the investigation and trial of his now-vacated murder charges violated his Fourteenth Amendment rights.[1] The Officer Defendants seek summary judgment. ECF 128, 129. Plaintiff opposed their motion, ECF 136, and the Officer Defendants have filed a reply. ECF 143. Plaintiff filed an unopposed motion seeking leave to file a surreply, ECF 144, which will be granted. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons stated herein, the Officer Defendants' Motion for Summary Judgment will be granted in part and denied in part.

---

[1] Plaintiff has also brought *Monell* claims against the Baltimore Police Department. This Court stayed discovery as to those claims and bifurcated the claims for trial. *See* ECF 65.

I.     BACKGROUND

This Court considers the facts in the light most favorable to Plaintiff as the non-moving party. The chronology of events in this case, and the content of the statements made by various witnesses at different times, are not in dispute, although there is present disagreement about what actually happened between the Officer Defendants and one witness. This summary focuses on the statements, testimony, and undisputed facts from the record, turning briefly to the disputed facts near its conclusion.

1.  The Murder of Kevin Smith

On the evening of October 25, 1991, Kevin Smith ("Kevin") was shot and killed during an attempted armed robbery. ECF 132 at 48[2]. Soon after, Baltimore Police Officer Laura Deuerling responded to a call for a shooting. *Id.* Upon arriving at the scene, she located Kevin lying on his left side in the street near the intersection of Joseph Avenue and Cherry Hill Road. *Id.* Officer Deuerling secured several witnesses at the scene, notably including Edward Eugene Smith[3], Kevin's brother. *Id.*

Edward gave a comprehensive statement to Officer Deuerling at the scene, explaining that he and his brother had been walking back from the Cherry Hill Shopping Center after making a trip to the liquor store. *Id.* As they approached the corner of Cherry Hill Road and Joseph Avenue, a man approached them, brandished a silver handgun, and said "you know what it is." *Id.* In response, Kevin turned to run, and the assailant shot him. *Id.* Edward next recalled picking up a bottle and throwing it at the assailant, who then ran north. *Id.* Edward described the

---

[2] The Court uses the page numbers generated by CM/ECF where only Bates numbers are otherwise available.

[3] This Court will refer to Edward and Kevin Smith by their first names for clarity. Edward is occasionally referred to as "Gene" by other witnesses.

shooter as a Black male, approximately 5'8", with a "thin mustache," and wearing "black hoodie, blue jeans." *Id.* Shortly after this conversation, Homicide Detective David Brown—the primary investigator[4]—and Defendant Disney arrived at the crime scene and began their investigation. *Id.* at 46–47. The two homicide detectives transported Edward to BPD's homicide office for a formal interview. *Id.* at 49.

Late that night, Detective Robert Bowman, another homicide detective, interviewed Edward again and took a handwritten statement. *Id.* at 73. Edward reported walking on Cherry Hill Road with his brother and a girl named Michelle after they had left a friend's house. *Id.* At some point, he recalled, a man walked up to the group, pulled out a silver gun from the front of his sweatshirt, and said, "you know what it is." *Id.* Edward said he replied, "I know you. I know who you are." *Id.* Edward reported that Kevin then started to run, and that when Edward bent over to pick up a bottle to hit the man with, the man shot Kevin. *Id.* Edward stated that after he hit the man with the bottle, the man pointed the gun at him, but it did not go off. *Id.* He watched the man run north. *Id.* He described the shooter to Detective Bowman as a Black male wearing a black sweatshirt and blue jeans who had short wavy hair, stood about 5'3", weighed approximately 150–60 pounds, and appeared to be around 29–30 years old. *Id.* at 74. Edward told Detective Bowman that he had seen the shooter earlier that night and that he has previously seen the shooter around Cherry Hill. *Id.* He confirmed that there were no other witnesses. *Id.*

Detective Bowman also interviewed George Boddy that night. *Id.* at 85. According to the detective's handwritten notes, Boddy did not see the shooting, but heard a gunshot and saw people gathering as he was walking through the neighborhood. *Id.* Boddy reported that he saw

---

[4] Detective Brown is deceased and was not named as a Defendant in this lawsuit.

three to four people running and saw "Jean"[5] chase and throw a bottle at a Black male wearing dark colored clothing, who cut through the parking lot of a nearby church. *Id.* Boddy told the detective that Michelle Shipley had also witnessed the shooting and provided two possible addresses for her. *Id.*

    2.  <u>Subsequent Interviews and Investigation</u>

On the morning of October 26, 1991, Edward called BPD and stated that he had heard "from the neighborhood" that the shooter was a man named Larry Davis. *Id.* at 196. Edward claimed that he did not recognize the name but that he would know the shooter by sight, having seen him in several locations around the Cherry Hill Recreation Center. *Id.* at 38. The officers ran a computer check for "Larry Davis" and identified Larry Darnell Davis. *Id.* They created a photo array including a picture of Larry Darnell Davis and showed it to Edward that day. *Id.* Edward did not identify any person in the array as the shooter. *Id.*

Investigators interviewed Michelle Shipley later that day.[6] *Id.* at 37. She told investigators that she was hysterical after her friend was shot and she fled the scene. *Id.* Michelle said that she could identify the shooter if she saw a "recent" photograph of him. *Id.* The investigators contemporaneously noted that she appeared upset and reluctant to speak with them. *Id.*

On October 28, 1991, Defendant Henneman, who worked in BPD's Special Operations Unit, called Detectives Brown and Disney. *Id.* at 40. Detective Henneman told the homicide

---

[5] Boddy was likely referring to Edward, who is also known as Gene.

[6] To avoid confusion with Plaintiff, who shares her surname, this Court will refer to Michelle Shipley as "Michelle."

detectives that that 18-year-old Allan Scott,[7] whom he had been questioning about unrelated car thefts, claimed to have information about a murder in Cherry Hill. *Id.* Scott claimed that a man named Scooter had robbed him and Stanley Harrison of cocaine at gunpoint a week before Kevin Smith's murder. *Id.* The evening of the murder, the same man approached him and pulled out the same gun in the same area where Kevin was later shot. *Id.* at 93. Scott described Scooter to be a Black male, 18–19 years old, 5'10", and about 170 lbs. *Id.* at 94. Scott reported that on the evening of the murder, Scooter was wearing a red San Francisco 49ers jacket with a hood, a blue sweatshirt, blue stonewash jeans, and red and white Fila tennis shoes. *Id.* Scott identified Scooter by name as Plaintiff. *Id.* at 97. Scott certified that his statement was "the truth to the best of [his] knowledge and recollection," and that it was a true and accurate statement. *Id.* at 95.[8]

On November 2, 1991, Detective Brown and Defendant Disney visited Edward again and presented him with a photo lineup that included Plaintiff. *Id.* at 42. Edward identified Plaintiff as the shooter, stating, "That's him right there, looks just like him. I'll never forget that face." *Id.*

That same morning, Officer Steven Histon received a call from an anonymous woman who reported that Larry Davis had killed Kevin Smith, and that the weapon he used was in the apartment Davis lived in with his girlfriend, Lachette Goodwin. *Id.* at 52. The caller provided a physical description of Davis—5'4", approximately 22–23 years old, and 130 lbs.—before claiming that Kevin's brother Edward was in the car with Davis on the night of the murder, and that she believed Edward would come forward once Davis was off the street. *Id.*

---

[7] Scott legally changed his name to Malik Abdul-Aziz in 1999. ECF 135-1 at 67–68. To remain consistent with the Parties' submissions and the homicide file, the Court refers to him as Allan Scott.

[8] Scott has now recanted and provided additional context surrounding his initial interrogation, which will be discussed *infra*.

Despite the woman's call, based on Edward's photo identification, police obtained an arrest warrant and a search and seizure warrant for Plaintiff's residence on November 2, 1991. *Id.* at 42. Early the next morning, Detective Brown, Defendant Disney, Defendant McLarney, and other uniformed patrol officers searched Plaintiff's residence. *Id.* at 54–55. The officers seized one pair of sneakers with suspected blood stains, a shoebox containing a handgun holster, and Plaintiff's personal papers. *Id.* The officers did not recover clothing consistent with any person's physical description of the assailant. The officers also did not find a murder weapon. The shoes tested negative for any sign of blood. ECF 137-2 at 65.

Plaintiff turned himself in at 7:00 a.m. on November 2, 1991. ECF 132 at 42. Plaintiff waived his rights and gave a brief statement pointing the finger at Larry Davis. *Id.* at 43, 59. He also told officers that he was at his girlfriend's house the night of the murder. ECF 134-4 at 70. Detective Brown and Defendant Disney noted in their report that they would continue to attempt to locate Larry Davis. ECF 132 at 43. The officers had previously identified a Larry Darnell Davis, however he did not even arguably match the physical description of the shooter. *Compare* ECF 135-2 at 166 *with id.* at 196. The officers did not search the home of Lachette Goodwin, despite the anonymous caller's suggestion that Larry Davis lived there and possessed the murder weapon.

On November 3, 1991, Edward testified before the grand jury. ECF 132-1 at 2. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

The following day, Scott met with Detective Brown and an Assistant State's Attorney. ECF 129-1 at 87. Scott appeared before the grand jury later that morning. ECF 132-1 at 8. ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

On November 7, 1991, Detective Brown and an Assistant State's Attorney interviewed Michelle Shipley. ECF 132 at 78. Later that morning, Michelle testified before the grand jury.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

███████████████████████     ██████████████████████

███████████████████████████████████████████████

██████████     █████████████████████████████████



Larry Reginald Davis was arrested on November 27, 1991, on a separate charge of armed robbery. ECF 132 at 6. Detective Brown and an Assistant State's Attorney interviewed Davis on January 2, 1992, for about 33 minutes. *Id.* at 99–103; ECF 135-5 at 219–20. Davis claimed he was at his girlfriend's house at the time of Kevin's shooting. ECF 132 at 99–103. As he was leaving, he said, he walked past the scene, and a person named Derrick told him that there were rumors that he, Davis, was the assailant. *Id.* at 101–02. He said the rumors spread throughout the neighborhood, and he had also heard that Plaintiff and Edward set Kevin up to be robbed the evening of the murder. *Id.*

Detective Brown testified before the grand jury on January 3, 1992. ECF 132-1 at 30. ▮



That same day, a grand jury indicted Plaintiff for the murder of Kevin Smith, attempted robbery of Kevin Smith, Edward Smith, and Michelle Shipley, and various related firearm

offenses. *See* ECF 129-6 at 302–308. On May 5, 1991, only a month before trial, Detective Brown and ASA Vicki Wash interviewed Plaintiff's alibi witnesses, including his then-girlfriend, Khadijah Webb, and her siblings. ECF 132 at 236–245. All of the alibi witnesses attested that Plaintiff was with them at home the night of the shooting, that they heard the shot while they were with Plaintiff, and that Plaintiff did not leave the home until Earl Griffin came to get him to check on Michelle after the shooting. *See id.* On May 21, 1991, Detective Brown and ASA Wash interviewed Earl Griffin, who also said that Plaintiff was at the Webb home the night of the shooting. *Id.* at 235.

3. <u>Trial</u>

Plaintiff's criminal trial commenced on June 10, 1992. In her opening, ASA Wash described Edward Smith's account of the events and never mentioned Allan Scott. ECF 129-2 at 17–21.

Edward Smith was the State's star witness. Edward testified that he and his brother Kevin ran into Michelle Shipley around 6 p.m. on October 25. ECF 129-2 at 40. He did not know Michelle's last name before the night of the murder, but he testified that they were friends. *Id.* at 41–43. They went to a friend's house and socialized for around two hours before leaving around 10pm to chat with Smith's aunt and then stop at the liquor store. *Id.* at 44–48. While walking back toward Cherry Hill Road, Edward noticed a man (whom Edward identified as Plaintiff, *id.* at 50) wearing a black hoodie and jeans approaching. *Id.* at 49. Edward testified further that the man pulled out a silver gun with a barrel, said "you know what is," and pointed the gun at Kevin and Michelle. *Id.* at 51–57. Edward said he repeatedly told the assailant that he knew who he was and that he recognized him. *Id.* at 54–55. He had observed the shooter in the neighborhood for the past two months, and Edward recalled seeing him about seven times. *Id.* at 55. Kevin tried to

flee, but the assailant shot him as he was running away. *Id.* at 56. The shooter turned his gun on Edward, but it did not go off. *Id.* Edward then chased the shooter, telling him that he knew him and was going to get him. *Id.* The shooter ran off, and Edward waited with Kevin until an ambulance came, and then spoke with police. *Id.* at 57–58. Edward affirmed his previous identification of Plaintiff as the shooter. *Id.* at 61–62.

On cross-examination, counsel challenged Edward's identification of Plaintiff. Edward admitted that he did not identify Plaintiff as the assailant until the photo array eight days after the shooting, despite having known Michelle Shipley, and who her brother was, well before the shooting. *Id.* at 67–76. He explained that he was in shock immediately after the shooting, and just recognized the face. *Id.* at 66. He did not remember that the shooter was Michelle's brother until eight days later. *Id.* at 69. Defense counsel did not ask about the phone call in which Edward implicated Larry Davis. On redirect, Edward testified that he did not know a Larry Davis, and he never told anyone that Larry Davis was the murderer. *Id.* at 11.[9]

The State's next witness was Officer Laura Deuerling, who first responded to the scene. *Id.* at 17. She testified that she first saw Kevin lying in the road, then observed Kevin's brother, Edward, who was hysterical. *Id.* at 18–19. She described her conversation with Edward. *Id.* at 20–21. The State briefly called David Williams, a BPD crime lab tech, next. *Id.* at 22. He described the sketch he created of the crime scene. *Id.* at 25. He also described the minimal physical evidence he recovered, most of which was food, and none of which contained usable fingerprints. *Id.* at 26–27. He also took several photographs at the scene, some of which were displayed for the jury. *Id.* at 30.

---

[9] The numbering of ECF 129-2 restarts from 1 after the first page 79. The remaining citations to ECF 129-2 refer to the second set of numbers.

Detective Brown, the primary investigator, testified extensively at trial. *Id.* at 33. He recalled that he and Defendant Disney responded to the scene shortly after the murder. *Id.* at 36. They did not learn any information at the scene that ultimately proved helpful in identifying the perpetrator. *Id.* at 39. He described his initial conversation with Edward Smith the next morning, during which Edward told him about buzz in the neighborhood that Larry Davis was the shooter. *Id.* at 39–41. He described his search for Larry Davis, which resulted in him including a photo of Larry Darnell Davis ("the first Larry Davis") in the photo array he showed Edward Smith. *Id.* at 41–42. Edward did not identify Larry Darnell Davis. *Id.* Detective Brown also noted that he later identified and interviewed Larry Reginald Davis ("the second Larry Davis") who had testified before the grand jury. *Id.* at 43. He concluded that "[t]he second Larry Davis was not involved." *Id.* at 42–43.

Detective Brown also testified that he spoke with Michelle Shipley, who denied seeing anything and seemed reluctant to help the officers. *Id.* at 45–46. She was later brought into the State's Attorney's Office for a more in-depth interview, during which she provided more information. *Id.* at 47–48. He showed her a picture of the first Larry Davis, and she did not recognize him. *Id.* at 48. Detective Brown opined that "[i]t was pretty evident to [him] that she was not telling [him] the truth during the interview." *Id.* at 48. Detective Brown was informed when Scott was arrested, and spoke with him on October 29, 1991. *Id.* at 51–52. After hearing Scott's account, he obtained a photo of "Scooter" (Plaintiff), and assembled a new photo line-up, which he showed to Edward. *Id.* at 52–53. Edward quickly identified Plaintiff. *Id.* at 58. Detective Brown then prepared an arrest warrant and a search and seizure warrant. *Id.* at 59. After Plaintiff turned himself in, "[h]e said he was at his girlfriend's house at 902 Cherry Hill Road when he heard one gun shot. His sister Michelle came down crying. She said she saw who

did it. She didn't want to talk to the police. She said it was Larry from Cherry Dale with a small silver Derringer and no one else was there." *Id.* at 70. The government rested its case after Detective Brown's testimony.

The defense called a number of Plaintiff's family members and friends. Plaintiff's mother, Ola Shipley, testified that her son had been at his girlfriend's house. *Id.* at 94. His sister, Michelle, testified that she saw Plaintiff at his girlfriend's house the evening of the murder. *Id.* at 108–09. She explained that Earl, who came to the scene after the murder, went to get Plaintiff. ECF 129-3 at 117–18. She said that Plaintiff then came to the scene, where he asked why she was screaming. *Id.* at 118–19. Later, investigators showed her photo line-ups, but she never recognized any person in the photographs. *Id.* at 120–21. Michelle testified that Edward told her that the shooter was Larry Davis. *Id.* at 123.

Khadijah Webb, Plaintiff's girlfriend, testified that Plaintiff was with her from 8 p.m. until two men came to tell him that his sister was crying near the store. *Id.* at 155. Four of her siblings, her brother's girlfriend, her goddaughter, and Earl Griffin were also there. *Id.* She heard a gunshot around 11 or 11:30 p.m. *Id.* at 156. Plaintiff was playing Nintendo in the same room; Webb was looking at him when she heard it. *Id.* at 156–58. Her siblings and Griffin corroborated her testimony. *See, e.g.*, *id.* at 176–77, 189, 205, 218.

Allan Scott testified only on rebuttal, and testified consistently with the story he had told officers during his interrogation. *Id.* at 230–238. No one inquired about, and Scott did not discuss, any potential offers of leniency from the Defendant-Officers in exchange for his testimony. *Id.*

The jury convicted Plaintiff on all counts after only two hours of deliberation. ECF 135-13 at 42. He received a sentence of life in prison. ECF 135-3 at 26.

4. <u>Post-Conviction</u>

In 2018, the Mid-Atlantic Innocence Project and the Conviction Integrity Unit of the Baltimore City State's Attorney's Office filed a Joint Petition for a Writ of Actual Innocence. *See generally* ECF 135-14. The CIU attributed Plaintiff's wrongful conviction and subsequent 27-year incarceration to "civilian error." ECF 135-15 at 263. The CIU did not investigate and made no finding regarding police misconduct. *Id.* at 267–68. On December 18, 2018, Plaintiff's Petition was granted, and the State's Attorney's Office declined to prosecute Plaintiff for the counts that remained. *Id.* at 90.

In the aftermath of Plaintiff's exoneration, several developments transpired. On February 26, 2020, Scott signed a declaration recanting his grand jury testimony and accusing BPD officers of assault, denial of medical attention, denial of counsel, threatening him with additional charges if he did not implicate Plaintiff, fabricating a statement and falsifying his signature, and continued coercive conduct during his detention. ECF 129-12. He said that the officers threatened to charge him with more stolen car cases if he did not implicate Plaintiff in Kevin's murder, and that the officers repeatedly beat him while he was in custody. ECF 135-1 at 217–20. Scott further attested that the officers offered him leniency and lesser time for the car thefts if he provided false testimony. ECF 135-6 at 8996. Scott stated that Defendant Henneman physically wrote the statement attributed to Scott, which the officers had Scott sign. ECF 135-7 at ¶ 6; ECF 135-8 at 110–11. Scott now maintains that he was coerced and threatened to implicate Plaintiff in the murder. ECF 135-7 at ¶¶ 1–7. The two other key government witnesses from Plaintiff's trial—Edward Smith and Detective Brown—died years ago. *See* ECF 135-2; *David Brown, Sr. Obituary*, The Balt. Sun (Dec. 31, 2013); Fed. R. Evid. 201(b)(2).

Plaintiff filed this lawsuit in 2021, ECF 1, and later amended his complaint, ECF 27. This Court granted Defendants' Motion to Dismiss, ECF 30, in its entirety as to Defendants Bowman and James, and on Count Two as to Defendants Henneman, Gerst, and Stanton. ECF 47. Discovery has now concluded as to the Section 1983 claims against the other individual officers and the supervisory liability claims. *Id.* The Officer Defendants seek summary judgment. Four remaining counts are at issue: Count One, a Fourteenth Amendment claim for fabrication of evidence against all remaining Officer Defendants; Count Two, a Fourteenth Amendment claim for *Brady/Giglio* violations by Defendants Disney and McLarney; Count Three, a Fourteenth Amendment claim for failure to intervene against all remaining Officer Defendants; and Count Four, a Fourteenth Amendment supervisory liability claim against Defendant McLarney.

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at

348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  DISCUSSION

28 U.S.C. § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). However, Section 1983 "is not itself a source of substantive rights, but provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Rather, Section 1983 provides relief only where a plaintiff can establish that they have been deprived of a right secured by the Constitution or laws of the United States by a "person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Substantive due process violations are cognizable under Section 1983. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *see* U.S. Const. amend. XIV. But "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" such that it gives rise to a substantive due process violation. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (holding that conduct must "shock[] the conscience"); *see also United States v. Salerno*, 481 U.S. 739, 746 (finding that substantive due process "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty" (internal quotation marks omitted)). The Fourth Circuit has further explained that for a substantive due process claim to lie, state officials must have engaged in "conduct which 'amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 720 (4th Cir. 1991) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)). "[C]onduct intended to injure in some way unjustifiable government interest" is "most likely" to "shock the conscience." *Lewis*, 532 U.S. at 849.

Both a *Brady* violation and fabrication of evidence can constitute substantive due process violations when they deprive a plaintiff of the right to a fair trial and result in a deprivation of liberty. *See, e.g.*, *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) ("[A] police officer who withholds exculpatory information does not violate the Fourteenth Amendment unless the officer's failure to disclose plausibly deprived the defendants of the 'right to a fair trial.'") (internal citation omitted); *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) ("Demonstration of a violation of Washington's constitutional rights requires, in this context, proof that Wilmore fabricated evidence and that the fabrication resulted in a deprivation of Washington's liberty.").

There is no dispute that the Officer Defendants were acting under color of state law as members of the BPD. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1941). The question here is whether Plaintiff has adduced sufficient evidence that the Officer Defendants violated Plaintiff's due process rights in the ways Plaintiff has alleged. The Court considers the four at-issue claims in turn, and differentiates between the Officer Defendants where necessary.

1. Fabrication of Evidence

Plaintiff first argues that the Officer Defendants violated his Fourteenth Amendment rights by fabricating evidence to implicate him in Kevin Smith's murder. The Fourth Circuit has recognized "a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government official acting in an investigative capacity." *Massey v. Ojanitt*, 759 F.3d 343, 354 (4th Cir. 2014) (quoting *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2004)) (internal quotation marks omitted).

To survive summary judgement on a on a fabrication of evidence claim, a plaintiff must adduce evidence that (1) the defendant deliberately fabricated evidence; and (2) the fabrication caused a deprivation of the plaintiff's liberty. *Washington*, 407 F.3d at 282; *Martin v. Connor*, 883 F. Supp. 2d 820, 847 (D. Md. 2012) ("To survive a motion for summary judgment, the plaintiff must 'adduce evidence showing that the defendants deliberately fabricated or falsified information; … unsupported allegations and speculation' are insufficient." (citation omitted)). Both the fabrication and causation prongs are addressed below.

a.    Fabrication

Plaintiff alleges that the Officer Defendants coerced, and therefore deliberately fabricated, Allan Scott's statement that Plaintiff robbed him the evening of the murder. Plaintiff continues that this coerced testimony was included in the application for statement of charges

and the affidavit in support of the warrant to search Plaintiff's home. The Parties dispute whether Scott's statement was false and, if it was, whether the Officer Defendants knowingly fabricated that statement.

Plaintiff relies primarily on Scott's revised testimony to prove his claim. Following his 2020 recantation, Scott asserts that, during his arrest in 1991, unnamed officers, who are not involved in this case, "assaulted" him on the head with a "flapjack." ECF 135-7 ¶ 2. He was then left in an interrogation room for three hours and denied medical attention, a lawyer, and an opportunity to see his parents. *Id.* ¶ 3. "When the BPD officers finally entered the room, they threatened to charge [him] with numerous car thefts, unless [he] admitted that [he] knew Clarence Shipley murdered Kevin Smith on October 25, 1991." *Id.* ¶ 4. At that time, Scott did not know Plaintiff's given name, and only knew him as "Scooter." *Id.* In his deposition, Scott testified that the interviewing officers, Gerst, Henneman, and Stanton, "threatened [him] with being beat again" and "with not going to college" (he was weeks away from beginning college) "if [he] didn't give [the Officer Defendants] the information that they wanted." ECF 132 at 217. Eventually, he recalled, he "gave in and gave them…what they wanted," and told the officers "that [he] witnessed a murder." *Id.* at 220. He testified that he had "rehearsed" with the officers what he was supposed to say—"that Scooter came up to me and pulled out a gun and said something to me, and I hopped the fence or something and I…watched him shoot…Kevin. I watched him do it. I gave them everything they asked me to say. I said it." *Id.* at 220–21. The officers then "fabricated a statement…in which [he] reportedly admitted that Scooter robbed [him] and Stanley Harrison of cocaine with a silver revolver on October 25, 1991 in the vicinity of the murder of Kevin Smith." ECF 135-7 ¶ 6; *see also* ECF 135-1 at 221.

Scott attests that, in a later interview, ASA Wash instructed Scott to testify exactly as he had with the detectives. *Id.* at 244. Although Scott did not feel pressured by her to give false testimony, he remained afraid of the police officers. *Id.* "The entire testimony wasn't true." *Id.*

The government called Scott to testify as a rebuttal witness at Plaintiff's trial. According to Scott's 2020 declaration, BPD officers drove him from the Maryland Correctional Institution where he was then incarcerated to the courthouse, and "[d]uring that ride, they made it clear that [he] was to implicate Scooter in the murder, so that I would not be charged with numerous car thefts" that would have increased his sentence. ECF 135-7 ¶ 9. He had "no information that Scooter committed the murder," but nevertheless testified consistent with his written statement and grand jury testimony. *Id.* ¶ 10.

Defendants rejoin that Scott's 1991 and 1992 statements were truthful, and if they were not, the Officer Defendants had no reason to know they were false. Defendants point to several inconsistencies in Scott's recantation that could call into question the veracity of his current version of events. ECF 129 at 16–18. But Defendants are wrong that those inconsistencies render Plaintiff's story "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 373, 380 (2007) (finding Respondent's claim that he was driving safely "utterly discredited" by video footage of Respondent speeding, swerving, and running multiple red lights). If Scott's recollections of what he was told to say, and what portions of his statements were accurate, have changed, it is for a jury to decide which version of events is credible. Because both Parties' arguments rely fundamentally on a credibility determination, there remain genuine issues of material fact as to whether Scott's statement was truthful. Defendants are right that several portions of Scott's present testimony are readily impeachable, but they have not shown that those weaknesses discredit Plaintiff's narrative altogether.

Defendants continue that, in the alternative, Plaintiff offers no evidence that the Officer Defendants were aware that Scott's 1991 statement was false. Officers Stanton, Gerst, and Henneman all testified that as a general matter, they returned detainees to their cells if they were unwilling to speak during an interrogation. ECF 20 at 144; ECF 28 at 153; ECF 29 at 187. But each officer stated he did not recall interacting with Scott, and two did not remember him at all. ECF 28 at 157; ECF 29 at 215. Those failures of recollection are insufficient to rebut Scott's assertions that the officers actively coerced his testimony. Moreover, the kind of coercion Scott has described goes beyond permissible practice, and evinces a reckless disregard for the truth. Scott alleges that the officers threatened him and told him exactly what to say, with no concern for the truth. In reply, Defendants turn to various indicia of the reliability of Scott's statement—namely, corroboration and repetition, including under oath—which left "no reason for Officer Defendants to seriously doubt its veracity." ECF 143 at 5. The problem is, Scott has explained that he continued to provide consistent false testimony because he feared facing stiffer criminal consequences or even physical violence from the Officers. Taking that current version as true, in the light most favorable to Plaintiff, he has adduced evidence sufficient to create a genuine dispute of material fact as to whether Defendants Henneman, Gerst, and Stanton—the officers who actually took part in Scott's interrogation—fabricated evidence.

But he has not as to Defendants McLarney or Disney. Although Count One is alleged against all Officer Defendants, Plaintiff cites no facts suggesting that Defendant McLarney was personally involved in the fabrication of evidence. Indeed, neither party discusses Defendant McLarney in the summary judgment briefing on this issue. Nor has Plaintiff adduced any evidence that Defendant Disney was personally involved in the alleged fabrication. It is undisputed that Defendant Disney was not present during any meeting with Scott. *See* ECF 129

at 21; ECF 135 at 17–19. Plaintiff merely states that Defendant Disney relied on the fabricated testimony in completing several other ultimately significant documents. ECF 135 at 17–19. But Plaintiff has no evidence indicating that Defendant Disney knew or should have known that the statement he was relying on was fabricated, or that "'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Massey*, 759 F.3d at 357. And there is certainly no evidence that Defendant Disney personally fabricated anything. In short, Plaintiff has not "adduce[d] evidence showing that [Defendant Disney] deliberately fabricated or falsified information," and instead relies on "unsupported allegations and speculation." *Martin*, 883 F. Supp. 2d at 847; *see also Humphreys & Partners Architects, L.P. v. Lessard Design Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (noting that a plaintiff cannot create a genuine dispute of fact by "build[ing] inference upon inference").

Accordingly, this Court will grant summary judgment on this count to Defendants McLarney and Disney because the fabrication prong is not met. It will continue to consider causation as to the other Officer Defendants.

### b.    Causation

"[T]o prove a due process violation, [Plaintiff] must prove both but-for causation and proximate causation—in other words, that the alleged wrongful act(s) caused [his] loss of liberty and the loss of liberty was a reasonably foreseeable result of the act." *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019); *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (noting that constitutional torts have the same causation requirements as ordinary torts). "The plaintiff must have been able to show that, despite any intervening acts of independent decision-makers, the conviction was a reasonably foreseeable result of the initial act of fabrication." *Massey*, 759 F.3d

at 354 (cleaned up); *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").

This case presents a close call as to causation. On the one hand, even with Scott's statements stricken entirely, the officers still had probable cause to arrest and prosecute Plaintiff based on Edward's identification, which was not coerced. *See Bailey v. Town of Smithfield, Va.*, 19 F.3d 10 (4th Cir. 1994) (single positive identification from photo array was sufficient to establish probable cause); *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker."). And an identification does not have to be "unfailingly consistent to provide probable cause." *Spiegel v. Cortese*, 196 717, 725 (7th Cir. 1999); *Washington v. Balt. Police Dep't*, 669 F. Supp. 3d 444, 464 (D. Md. 2023).

But unlike many cases involving an independent identification, here, the homicide detective only included Plaintiff in the photo array from which he was ultimately identified because of Scott's statement. In a broad sense, Scott's coerced statement set this chain of events in motion. Plaintiff was not a suspect in the murder of Kevin Smith until Scott implicated him. And Scott remained involved in the case, giving statements to officers, providing grand jury testimony, and finally testifying during the government's rebuttal case at trial.

The fact remains, however, that Edward Smith was unaware of what happened with Allan Scott, or that Allan Scott even existed, and he identified Plaintiff from the photo array with no prompting from the homicide detectives. Edward Smith was the star witness at trial, and, indeed,

the sole civilian witness the government called in its case-in-chief. In a vacuum, his identification and subsequent testimony provided a sufficient basis for Plaintiff's conviction.

But even if Edward's photo identification provided independent probable cause, that does not compel a finding that Scott's false testimony did not, at least in part, influence Plaintiff's wrongful conviction. The jury heard Scott's false statement,[10] and it is impossible to know to what extent the statement influenced the outcome. Conviction was a foreseeable result of the officers' fabrication of Scott's statement, which influenced the charging decision, was presented to the grand jury, and was presented at trial. *Massey*, 759 F.3d at 354. Considering the cumulative effect of the false evidence, moreover, Plaintiff has adduced evidence sufficient to create a genuine issue of material fact as to whether the alleged fabrication caused his deprivation of liberty. *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019). In a case involving only two government civilian witnesses, it is difficult to discount the import of one such witness's testimony, particularly in a trial that had little documentary evidence. Taken in the light most favorable to Plaintiff, then, a reasonable juror could find that Scott's testimony was a cause of Plaintiff's conviction and subsequent deprivation of his liberty.

Accordingly, summary judgment on this Count will be denied as to Defendants Henneman, Gerst, and Stanton.

---

[10] Defendants rightly note that Scott's physical fabricated statement was not introduced, but Scott testified consistently with his prior statements in the case, all of which stem from that initial fabricated statement. The substance of the false statement was presented to the jury; this is not a case where a false statement was made in a police report that never came up again.

2.  Failure to Disclose Exculpatory and Impeachment Evidence

Plaintiff next alleges that Officers Disney and McLarney[11] violated his substantive due process rights by failing to disclose exculpatory evidence, as is required by *Brady v. Maryland*, 373 U.S. 83 (1963), and impeachment material, as is required by *Giglio v. United States*, 405 U.S. 150 (1972). Although *Brady* claims are more often brought to address prosecutorial misconduct, *Brady* also "applies to 'evidence known only to police investigators and not to the prosecutor.'" *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021) (quoting *Kyles v. Whitely*, 514 U.S. 419 (1995)). Accordingly, law enforcement officers have an affirmative duty to disclose material evidence favorable to the accused to the prosecution. *See Barbee v Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964). The withholding of exculpatory evidence by an officer can constitute a substantive due process violation when it deprives a plaintiff of the right to a fair trial and results in a deprivation of liberty. *See, e.g.*, *Safar*, 859 F.3d at 245; *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396 (4th Cir. 2014). That is, "the suppressed evidence must be materially favorable to the accused." *Blankenship*, 19 F.4th at 692.

To prevail on a *Brady* claim against police officers, a plaintiff must prove "(1) that the evidence was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens*, 767 F.3d at 396–97; *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972). "Prejudice ensures if 'there is a reasonable probability' that the jury would have reached a different result had the evidence been properly disclosed." *Owens*, 767 F.3d at 396–97 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The Court can infer bad faith "when police officers fabricate evidence and fail to disclose pertinent exculpatory evidence." *Johnson v. Balt.*

---

[11] This Court previously dismissed this claim as to Defendants Henneman, Gerst, and Stanton, who did not work in the homicide unit and had no involvement in prosecuting Plaintiff. ECF 47.

*Police Dep't.*, Civil No. ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020) ("A plaintiff need not demonstrate bad faith directly; it can be inferred through gross deviations from routine police conduct.").

Here, Plaintiff has alleged that ten different items of exculpatory evidence were withheld from prosecutors: (1) Edward Smith's statement to Detective Bowman; (2) Edward's note regarding Larry Davis as a potential suspect; (3) notes from Michelle Shipley's interview on October 26, 1991; (4) the circumstances surrounding Scott's arrest and interrogation; (5) documentation from Detective Brown's encounters with Scott on October 28 and 29, 1991; (6) the October 26th report that memorialized Scott's statement; (7) BPD reports from Scott's arrest; (8) documents stemming from Plaintiff's interrogation; (9) notes from Larry Reginald Davis's interview on January 2, 1992; and (10) information about any threats made to Scott while he was being transported to trial. ECF 27.

"Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984); *see also Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that as the nonmoving party rebutting the lack of evidence in the record, a plaintiff "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."). While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence[,] [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958). It is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* "The court's role is especially crucial when, as here, the plaintiff's case, and therefore the

defendant's liability, is based solely on circumstantial evidence." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980).

This claim cannot proceed because Plaintiff has not adduced any actual evidence that the foregoing documents were not disclosed to the prosecution, or even to defense counsel. Instead, Plaintiff asks this Court to build inference on inference to find that the officers withheld evidence. The relevant events in this case happened decades ago, many critical witnesses are deceased, and those who are living lack specific recollections of the events. *See McPherson v. Balt. Police Dept.*, Civil No. SAG-20-795, 2023 WL 5433011 at *21 (D. Md. Aug. 3, 2023) ("The age of this case and lack of available witnesses makes it challenging to prove that the Officer Defendants suppressed any evidence. [The] defense attorney from 1995 has no memory of the case and did not retain his case file."); *Washington.*, 669 F.Supp.3d at 466 ("The relevant events in this case happened decades ago, and unsurprisingly most of the files and the relevant recollections no longer exist. The defense file is unavailable…. The defense attorney has no recollection of what evidence he did or did not receive. The prosecutor has no recollection of the case at all, including what evidence she collected or produced."). Plaintiff's trial counsel died in 2016, and his case file is unavailable. *See* Maynard R. Rohrback, Obituary.[12] There is simply no reliable evidence regarding what defense counsel obtained from the prosecution.

In fact, the only available evidence suggests that the prosecution team had most of the documents Plaintiff now alleges were withheld by the officers. The lead prosecutor on the case has testified that she personally reviewed the entire homicide file, which included many of the above-mentioned documents. ECF 129-39 at 57–58, 149; *see also* ECF 132 at 40–41 (Oct 28 Report); *id.* at 52 (November 2 tip); *id.* at 71–74 (Edward's statement to Bowman); *id* at 196

---

[12] *Available at* https://www.simplicitycfs.com/obituaries/Maynard-R-Rohrback?obId=9546014.

(Note from Edward). The State's Attorney's Office produced its copy of the homicide file in this case. *See* ECF 129-44. One of the supposedly withheld documents was introduced at Plaintiff's trial, and was included in the lead ASA's case file when it was produced. ECF 129-2 at 149–151; ECF 129-40 at 4–7; ECF 129-5 at 317–21. There is simply no evidence that any of these materials were withheld from the prosecutors by the homicide detectives, and in fact, there is some direct evidence to the contrary. Plaintiff's contention that the documents must have been withheld simply because they were not mentioned at trial is unavailing. *See Washington*, 660 F. Supp. 3d at 466–67 (rejecting similar argument in absence of any testimony). Such omissions can be attributable to strategic decisions rather than an absence of production. Even if the prosecutors did not disclose the materials to the defense, moreover, the question here is whether the police officers produced the materials to the prosecutors.

A few pieces of evidence remain unaccounted for: notes from Michelle Shipley's interview, documentation from Detective Brown's encounters with Scott, notes from Larry Davis's interview, the allegations surrounding Scott's arrest and interrogation, and information about threats made to Scott on the way to trial.[13] Plaintiff offers nothing but speculation that the officers had notes from the interviews of Michelle Shipley, Scott, and Davis. As above, the absence of questioning on issues that Plaintiff believes would stem from the documents is not evidence that they were suppressed, or that they even exist. As to the categories of evidence relating to Allan Scott's interrogation and allegations of other threats made to him by Defendants Henneman, Gerst, and Stanton, it is unlikely that any documentary evidence exists, and further unclear whether any homicide detectives would have been aware of what happened during the initial interview. *Brady* does not "require the creation of exculpatory evidence, nor does it

---

[13] The latter two categories, obviously, would only exist if Scott's recantation were truthful.

compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El v. Rohde, et al.*, 778 F.3d 556, 562 (7th Cir. 2015). As this Court discussed *supra*, there is no evidence that Defendants McLarney and Disney had any involvement with Scott. "Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts." *Edward J. Sweeney & Sons*, 637 F.2d at 116. The inferential leap that Plaintiff asks this Court to make is without factual basis or reason.

The practical reality of this claim is that, due to the erosion of all pertinent evidence over time, Plaintiff cannot adduce non-speculative evidence that would allow a factfinder to reasonably conclude that exculpatory evidence was withheld. Even if such an inference were reasonable, Plaintiff fails to present any evidence aside from speculation that it was the Officer Defendants (as opposed to the prosecutor) who withheld such evidence. This claim, therefore, cannot survive summary judgment.[14]

### 3. Failure to Intervene

A duty to intervene "attaches when an officer observes or has reason to know that a constitutional violation is being committed by other officers and possesses a reasonable opportunity to intervene to prevent the harm from occurring." *Burley v. Balt. Police Dept.*, 422 F. Supp. 3d 896, 1030 (D. Md. 2019) (cleaned up). A failure to intervene claim thus lies where there is "an omission to act" and "a duty to act." *Randall v. Prince George's Cnty.*, 203 F.3d 188,

---

[14] The Parties agree that Plaintiff's Failure to Investigate claim is not a distinct claim, but rather provides support for Plaintiff's argument that the Officer Defendants suppressed evidence in bad faith. ECF 135 at 33–36 (discussing failures to investigate as examples of bad faith). Because Plaintiff has not adduced evidence that any evidence was withheld, this Court need not continue to bad faith or assess whether the officers failed to adequately investigate Kevin's murder.

202 (4th Cir. 2002); *see also Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416–17 (4th Cir. 2014) ("[B]ystander liability [is] premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them."). An officer who "(1) is confronted with a fellow officer's illegal act; (2) possesses the power to prevent it; and (3) chooses not to act" may be held liable for failing to intervene. *Randall*, 302 F.3d at 203.

An officer who fails to intervene "functionally participates in the unconstitutional act of his fellow officer." *Id.* at 203 n.24. But "the imposition of personal liability is impermissible" if "the bystander lacks … specific knowledge" of the constitutional violation. *Id.* This claim is thus "derivative" of Plaintiff's fabrication of evidence and *Brady* claims. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996). Where those claims have failed, so too must any claims that other officers failed to intervene. *See Dodson v. Prince George's Cnty.*, Civil Case No. JKS-13-2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016); *Hinkle*, 81 F.3d at 416. Accordingly, this Court's analysis is limited to whether the Officer Defendants failed to intervene in Officer Defendants Henneman, Gerst, and Stanton's fabrication of evidence.

a. *Officers Henneman, Gerst, and Stanton*

Defendants Henneman, Gerst, and Stanton were all present during Allan Scott's interrogation during which Scott alleges he was coerced into providing false testimony. ECF 135-3 at 90. Ultimately, like the substantive fabrication claim, whether any of these officers can be held liable for failing to intervene in the fabrication of evidence will depend on the credibility of Scott's testimony. At this juncture, however, this Court must view the facts in the light most favorable to Plaintiff and credit Scott's recantation. Each of the aforementioned officers was physically present for, and participated in, the interrogation that produced the fabricated statement. Accordingly, they "observe[d] [and] ha[d] reason to know that a constitutional

violation was being committed by other officers and possesse[d] a realistic opportunity to intervene to prevent the harm from occurring." *Burley*, 422 F. Supp. 3d at 1030. The officers were physically "confronted with a fellow officer's illegal act," "possesse[d] the power to prevent it," and "cho[se] not to act." *Randall*, 302 F.3d at 203.

Although Defendant Henneman signed the written statement, Gerst and Stanton were present and could have intervened. Moreover, Scott has testified that all of the Officers took an active role in the coercion. Each of them thus could have intervened in the conduct of the others, and per Scott's account, no one did in fact intervene. Like the substantive fabrication count, ultimate success on this count will depend heavily on the jury's view of the credibility of Allan Scott. Despite the plethora of material with which to impeach Scott at trial, at this juncture, this Court cannot wade into the Parties' credibility dispute, which is best left to the jury. Accordingly, Plaintiff has raised a genuine issue of material fact as to whether the Officer Defendants intervened, and summary judgment is inappropriate.

           b. *Officers Disney and McLarney*

Defendants Disney and McLarney, by contrast, were not present during Scott's interrogation, nor is there any evidence, or even suggestion, that they had a reasonable opportunity to intervene. Because they were not "confronted with…[the] illegal act," they had no opportunity to stop it. *Brooks v. Johnson*, 924 F.3d 104, 100 (4th Cir. 2019).[15] Defendants Disney and McLarney lack the "specific knowledge," and it is therefore inappropriate to find that

---

[15] Plaintiff repeatedly emphasizes Defendant Disney's important role in the investigation as a basis for finding him liable for misconduct that occurred in the course of the investigation of Kevin Smith's murder. While Defendant Disney was undeniably an important player in the investigation as secondary detective, Plaintiff has failed to adduce any evidence tying him to specific constitutional violations. This Court declines to make the unjustified inferential leap that because of his position, he was aware of everything the other officers did, especially the non-homicide detectives conducting an entirely separate investigation.

they "functionally participate[d] in the unconstitutional act[s]" of the other Officer Defendants. *Randall*, 302 F.3d at 203 n.24. They did not have "a realistic opportunity to intervene to prevent the harm from occurring." *Id.* at 203–04 (citation omitted). Summary judgment is thus warranted for Officer Defendants Disney and McLarney on this Count.

    4.  <u>Supervisory Liability</u>

Plaintiff finally asserts that Defendant McLarney, the homicide unit supervisor, is liable for constitutional violations by the officers he oversaw. It is well settled that, under Section 1983, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Technically, "the term 'supervisory liability' is a misnomer," because a supervisory official can only be held liable "for his or her own misconduct"—there is no *respondeat superior* liability under Section 1983. *Iqbal*, 556 U.S. at 676–77; *accord Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 691); *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017). Put differently, supervisory liability claims require "a showing of personal fault based on a defendant's own conduct." *Johnson v. Balt. Police Dep't*, Civil Case No. ELH-19-0698, 2022 WL 9976525, at *42 (D. Md. Oct. 14, 2022) (citing *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).

"Supervisory liability" exists only to address those cases in which a supervising authority's "indifference or tacit authorization of subordinates' misconduct may be a causative factor" in constitutional harm suffered at the hand of those subordinates. *Slakan*, 737 F.2d at 372–73. Specifically, a plaintiff alleging supervisory liability must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (alteration omitted) (quoting *Shaw*, 13 F.3d at 799). Whether supervisory liability exists "is ordinarily [an issue] of fact, not law." *Shaw*, 13 F.3d at 799.

Because the first two elements of supervisory liability are intertwined, the Court analyzes them together. *See Shaw*, 13 F.3d at 799 n.12. As to the first element, Plaintiff must adduce facts showing that the Officer Defendants' conduct "is widespread, or at least has been used on several different occasions[,] and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Wilkins*, 751 F.3d at 226 (quoting *Shaw*, 13 F.3d at 799). The second element, the supervisors' deliberate indifference to the alleged offensive practices, can be established "by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Id.* (quoting *Shaw*, 13 F.3d at 799). In *Slakan*, the Fourth Circuit explained how a plaintiff meets the "heavy burden" to show deliberate indifference:

> Ordinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

737 F.2d at 373 (internal citation omitted).

Plaintiff has not adduced evidence sufficient to meet these high bars. Plaintiffs argue that because Defendant McLarney was "set to testify" at Plaintiff's trial and grand jury, signed off on reports, and had a generally "hands on approach," he must have had actual or constructive knowledge of the other Defendants' constitutional violations. ECF 135 a 42–43. Even if he had extensive knowledge of the Kevin Smith homicide investigation as Plaintiff suggests, however, he has not adduced any evidence that McLarney was aware of the fabrication of evidence from Allan Scott, the only constitutional violation remaining viable. Significantly, Officers Henneman, Gerst, and Stanton were not under McLarney's homicide command—they were a part of the Special Operations Unit. ECF 129-20 at 68. The record reflects that Defendant McLarney had no supervisory relationship with Defendants Henneman, Gerst, and Stanton, and had no reason to know of their possible constitutional violations. It seems essentially impossible to suggest that McLarney culpably failed to supervise persons whom he was not tasked with supervising at all. Accordingly, summary judgment on this count is appropriate.

\*      \*      \*

Plaintiff has adduced evidence sufficient to create a genuine dispute as to whether Officer Defendants Henneman, Gerst, and Stanton violated his due process rights by fabricating evidence and failing to intervene when other officers fabricated evidence. He has not, however, created a genuine dispute of material fact as to whether any of the Officer Defendants violated his constitutional rights by failing to disclose exculpatory evidence. He has also failed to adduce evidence that Officer Defendants Disney and McLarney were personally involved in or had a reasonable duty to know of the other officers' constitutional violations.

## IV.   QUALIFIED IMMUNITY

Because this Court has found that Plaintiff has created a genuine dispute of material fact as to whether Officers Henneman, Gerst, and Stanton violated Plaintiff's constitutional rights, this Court must next determine whether those rights were clearly established. *Harlow v. Fitzgerald*, 467 U.S. 800, 818 (1982); *Pearson v. Callahan*, 55 U.S. 223, 232 (2009). The Fourth Circuit has recognized "a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government official acting in an investigative capacity." *Massey*, 759 F.3d at 354 (quoting *Washington*, 407 F.3d at 282). (internal quotation marks omitted). It similarly has recognized that a failure to intervene in other officers' constitutional violations is an independent constitutional violation. *Randall*, 203 F.3d at 202. Viewed in the light most favorable to Plaintiff, the facts would establish intentional fabrication of evidence by the three Officer Defendants. No reasonable officer would believe that conduct to be constitutional. This Court will therefore reject the Officer Defendants' qualified immunity defense at this juncture.

## V.   CONCLUSION

For the reasons stated above, Plaintiff's Motion for Leave to File a Surreply, ECF 144, will be granted and Defendant's Motion for Summary Judgment, ECF 128, will be granted in part and denied in part. A separate Order follows.


Dated: October 25, 2024                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge